No. 23-3202

===============================================================

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

COINBASE, INC.,

*Petitioner*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

---

On Petition for Review of an Order of the
Securities and Exchange Commission
Docket No. 4-789

===============================================================

# BRIEF FOR PETITIONER

===============================================================

Eugene Scalia
  *Counsel of Record*
Jonathan C. Bond
Nick Harper
Tessa Gellerson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner Coinbase, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, Petitioner Coinbase, Inc. states that it is a wholly owned subsidiary of Coinbase Global, Inc. No publicly held companies besides Coinbase Global, Inc. hold 10% or more of Coinbase, Inc.'s stock.

Dated: March 11, 2024

/s/ *Eugene Scalia*
Eugene Scalia

*Counsel for Petitioner*
*Coinbase, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................... 1

JURISDICTIONAL STATEMENT ................................................ 4

STATEMENT OF THE ISSUES.................................................... 4

STATEMENT OF RELATED CASES ........................................... 4

STATEMENT OF THE CASE....................................................... 5

    A. Coinbase For Years Has Provided Millions Of Americans With Safe, Regulated Access To Digital Assets................................................5

    B. Coinbase Does Not Currently Deal In Digital Asset Securities Because There Is No Workable SEC Framework To Offer Them.........6

    C. The SEC Has Been Unable To Articulate Any Consistent, Coherent View Of The Securities Laws' Applicability To Digital Assets ................................................................................7

    D. Without Notice, The SEC Abruptly Adopted A More Hostile Posture Toward Digital Assets And Pursued Aggressive Enforcement................................................................................9

    E. Coinbase Filed A Rulemaking Petition Asking For The SEC To Explain Its Views And Provide Clear, Workable Rules For Digital Assets Securities ..................................................................12

    F. Other Stakeholders Echoed Coinbase's Call For Rulemaking, But The Onslaught Of Enforcement Actions Has Continued .....................15

    G. After Protracted Delay And Under Threat Of Mandamus, The SEC Issued A Threadbare Order Denying Coinbase's Rulemaking Petition .........................................................................16

SUMMARY OF THE ARGUMENT ............................................. 19

STANDARD OF REVIEW .......................................................... 23

ARGUMENT .............................................................................. 23

    I. The SEC Must Engage In Rulemaking For Its Sweeping New View Of The Securities Laws .................................................................23

A. The SEC's Unfounded Assertion Of Jurisdiction Over The Digital Asset Industry Must Be Tested Through Notice-And-Comment Rulemaking And In Ensuing Judicial Review......................................24

   1. Rulemaking Is Presumptively Needed For Significant Agency Policy Changes To Permit Public Input, Facilitate Consideration Of All Aspects Of A Problem, And To Provide Fair Prospective Notice And For Judicial Review..........25

   2. The SEC's Erroneous, Expansive View Of Its Regulatory Authority Must Be Explained Through Rulemaking, Not Workshopped In Enforcement Suits.............................................29

      a. Rulemaking is necessary to test the SEC's audacious new claim of authority over digital assets ............................30

      b. Rulemaking is the only way for the SEC to grapple with all aspects of the problem of regulating the entire digital asset industry .......................................................................32

      c. The SEC's regulation of the digital asset industry using new standards in backward-looking enforcement actions creates glaring fair-notice problems ......................................32

   3. The SEC Cannot Rationally Regulate Digital Assets Through Ad Hoc District Court Enforcement Actions ................35

B. The SEC Must Engage In Rulemaking Because Fundamentally Changed Circumstances Have Rendered The SEC's Existing Rules Unworkable For Digital Assets, Including Digital Asset Securities..............................................................................................38

   1. An Agency Must Engage In Rulemaking When Changed Circumstances Eviscerate The Assumptions Underlying Its Existing Regulatory Framework....................................................39

   2. The SEC's Existing Rules Are Unworkable For Digital Assets Generally And Digital Asset Securities In Particular .......40

II. The SEC's Refusal To Commence Rulemaking Should Be Vacated Because The SEC Offered No Rational Explanation For Its Inaction.......47

A. The SEC's Unexplained Ipse Dixit That It "Disagrees" With Coinbase's Demonstrated Workability Concerns Is Insufficient.........47

B. The SEC's Remaining Excuses For Inaction Are Makeweights..........50

1.   The SEC Failed To Provide Any Reasoned Explanation For Its Refusal To Engage In Rulemaking ........................................... 50

2.   The Reasons The SEC Did Provide For Refusing To Engage In Rulemaking Are Unavailing ..................................................... 51

CONCLUSION ................................................................................................ 55

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Horse Prot. Ass'n, Inc. v. Lyng*,
812 F.2d 1 (D.C. Cir. 1987) ...................................................................39, 48

*In re Barr Lab'ys, Inc.*,
930 F.2d 72 (D.C. Cir. 1991) .......................................................................53

*Bell Tel. Co. of Pa. v. FCC*,
503 F.2d 1250 (3d Cir. 1974) ............................................................25, 26, 27

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)......................................................................................29

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019) .....................................................................26

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)......................................................................................29

*Cmty. Television of S. Cal. v. Gottfried*,
459 U.S. 498 (1983)......................................................................................25

*Compassion Over Killing v. FDA*,
849 F.3d 849 (9th Cir. 2017) ........................................................................53

*ConocoPhillips Co. v. EPA*,
612 F.3d 822 (5th Cir. 2010) ........................................................................26

*Dickson v. Sec'y of Def.*,
68 F.3d 1396 (D.C. Cir. 1995).......................................................................48

*EMR Network v. FCC*,
391 F.3d 269 (D.C. Cir. 2004).......................................................................39

*Env't Health Tr. v. FCC*,
9 F.4th 893 (D.C. Cir. 2021).....................................................................47, 48

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)......................................................................................28

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021)................................................................26, 48

*Fed. Lab. Rels. Auth. v. U.S. Dep't of Navy*,
   966 F.2d 747 (3d Cir. 1992) ...........................................................32

*Ford Motor Co. v. FTC*,
   673 F.2d 1008 (9th Cir. 1981) ........................................................25

*FTC v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) ...........................................................28

*Geller v. FCC*,
   610 F.2d 973 (D.C. Cir. 1979).....................................................22, 40

*Gen. Elec. Co. v. EPA*,
   53 F.3d 1324 (D.C. Cir. 1995).....................................................28, 33

*Glob. Van Lines, Inc. v. ICC*,
   714 F.2d 1290 (5th Cir. 1983) ....................................................25, 26

*Int'l Union v. Chao*,
   361 F.3d 249 (3d Cir. 2004) ...................................................4, 23, 54

*Maier v. EPA*,
   114 F.3d 1032 (10th Cir. 1997) ......................................................23

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)......................................................................53

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm
   Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)...........................................................22, 27, 32, 49

*Nat'l Customs Brokers & Forwarders Ass'n of Am.,
   Inc. v. United States*,
   883 F.2d (D.C. Cir. 1989)...............................................................23

*Nat'l Petroleum Refiners Ass'n v. FTC*,
   482 F.2d 672 (D.C. Cir. 1973)........................................................27

*NLRB v. Bell Aerospace Co.*,
   416 U.S. 267 (1974).............................................................28, 33, 35

*NLRB v. Majestic Weaving Co.*,
    355 F.2d 854 (2d Cir. 1966) ...............................................................35

*Patel v. INS*,
    638 F.2d 1199 (9th Cir. 1980) ...........................................................25

*Pfaff v. U.S. Dep't of Hous. & Urban Dev.*,
    88 F.3d 739 (9th Cir. 1996) ...........................................................29, 33

*RSR Corp. v. EPA*,
    102 F.3d 1266 (D.C. Cir. 1997) .........................................................39

*Satellite Broad. Co. v. FCC*,
    824 F.2d 1 (D.C. Cir. 1987) ...............................................................28

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .......................................................................26, 48

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) .............................................24, 25, 27, 36, 37

*SEC v. Ripple Labs, Inc., et al.*, No. 20-cv-10832,
    (S.D.N.Y 2021) ..................................................................................12

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ..........................................................................10

*Shays v. FEC*,
    424 F. Supp. 2d 100 (D.D.C. 2006) ..................................................50

*Sheet Metal Workers' Int'l Ass'n, Loc. No. 355 v. NLRB*,
    716 F.2d 1249 (9th Cir. 1983) ...........................................................35

*SNR Wireless LicenseCo, LLC v. FCC*,
    868 F.3d 1021 (D.C. Cir. 2017) .........................................................33

*Texaco, Inc. v. Fed. Power Comm'n*,
    412 F.2d 740 (3d Cir. 1969) ..............................................................27

*United States v. Whitlow*,
    714 F.3d 41 (1st Cir. 2013) ...........................................................25, 26

*Wis. Res. Prot. Council v. Flambeau Min. Co.*,
    727 F.3d 700 (7th Cir. 2013) .............................................................28

*WWHT, Inc. v. FCC,*
  656 F.2d 807 (D.C. Cir. 1981) ............................................................ 50

**Statutes**

5 U.S.C. § 553 ..................................................................... 24, 25, 26, 31

5 U.S.C. § 554 ................................................................................. 24

5 U.S.C. § 706(2)(A) ........................................................................ 23

15 U.S.C. § 77b(a)(1) ....................................................................... 10

15 U.S.C. § 77e ............................................................................... 41

15 U.S.C. § 77i ................................................................................. 4

15 U.S.C. § 78c(a)(10) ..................................................................... 10

15 U.S.C. § 78e ............................................................................... 39

15 U.S.C. § 78f. ........................................................................... 6, 44

15 U.S.C. § 78j(b) ........................................................................... 39

15 U.S.C. § 78*l* .............................................................................. 43

15 U.S.C. § 78m(e)(2) ..................................................................... 39

15 U.S.C. § 78o(a)(2) ...................................................................... 39

15 U.S.C. § 78q-1(b) ....................................................................... 39

15 U.S.C. § 78y ........................................................................... 4, 31

**Regulations**

17 C.F.R. § 242.301 ........................................................................... 6

SEC, *Custody of Digital Asset Securities by Special Purpose
  Broker-Dealers*, 86 Fed. Reg. 11627 (Feb. 26, 2021) ................... 37, 52

**Other Authorities**

Amy Caiazza & Neel Maitra, *FINRA Finally Approves a Special
  Purpose Broker-Dealer to Custody Crypto Asset Securities-What's Next?*,
  JD Supra (May 24, 2023) .................................................................. 45

Brian Armstrong, *Coinbase Is a Mission Focused Company*, Coinbase Blog
  (Sept. 27, 2020) ................................................................................ 5

Brian Quarmby, *SEC Chair Gensler Claps Back at Coinbase, Says Crypto Rules Already Exist*, CoinTelegraph (May 16, 2023) ................... 37

Casey Wagner, *CFTC's Behnam Says Prometheum's ETH Stance Could Create Inter-Agency Conflict*, Blockworks (Mar. 6, 2024) .................... 45

Cornerstone Research, *SEC Enforcement of Cryptocurrency Reaches a New High* (Jan. 24, 2024) ................................................................ 10

Fin. Mkts. Conf., *Afternoon Keynote, May 15*, YouTube (May 15, 2023) ................................................................................................. 10

First on CNBC: CNBC Transcript: *SEC Chair Gary Gensler Speaks with CNBC's "Squawk Box" Today*, CNBC (Feb. 10, 2023) ............... 10

*The Future of Digital Asset Regulation*, Hearing Before the H. Comm. on Agric., 117th Cong. 10 (June 23, 2022) ....... 33

*The Future of Digital Assets: Identifying the Regulatory Gaps in Digital Asset Market Structure*, Hearing Before the H. Fin. Servs. Comm., 118th Cong. (Apr. 27, 2023) .......... 46

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide*, Part III, 117th Cong. 1 (May 6, 2021) ............. 8, 12

Gary Gensler, SEC Chair, *Prepared Remarks of Gary Gensler on Crypto Markets Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022) ................................................................ 9, 12

Gary Gensler, SEC Chair, *Partners of Honest Business and Prosecutors of Dishonesty* (Oct. 25, 2023) .................................................................. 9

Gary Gensler, SEC Chair, *Remarks Before the Aspen Security Forum* (Aug. 3, 2021) ........................................................................................ 9

Paul Grewal, *We Asked the SEC for Reasonable Crypto Rules for Americans. We Got Legal Threats Instead*, Coinbase Blog (Mar. 22, 2023) ....................... 16

Jesse Hamilton, *Prometheum Earns Final Regulatory Nod to Try Hand at Fully-Compliant Crypto*, Coinbase (Dec. 21, 2023) ........................... 45

Hester M. Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023) ......................... 14, 30, 43

Hester M. Peirce, Comm'r, SEC, *Overdue: Statement of Dissent on LBRY*
(Oct. 27, 2023) ........................................................................10, 14

Hester M. Peirce, Comm'r, SEC, *Token Safe Harbor Proposal 2.0*
(Apr. 13, 2021)........................................................................37

*Oversight of the Securities and Exchange Commission,*
118th Cong., 1st Sess. (Apr. 18, 2023) ...................................12, 31, 37

SEC, *Correspondence Related to Draft Registration Statement*
(Dec. 7, 2020) ........................................................................8, 12, 44

SEC, *Crypto Assets and Cyber Enforcement Actions*
(last updated Mar. 6, 2024)......................................................10, 54

SEC, *Framework for "Investment Contract" Analysis of Digital Assets*
(Apr. 3, 2019).........................................................................8

SEC, *On Today's Episode of As the Crypto World Turns:*
*Statement on ShapeShift AG* (Mar. 5, 2024)................................19, 52

SEC, *Regulation Best Execution*, 88 Fed. Reg. 5440 (Jan. 27, 2023) ....................52

SEC, *Regulation Systems Compliance and Integrity,*
88 Fed. Reg. 23146 (Apr. 14, 2023) ........................................52

SEC, *Report of Investigation Pursuant to Section 21(a) of the*
*Securities Exchange Act of 1934: The DAO* (July 25, 2017) ..............8

SEC, *Safeguarding Advisory Client Assets*, 88 Fed. Reg. 14672
(Mar. 9, 2023) ........................................................................52

SEC, *SEC Nearly Doubles Size of Enforcement's Crypto Assets*
*and Cyber Unit* (May 3, 2022) ................................................54

SEC, *Statement Regarding Denial of Petition for Rulemaking*
(Dec. 15, 2023) ......................................................................19

SEC, *Supplemental Information and Reopening of Comment Period for*
*Amendments Regarding the Definition of "Exchange,"*
88 Fed. Reg. 29448 (May 5, 2023)...........................................52

SEC's *Gensler: The 'Runway Is Getting Shorter' for Non-Compliant*
*Crypto Firms*, Yahoo (Dec. 7, 2022).................................9, 10, 31, 48

Soyoung Yoo, *Industry Ratchets Up Pressure on SEC Asking for Crypto Regulation, but Gensler Says Clear Rules Already Exist*, Thompson Reuters (Aug. 26, 2022) ...................................................................15

*What Is a Blockchain?*, Coinbase, https://bit.ly/3ICTlY1 ........................................6

*What Is Bitcoin?*, Coinbase, https://bit.ly/3SCqw2p .................................................6

*What Is Ethereum?*, Coinbase, https://bit.ly/3lOvJIE.................................................6

William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018)........................................8, 12

## INTRODUCTION

The Securities and Exchange Commission (SEC) is asserting sweeping new authority over a vibrant, rapidly expanding industry—digital assets. But the SEC is pursuing this power grab through enforcement actions, and it has refused to set forth its new interpretation of its enabling statutes in a rulemaking, where the lack of legal basis for its self-aggrandizement would be laid bare.

For years the SEC indicated that it had little statutory authority over digital assets and that what authority it did have was unclear. Market participants responded by investing heavily in a now two-*trillion*-dollar industry and built their businesses in compliance with relevant agencies' regulatory frameworks. But the SEC then performed an extraordinary about-face: After its Chair unilaterally decreed his belief that most digital assets *are* securities, the agency swiftly pivoted by attempting to regulate them—not by rulemaking, but through enforcement, in a scorched-earth, nationwide campaign against an entire industry. That turnabout put digital asset companies in a Catch-22: The SEC told digital asset firms to "come in and register" under threat of enforcement suits, but registration is neither required nor possible under existing rules, which were designed decades ago for legacy financial assets and businesses.

Coinbase, a publicly traded and U.S.-based digital asset exchange, agrees with the SEC's original position: The Commission lacks statutory authority over most

digital assets, including all of the digital assets listed on Coinbase's platform. If the SEC wants broader authority, it must ask Congress. But to whatever extent the Commission may lawfully assert authority over any digital assets, it must do so through rulemaking—in which the SEC articulates the legal basis and rationale for its position and opens that position up to public comments and legal challenge. That is the proper, and here required, means for vetting significant policy changes with the public and, if necessary, with the courts. And for any digital assets the SEC might properly classify as securities, rulemaking is the only way for the agency to draw clear lines identifying them, to provide fair notice, and to create a workable regulatory framework that makes compliance with the securities laws possible.

Coinbase explained all this in a rulemaking petition 20 months ago. But even while accelerating its campaign of enforcement suits against digital asset companies (including Coinbase), the Commission ignored that petition until forced to explain itself by this Court in a mandamus proceeding Coinbase initiated last year. In December 2023, anticipating imminent action by the Court in the mandamus proceeding, the SEC summarily denied Coinbase's rulemaking petition in a terse, two-page letter. Despite the voluminous input the SEC received from more than a thousand participants, the agency mustered just one paragraph of rationale. And it offered just a single, conclusory *sentence* on the serious workability concerns raised by Coinbase

and others, stating simply that it "disagrees" the existing regime is "unworkable." JA6.

That ipse dixit does not begin to justify the SEC's refusal to conduct rulemaking. It is arbitrary on its face, and it goes to the heart of the opaque, oppressive nature of the SEC's enforcement campaign as a whole. The SEC demands that the industry comply with inapplicable, inapt, and still-evolving securities-law requirements or else join the many companies now facing enforcement actions—including Coinbase. Yet the SEC refuses to conduct the rulemaking needed to set stable standards, to show how it believes compliance with those irrelevant requirements is even possible, and to provide a path to do so. In opting for regulation by enforcement over rulemaking, the SEC has refused to provide the fair notice and regulatory adaptations the industry would need to satisfy the illegitimate demands the agency is making. It is this very quandary that the Commission refused to address intelligibly in the Order under review.

\*    \*    \*

Usually when petitioners seek to force agency rulemaking, they seek to change the agency's priorities. Not so here. The SEC already has made digital assets a top priority—it has launched a barrage of enforcement suits based on a novel, profoundly mistaken legal theory that it has never set forth in a regulation and that changes day-to-day. Coinbase seeks only to hold the Commission to its legal duty to

pursue that new priority in the appropriate manner: rulemaking. This Court should grant the petition for review, vacate the Order, and direct the agency to begin a long-overdue rulemaking process.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to the Securities Act of 1933 (Securities Act) and Securities Exchange Act of 1934 (Exchange Act), which provide that final orders and rules of the Commission are subject to the exclusive jurisdiction of the court of appeals. 15 U.S.C. §§ 77i, 78y. The SEC's December 15, 2023 order (JA5-6) denying Coinbase's petition for rulemaking constitutes a final order. *See Int'l Union v. Chao*, 361 F.3d 249, 251 (3d Cir. 2004). Coinbase timely filed its petition for review (JA1-4) in this Court on December 15, 2023. 15 U.S.C. §§ 77i, 78y.

## STATEMENT OF THE ISSUES

1.    Whether the Commission's refusal to engage in rulemaking regarding digital assets violates the Administrative Procedure Act (APA). JA6.

2.    Whether the Commission's failure to provide a reasoned explanation for its denial of Coinbase's rulemaking petition is arbitrary and capricious. JA6.

## STATEMENT OF RELATED CASES

Pursuant to Third Circuit Local Appellate Rule 28.1(a)(2), the following cases and proceedings are related to this appeal:

1.    Coinbase filed a petition for writ of mandamus with this Court in April 2023. *See In re Coinbase, Inc.*, No. 23-1779 (3d Cir.) ("Coinbase Mandamus

Action"), ECF 1-1. Following the SEC's denial of Coinbase's rulemaking petition, that action was dismissed as moot. *Id.*, ECF 41.

2.    While Coinbase's petition for writ of mandamus was pending before this Court, the SEC initiated enforcement proceedings against Coinbase for alleged violations of the Exchange Act and the Securities Act that are ongoing. *SEC v. Coinbase, Inc.*, No. 23-cv-04738 (S.D.N.Y.) ("Coinbase Enforcement Action"), ECF 1.

## STATEMENT OF THE CASE

### A.    Coinbase For Years Has Provided Millions Of Americans With Safe, Regulated Access To Digital Assets

Coinbase is the largest and only publicly traded digital asset trading platform in the United States, serving millions of Americans.[1] It was founded in 2012 to bring economic freedom worldwide by creating a more open, inclusive, and efficient financial system leveraging digital assets and blockchain technology.[2]

Digital assets (also known as "cryptocurrencies," "crypto assets," or "tokens") are computer code entries recorded on a blockchain.[3] A blockchain is a public ledger that records digital asset transactions on the Internet so that they can be viewed and

---

[1] Coinbase's parent company, Coinbase Global, Inc., serves tens of millions more worldwide through distinct, non-U.S. entities.

[2] *See* Brian Armstrong, *Coinbase Is a Mission Focused Company*, Coinbase Blog (Sept. 27, 2020), https://bit.ly/3kkEHfT.

[3] For simplicity, this brief uses the terms "cryptocurrencies" and "digital assets" interchangeably.

verified by anyone with an Internet connection.[4] A blockchain is typically decentralized, meaning that no single person or entity operates it.

Bitcoin was the first blockchain and digital asset, invented in 2008.[5] Many other blockchains and digital assets, such as Ethereum, have been created since, with capabilities well beyond peer-to-peer transfers.[6] For example, some digital assets serve as a medium for exchange on applications, function as a digital currency, or help secure digital networks.[7]

### B.    Coinbase Does Not Currently Deal In Digital Asset Securities Because There Is No Workable SEC Framework To Offer Them

Coinbase has built its business in painstaking compliance with all applicable laws, including the federal securities laws. The Securities Act and Exchange Act govern transactions involving "securities." Under the Exchange Act, a business offering securities for sale generally must register with the SEC either as a national securities exchange or as an "alternative trading system," which is a more narrowly regulated exchange run by a broker-dealer that is often used to trade over-the-counter securities. *See* 15 U.S.C. § 78f; 17 C.F.R. § 242.301.

---

[4] *What Is a Blockchain?*, Coinbase, https://bit.ly/3ICTlY1.

[5] *What Is Bitcoin?*, Coinbase, https://bit.ly/3SCqw2p.

[6] *What Is Ethereum?*, Coinbase, https://bit.ly/3lOvJIE.

[7] JA18 (pet. for rulemaking).

Coinbase has not registered with the SEC as a national securities exchange or an alternative trading system because it does not offer securities on its platform.[8] The digital assets on Coinbase's platform are instead commodities, like gold or diamonds. Other digital assets, such as tokenized versions of traditional stocks, *can* be sold as securities if the tokens are accompanied by contractual rights to the profits, income, or assets of an underlying business. *See* Coinbase Enforcement Action, ECF 36 at 14-15. Because Coinbase and many others in the digital asset industry would like to be able to offer those kinds of digital asset securities, and because the SEC's own fluctuating interpretations have spawned industry-wide confusion, Coinbase and others have repeatedly urged the SEC to establish clear rules for the application of existing securities regulations to digital assets.

### C.    The SEC Has Been Unable To Articulate Any Consistent, Coherent View Of The Securities Laws' Applicability To Digital Assets

The SEC has never provided a clear or definitive statement of how, in its view, the securities laws apply to digital assets.

For years, the SEC stated that it had at most limited authority over digital assets and candidly acknowledged a lack of clarity in the law. In its 2017 "DAO report," which analyzed a set of transactions involving a single digital asset, all the agency could say definitively is that whether the securities laws apply to a digital

---

[8] *See* Coinbase Amicus Br. 9-17, *SEC v. Wahi*, No. 22-cv-1009, Dkt. 104 (W.D. Wash. Apr. 3, 2023).

asset turns on the "particular facts and circumstances."[9] In 2018, the SEC's then-Director of Corporation Finance stated that a digital asset "all by itself is *not* a security."[10] In 2019, an SEC division published a *60-factor* "Framework" for analyzing whether a digital asset may be a security.[11] And in reviewing Coinbase's public-offering disclosures in late 2020, SEC Staff stated that there is "no certainty" about whether most digital assets are securities.[12]

Despite its uncertainty, the SEC *was* clear that digital asset exchanges like Coinbase did not need to register with the agency. In May 2021, for example, the current SEC Chair testified before Congress that "the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the Commodity Futures Trading Commission"; "only Congress," he said, "could really address" that issue.[13] And a month prior, the SEC cleared the way for Coinbase to become a public company after reviewing and commenting on

---

[9] SEC, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* at 10 (July 25, 2017), https://bit.ly/3IpiWDt.

[10] William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://bit.ly/2l8t5dB (emphasis added).

[11] SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019), https://bit.ly/2HXfEdZ.

[12] SEC, *Correspondence Related to Draft Registration Statement* at 4 (Dec. 7, 2020), https://bit.ly/3lRrY4y; *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide*, Part III, 117th Cong. 1, 12 (May 6, 2021), https://bit.ly/3n5vgSH.

[13] *Game Stopped?*, *supra* note 12.

Coinbase's business model without ever suggesting that Coinbase needed to register with the SEC.[14]

### D.    Without Notice, The SEC Abruptly Adopted A More Hostile Posture Toward Digital Assets And Pursued Aggressive Enforcement

By the next year, the SEC Chair had abruptly changed positions, telling a reporter in December 2022 that he "feel[s] that [the SEC] ha[s] enough authority … in this space" to require digital asset firms "to come into compliance" with the SEC's registration requirements.[15] The Chair now proclaims that "[t]here's actually a lot of clarity" about the status of digital assets "offered and sold as securities."[16] And he contends that "Congress gave [the SEC] a broad framework … to regulate exchanges" and regularly asserts that the "vast majority" of digital assets "*are* securities."[17]

The Commission has never engaged in rulemaking to adopt or explain the Chair's novel view. Instead, the Chair maintains that "the rules have *already* been

---

[14] *See, e.g.*, Coinbase Enforcement Action, ECF 1 (Compl.) ¶ 111 (Coinbase Global, Inc.'s S-1 form was "declared effective").

[15] *SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo (Dec. 7, 2022), https://yhoo.it/3EJrqo1.

[16] Gary Gensler, SEC Chair, *Remarks Before the Aspen Security Forum* (Aug. 3, 2021), bit.ly/3Zdia3U.

[17] *E.g.*, Gary Gensler, SEC Chair, *Partners of Honest Business and Prosecutors of Dishonesty* (Oct. 25, 2023), bit.ly/3UEkr8D; Gary Gensler, SEC Chair, *Prepared Remarks of Gary Gensler on Crypto Markets Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022), bit.ly/41azGqb (emphasis added).

published," that there's a "clear way" to register, and that digital asset firms must "come in and register" or face "enforcement actions."[18] True to the Chair's threats, the SEC is pursuing a punitive enforcement campaign against digital asset firms, including Coinbase.[19] Nearly $300 million in fines were imposed in 2023 alone.[20] The Commission's own members have called its enforcement campaign a "scorched earth" strategy.[21]

Underlying those enforcement suits is a profound shift in the SEC's reading of the securities statutes. Those laws grant the SEC the power to regulate (as relevant) "investment contract[s]." 15 U.S.C. § 77b(a)(1); *id.* § 78c(a)(10). For almost a century, the SEC and courts correctly interpreted that term to require a contract or a "transaction or scheme" accompanied by contractual rights to the profits, income, or assets of an underlying business. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). But the SEC's enforcement suits rest on a novel view of uncertain

---

[18] Fin. Mkts. Conf., *Afternoon Keynote, May 15* at 25:22, YouTube (May 15, 2023) (emphasis added); Gensler, *Runway Is Getting Shorter*, *supra* note 15; First on CNBC: CNBC Transcript: *SEC Chair Gary Gensler Speaks with CNBC's "Squawk Box" Today*, CNBC (Feb. 10, 2023), https://cnb.cx/3IHNmRQ.

[19] Cornerstone Research, *SEC Enforcement of Cryptocurrency Reaches a New High* (Jan. 24, 2024), bit.ly/4buU3nH; SEC, *Crypto Assets and Cyber Enforcement Actions*, bit.ly/48hlnmy (last updated Mar. 6, 2024).

[20] Cornerstone Research, *SEC Enforcement of Cryptocurrency Reaches a New High* (Jan. 24, 2024), bit.ly/4buU3nH.

[21] Hester M. Peirce, Comm'r, SEC, *Overdue: Statement of Dissent on LBRY* (Oct. 27, 2023), bit.ly/3ui8ESU.

dimensions and boundless reach that is being revealed and revised by the agency piecemeal in court.

In October 2023, for example, the SEC argued in federal court that *any* transaction where an investor "part[s] with capital on the expectation of profit"—including the purchase of a digital asset—is an "investment contract." Coinbase Enforcement Action, ECF 69 at 8. Months later, though, the SEC acknowledged that a digital asset alone is not a security, but simply "computer code," and it ventured a new, ill-defined test to justify its broad claim of power: transactions in digital assets can be securities *if* the efforts of third parties "drive the value of the ecosystem" with which the asset is associated.[22] Just days later, the SEC again reversed course in another federal court, contending that a digital asset *itself* "represents the investment contract."[23] The SEC's reversal and its inability to articulate its novel position has left a cloud over the industry for years. Here is a sampling of the uncertainty and incoherence hanging over the industry:

---

[22] *SEC v. Payward, Inc.*, No. 23-cv-06003 (N.D. Cal. 2024), ECF 26-1 at 18:22-23, 19:13-19, 23:13-14 (Hearing Tr. from Coinbase Enforcement Action).

[23] *SEC v. Payward, Inc.*, No. 23-cv-06003 (N.D. Cal. 2024), ECF 26-2 at 92:14-15 (Hearing Tr. from *SEC v. Binance Holdings Ltd., et al.*, No. 23-cv-1599 (D.D.C Jan. 22, 2024)).

| Issue | Examples Of The SEC's Conflicting Statements | | | |
|-------|-------|-------|-------|-------|
| Is a digital asset a security? | No (2018): A digital asset "all by itself is *not* a security."[24] | Yes (2021): A digital asset "embodi[es]" and "represents th[e] investment contract."[25] | No (2024): A digital asset is just "computer code."[26] | Yes (2024, five days later): The digital asset itself "represents the investment contract."[27] |
| Can the SEC regulate digital asset exchanges? | No (2021): "Right now, there is not a market regulator [for] crypto exchanges."[28] | | Yes (2022): "Congress gave us a broad framework … to regulate exchanges."[29] | |
| Is existing law clear? | No (2020): There is "no certainty" about whether digital assets are securities.[30] | | Yes (2023): "We have a clear regulatory framework built up over 90 years."[31] | |

### E.     Coinbase Filed A Rulemaking Petition Asking For The SEC To Explain Its Views And Provide Clear, Workable Rules For Digital Assets Securities

Coinbase strongly disagrees that the SEC has the statutory authority it claims

over digital assets today. But if the agency is going to assert that authority, it must

---

[24] Hinman, *When Howey Met Gary*, *supra* note 10.

[25] *SEC v. Ripple Labs, Inc., et al.*, No. 20-cv-10832 (S.D.N.Y 2021), ECF 153 at 24 (emphasis omitted).

[26] *Supra* note 22, Hearing Tr. from Coinbase Enforcement Action at 18:23.

[27] *Supra* note 23, Hearing Tr. from *SEC v. Binance Holdings Ltd.*, at 92:14-15.

[28] *Game Stopped?*, *supra* note 12.

[29] Gensler, *Penn Law Capital Markets*, *supra* note 17.

[30] SEC, *Correspondence Related to Draft Registration Statement*, *supra* note 12.

[31] *Oversight of the Securities and Exchange Commission* at 4:12:30-58, 118th Cong., 1st Sess. (Apr. 18, 2023), https://bit.ly/3MRHRna.

first articulate its position through rulemaking. So in July 2022, Coinbase filed a petition with the SEC asking it to "propose new rules for the offer, sale, registration, and trading of digital asset securities." JA13.

Coinbase's rulemaking petition highlighted the SEC's "[l]ack of clarity regarding how to determine whether a digital asset is a security." JA15; *see* JA17-22. It urged the SEC to "provide clarity" on that key threshold issue "by defining a digital asset security through rulemaking." JA18.

Coinbase's rulemaking petition also explained that existing securities regulations are "fundamentally incompatible with the operation of digital asset securities." JA15; *see also* JA16-18, 22-23, 25-28, 30-37. That problem has always existed, but the SEC's shifting stance has given it new urgency. For example, unlike stocks and bonds, many digital assets are not just passively held; they are actively *used* on blockchain networks. *See* JA18. Registering digital assets as securities would render them unusable on those networks because they could then only be "held and used" by "a securities dealer, bank, or other qualified custodian." JA49-50 (Coinbase Dec. 6, 2022, comment). Many blockchains cannot function that way.

Coinbase's rulemaking petition identified other serious practical problems caused by the lack of digital asset rules. There often will be no one who can register digital assets and make required disclosures. *See, e.g.*, JA22-23, 25-26. Existing registration and disclosure requirements were designed for traditional financial

instruments managed by centralized companies, not for decentralized blockchain projects that are often run by decentralized groups of individuals. *Id.* And, as an SEC Commissioner has noted, even if digital assets could be registered, "it would not be a particularly useful effort."[32] This is because the focus of existing rules "on disclosure about companies, their management and their financial results" "poorly fit[s] the decentralized and open-source nature of blockchain-based digital asset[s]."[33] Existing requirements might even *mislead* investors by highlighting information that is not relevant to them.[34]

Coinbase's petition explained how force-fitting digital assets into existing registration requirements presents insurmountable hurdles not only for issuers but also for digital asset platforms. *See* JA27-28. Among other barriers, registering with the SEC as an exchange would limit a platform to permitting *only* digital asset transactions. Transactions in digital assets that are commodities, including Bitcoin and Ethereum, could no longer be offered, because current rules prohibit an exchange from offering both securities and commodities. Yet even the Commission agrees that Bitcoin and certain other digital assets are *not* securities.

---

[32] Hester M. Peirce, Comm'r, SEC, *Overdue: Statement of Dissent on LBRY* (Oct. 27, 2023), bit.ly/3ui8ESU; JA22-23 (pet. for rulemaking).

[33] Hester M. Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://bit.ly/3YWPSKO; *see also* JA22-23 (pet. for rulemaking).

[34] Peirce, *Outdated*, *supra*; *see also* JA22-23 (pet. for rulemaking).

Finally, Coinbase's rulemaking petition explained that compliance with other requirements in the existing rules would either strip digital assets of the very efficiencies and consumer benefits they are designed to provide, or else would make existing business models entirely "unsustainable" and inhibit digital asset innovation in the United States. JA30-31, 34.

### F.    Other Stakeholders Echoed Coinbase's Call For Rulemaking, But The Onslaught Of Enforcement Actions Has Continued

The U.S. Chamber of Commerce's Center for Capital Markets Competitiveness filed a comment in support of Coinbase's rulemaking petition underscoring the fundamental mismatch between existing securities laws and digital assets. *See* JA61-62. Rather than "shoehorning blockchain technology into existing regulatory requirements," the Chamber called for the development of new, "sensible" rules for digital asset transactions. JA61. More than 1600 other commenters endorsed Coinbase's call to action in letters that emphasized the need for "well-designed regulation," "not ad hoc litigation or speeches that change depending on the politics."[35] Since 2018, the SEC has received at least five other rulemaking petitions making requests similar to Coinbase's.[36]

---

[35] Soyoung Yoo, *Industry Ratchets Up Pressure on SEC Asking for Crypto Regulation, but Gensler Says Clear Rules Already Exist*, Thompson Reuters (Aug. 26, 2022), https://tinyurl.com/bpj3tvkr; JA63 (Letter Type A).

[36] *See* SEC File Nos. 4-736, 4-743, 4-771, 4-782, 4-789.

Coinbase supplemented its rulemaking petition with a series of further comments reiterating the need for rulemaking and proposing a concrete regulatory framework. And over the course of more than *30* meetings with SEC staff, Coinbase presented multiple potential registration paths that the SEC could consider for any digital assets that might be properly subject to registration. But the SEC offered no feedback at all and then suddenly called off the discussions altogether.[37]

Instead, the SEC intensified its path of regulation by enforcement. In March 2023, it served Coinbase with a Wells notice that did not identify which assets on Coinbase's platform the agency believed were securities. When Coinbase sought clarity, the agency refused.[38] The first time the SEC identified any such assets to Coinbase was June 2023—in its complaint. *See* Coinbase Enforcement Action, ECF 1.

### G.    After Protracted Delay And Under Threat Of Mandamus, The SEC Issued A Threadbare Order Denying Coinbase's Rulemaking Petition

After months without word on its rulemaking request from the SEC, Coinbase filed a petition for writ of mandamus in this Court in April 2023, seeking to compel the SEC to act on the long-pending rulemaking petition. *See* Coinbase Mandamus

---

[37] Paul Grewal, *We Asked the SEC for Reasonable Crypto Rules for Americans. We Got Legal Threats Instead*, Coinbase Blog (Mar. 22, 2023), https://bit.ly/43eSNA1.
[38] *Id.*

Action, ECF 1-1. As Coinbase explained to this Court, the SEC had long shown by its conduct—including its rapidly expanding flotilla of enforcement actions—that it had determined not to engage in rulemaking. But by withholding a formal denial of Coinbase's rulemaking petition, the agency was frustrating judicial review of that determination.

In the mandamus action, the SEC denied that it had already decided not to engage in rulemaking. Coinbase Mandamus Action, ECF 26 at 18-19. Yet within weeks it commenced an enforcement action against Coinbase itself, alleging that Coinbase was failing to comply with the very securities regulations that Coinbase's rulemaking petition (and mandamus petition) explained do not exist for digital assets. *See* Coinbase Enforcement Action, ECF 1 (Compl.) ¶¶ 1, 8.

Within hours of the SEC's commencement of its enforcement action, this Court *sua sponte* directed the SEC to explain itself. *See* Coinbase Mandamus Action, ECF 28. And after further briefing, this Court retained jurisdiction and directed the Commission to report on the rulemaking petition's status. *Id.*, ECF 32. On October 11, 2023, the Commission reported that its staff had made a recommendation to the Commission. *Id.*, ECF 33. In November 2023, after another month of inaction—and only after a further order from this Court suggested that a decision on Coinbase's mandamus petition might be imminent—the SEC promised a further update by December 15, 2023.

Finally, on December 15, the SEC informed the Court that it had denied Coinbase's rulemaking petition. Coinbase Mandamus Action, ECF 39. The SEC's two-page letter contained a single paragraph of reasoning for denying the petition. The agency claimed that its consideration of whether and how to modify its rules for digital assets "may be informed" by its other initiatives related to digital assets. JA6. A rulemaking, it said, would "constrain the Commission's choices regarding competing priorities" outside of the digital asset context. *Id.*

In response to the serious workability concerns Coinbase raised in its rulemaking petition, the SEC offered this one-sentence response: "The Commission disagrees with the Petition's assertion that application of existing securities statutes and regulations to crypto asset securities, issuers of those securities, and intermediaries in the trading, settlement, and custody of those securities is unworkable." JA6. The Commission provided no explanation *why* it considered certain digital assets to fall within the securities laws. Nor did it respond at all to the record evidence marshaled by Coinbase and others that the rules in fact are infeasible.

SEC Commissioners Hester Peirce and Mark Uyeda dissented from the denial. They underscored that the rulemaking petition "raises issues presented by new technologies" and that a "core part of being a responsible regulator" is addressing such

"innovations."[39] "Any exploration of these issues," they emphasized, should be made through "public roundtables … and requests for comment."[40] Those same dissenting Commissioners more recently characterized the current state of affairs as "untenable" for the digital assets industry. SEC, *On Today's Episode of As the Crypto World Turns: Statement on ShapeShift AG* (Mar. 5, 2024). The agency's "standards are so opaque and arbitrary that the Commission itself is unwilling to stand by its own analysis," resulting in the agency dangling "a regulatory sword of Damocles" above the heads of "well-meaning entrepreneurs." *Id.*

## SUMMARY OF THE ARGUMENT

The SEC violated the APA by refusing to engage in rulemaking and by failing to provide a reasoned explanation for its denial of Coinbase's rulemaking petition. This Court should vacate the denial of Coinbase's rulemaking petition and remand to the agency with instructions to engage in rulemaking.

**I.**     The SEC must engage in rulemaking to set forth its position on whether and how existing securities laws apply to digital assets, and to establish a feasible path for compliance.

---

[39] SEC, *Statement Regarding Denial of Petition for Rulemaking* (Dec. 15, 2023), bit.ly/3HSiqho.

[40] *Id.*

**A.**    Rulemaking is presumptively required for significant policy changes such as the SEC's here. The SEC lacks statutory authority to extend the existing securities regime to digital assets. But if the SEC insists on plowing ahead without congressional authorization, that decision must be made and implemented through prospective rulemaking. Rulemaking enables an agency's policies to be properly vetted by requiring the agency to set forth its position, statutory authority, and rationale, which can be tested by public comments and in court without the threat of retroactive penalties. Rulemaking is also the only way an agency can consider all important aspects of such a broad, complex issue and provide fair notice to regulated parties.

Rulemaking is required here. The SEC cannot effect a sea change in a two-trillion-dollar industry without articulating its authority, position, and rationale, considering all aspects of the problem, and providing fair notice. Whatever discretion it might otherwise possess to choose between rulemaking and case-by-case adjudication is irrelevant here: The SEC is not trying to gain experience or develop policy incrementally through ad hoc adjudications. Rather, its enforcement actions and public statements show that it has *already* formed a new view on how securities laws apply to digital assets that it is asking courts to enforce retroactively.

**B.**    Rulemaking is also required because Coinbase's rulemaking petition identified changed circumstances that undermine key assumptions underlying the

SEC's existing regulatory framework. The emergence of digital assets and the SEC's novel assertion of jurisdiction over them are prototypical changed circumstances that require rulemaking. A key premise of the SEC's existing securities regulations is that compliance is possible. Yet as Coinbase's petition showed, the SEC's existing rules are not workable for digital assets, including digital asset securities.

At the most basic level, if many digital assets were registered as securities, they could not function. All digital asset transactions would have to be routed through a broker-dealer on a registered exchange, subjecting them to clearing and settlement rules that would not permit the real-time uses for which the assets are designed.

Digital asset firms also are unable to comply with registration and disclosure requirements designed for legacy financial instruments managed by centralized companies, rather than for digital assets operating on decentralized blockchains. The SEC's square-peg-round-hole approach contradicts its statutory mandate to act in the public interest by robbing the public of the very efficiencies digital assets are designed to provide and potentially misleading digital asset users.

If the SEC insists on suing digital asset firms for failing to "come in and register" under its rules, at a minimum the agency has a duty to make compliance possible. It cannot "sidestep a reexamination" of its rules while it attempts to drive

digital asset firms out of business. *Geller v. FCC*, 610 F.2d 973, 979 (D.C. Cir. 1979) (per curiam).

**II.**     The SEC was required, but entirely failed, to provide a reasoned justification for refusing to engage in rulemaking. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's unelaborated "disagreement" with the serious workability problems Coinbase detailed does not cut it. Under the most basic administrative law precepts, the agency must give a reasoned, reasonable explanation of *why* it disagrees. And it must show its work by explaining *how* in its view compliance with existing rules is already required and possible. The SEC's failure to explain how its rules are workable—even while it continues to enforce those rules aggressively against the digital asset industry—is reason enough to conclude that its denial of Coinbase's rulemaking petition is arbitrary and capricious.

The SEC's remaining justifications for forgoing rulemaking are insubstantial. The SEC pointed obliquely to other projects in the pipeline related to digital assets as a basis to forgo rulemaking, but none concerns the issues raised in Coinbase's petition. And the SEC cannot credibly claim that a rulemaking would divert it from other priorities. The agency's expanding brigade of enforcement actions and the unrelenting threats issued by its Chair demonstrate beyond cavil that digital assets are a high priority for the agency. It is a priority that requires rulemaking.

This Court should order the SEC to begin a long-overdue rulemaking. At the very least, the Court should require the SEC to provide the reasoned justification for its inaction that the APA demands.

## STANDARD OF REVIEW

An agency's denial of a petition for review may be vacated if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Int'l Union v. Chao*, 361 F.3d 249, 254 (3d Cir. 2004). Denials will be "overturn[ed] … for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency." *Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d at 93, 96-97 (D.C. Cir. 1989); *see Maier v. EPA*, 114 F.3d 1032, 1040 (10th Cir. 1997) ("we will not blindly uphold agency refusals to initiate rulemaking in the face of new information" because "'[c]hanges in factual and legal circumstances may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so'" (citation omitted)).

## ARGUMENT

### I.    The SEC Must Engage In Rulemaking For Its Sweeping New View Of The Securities Laws

The SEC's novel assertion of authority over swaths of the crypto industry—if it can be justified at all—must be made through rulemaking, not ad hoc enforcement suits imposing retroactive liability. Foundational principles of administrative

23

law require the SEC to engage in rulemaking (1) to explain its position on whether or how the securities laws apply to digital assets and to allow that position to be tested against the statute by public comments and, if necessary, in court; and (2) to write rules that remedy the incompatibility between digital assets and existing securities regulations.

### A.   The SEC's Unfounded Assertion Of Jurisdiction Over The Digital Asset Industry Must Be Tested Through Notice-And-Comment Rulemaking And In Ensuing Judicial Review

The APA provides two mechanisms for agency action: rulemaking and adjudication. *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947) (*Chenery II*); 5 U.S.C. §§ 553, 554. Agencies often have discretion to choose between rulemaking or adjudication to effect change, but that discretion is not unbounded. Rulemaking is presumptively required for significant policy changes because it allows an agency's new position to be tested through public comment and judicial review, and because it is often the only way for an agency to consider all important aspects of the problem at issue and provide fair notice of its new position. That presumptive course is required here. The SEC is seeking to effect dramatic changes to industry-wide policy that would undermine reliance interests and impose severe retroactive penalties, contrary to the requirements of the APA.

**1.    Rulemaking Is Presumptively Needed For Significant Agency Policy Changes To Permit Public Input, Facilitate Consideration Of All Aspects Of A Problem, And To Provide Fair Prospective Notice And For Judicial Review**

The "function of filling in the interstices of [statutes] should be performed, as much as possible, through th[e] quasi-legislative promulgation of rules to be applied in the future." *Chenery II*, 332 U.S. at 202; *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 511 (1983) (similar); *Bell Tel. Co. of Pa. v. FCC*, 503 F.2d 1250, 1265 (3d Cir. 1974) (similar); *Patel v. INS*, 638 F.2d 1199, 1204 (9th Cir. 1980) (similar); *Ford Motor Co. v. FTC*, 673 F.2d 1008, 1009-10 (9th Cir. 1981) (same). That is so for several reasons.

*First*, rulemaking respects the interest of the American people in shaping the law and in obtaining a global resolution of disputed issues. Rulemaking does that in part by forcing the agency to provide a cogent explanation for its actions on the record, including its purported legal basis. The APA expressly requires an agency proposing a rule to set forth "the legal authority under which the rule is proposed." 5 U.S.C. § 553(b)(2). That requirement "ensure[s] that the agency considers whether it actually has the authority to make the rule it is proposing" and explains the legal basis for the authority it ultimately asserts. *United States v. Whitlow*, 714 F.3d 41, 46 (1st Cir. 2013) (citing 5 U.S.C. § 553(b)(2)); *see, e.g.*, *Glob. Van Lines, Inc. v. ICC*, 714 F.2d 1290, 1297-99 (5th Cir. 1983) (based on § 553(b)(2) and *SEC v.*

25

*Chenery Corp.*, 318 U.S. 80, 88-90 (1943) (*Chenery I*), refusing to consider an agency attempt to justify a rule under a legal authority not cited in the rulemaking).

Generically invoking a statute without explanation does not suffice. Instead, the agency's articulation of its claimed legal authority "must be sufficiently precise" and "reasonably explained" "to apprise interested persons of the agency's legal authority to issue the proposed rule." *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 833 (5th Cir. 2010); *see FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (agency action must be not only "reasonable" but also "reasonably explained"). That allows the public to "comment on that question" and submit informed "written data, views, or arguments." *Whitlow*, 714 F.3d at 46; *Glob. Van Lines*, 714 F.2d at 1298 (holding that agency's "failure to articulate the legal basis" for a rule "deprived the petitioners of *any* opportunity to present comments" on that issue); 5 U.S.C. § 553(c). The agency also must then rationally respond to comments pointing out significant gaps or defects in the agency's reasoning. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344-45 (D.C. Cir. 2019) (agency must respond to comments "challeng[ing] a fundamental premise" of a proposed rule).

In this manner, rulemaking "permits broad participation in the decision-making process." *Bell Tel. Co.*, 503 F.2d at 1265. And once a final rule is issued, all affected parties can pursue immediate and comprehensive judicial review to test the agency's legal authority in court without the threat of retroactive penalties.

*Second*, rulemaking often is the only way an agency can consider a complex issue from all sides, as the APA demands. It is hornbook administrative law that an agency must consider every "important aspect of the problem" when exercising policymaking authority. *State Farm*, 463 U.S. at 43. Rulemaking is the only way for an agency to do that when making dramatic, industry-wide changes in a complex area. Rulemaking "enables the agency … to educate itself *before* establishing rules and procedures," *Texaco, Inc. v. Fed. Power Comm'n*, 412 F.2d 740, 744 (3d Cir. 1969) (emphasis added); to "benefit from th[e] advice" of all affected parties, *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 682 (D.C. Cir. 1973) (quotation marks omitted); and "to develop integrated plans in important policy areas," *Bell Tel. Co.*, 503 F.2d at 1265.

Among the issues an agency explores most effectively through rulemaking are the bounds of its own authority and the best understanding and implementation of detailed regulatory frameworks. *See Nat'l Petroleum Refiners Ass'n*, 482 F.2d at 682, 692. Case-by-case adjudication, by contrast, is designed precisely for those instances when the agency does not need to consider the whole picture. That approach can have its benefits. *See Chenery II*, 332 U.S. at 202-03. But an agency's choice to proceed incrementally and focus on a limited and possibly idiosyncratic set of party-specific circumstances necessarily prevents it from appreciating all of the issues associated with regulating an entire industry.

*Third*, rulemaking often is necessary to provide fair notice to regulated parties, particularly of significant policy changes. A foundational principle of our system of government is that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Regulated parties, in other words, "are entitled to have 'ascertainable certainty' of what conduct is legally required." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 251 (3d Cir. 2015).

The "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Fox Television Stations*, 567 U.S. at 253. That principle has been "incorporated into administrative law," and it "preclude[s] an agency from penalizing a private party for violating a rule" without providing adequate notice. *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 34 (D.C. Cir. 1987); *see Wis. Res. Prot. Council v. Flambeau Min. Co.*, 727 F.3d 700, 707 (7th Cir. 2013) (similar); *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (similar) (collecting additional authorities). An agency cannot impose "new liability" "for past actions which were taken in good-faith reliance on [agency] pronouncements." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974).

Rulemaking is instrumental to providing fair notice because it culminates in the public codification of new standards that apply only prospectively. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). In adjudications, by

28

contrast, parties may be left to "divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012). And that problem only "grows more acute the further the new rule deviates from the one before it." *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 748 n.4 (9th Cir. 1996). Rulemaking therefore is imperative when an agency seeks to make a large "leap[]" in policy, especially when the public has relied on the agency's position to the contrary. *Id.*

> ### 2.    The SEC's Erroneous, Expansive View Of Its Regulatory Authority Must Be Explained Through Rulemaking, Not Workshopped In Enforcement Suits

Rulemaking is the only permissible option for the SEC here. By refusing to engage in rulemaking, the agency is evading its responsibility to articulate clearly its new position on its authority over the digital asset industry and to explain the legal basis for that revisionist view. That evasion hamstrings the public's ability to participate in the development of the law and to call out matters the agency has overlooked or willfully ignored, and it circumvents the pre-enforcement judicial review of SEC rules that Congress expressly ordained. It also prevents the agency from considering the many important issues associated with regulating the digital asset industry. And it deprives digital asset firms of fair notice even as the agency seeks

to impose punishing liability on firms that relied in good faith on the SEC's prior position.

> ### a. Rulemaking is necessary to test the SEC's audacious new claim of authority over digital assets

The SEC's newly minted understanding of its authority has no basis in the securities statutes. If the agency wishes to assert authority over the digital asset industry, it must seek that authority from Congress. *See* Coinbase Enforcement Action, ECF 62. As one of the SEC's own Commissioners has observed, if the SEC "seriously grappled with" the question of its authority, it would "have to admit" that it "likely need[s] … more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us."[41] This is what the SEC Chair told Congress as recently as May 2021. *Supra* p.8.

But the SEC's new determination to exert authority in this area only makes the need more urgent to proceed through rulemaking. The SEC's newfound interpretation of "investment contract[s]" is out of step with almost a century of case law. *See supra* pp.10-11. If the SEC insists on pursuing this dubious jurisdictional land grab, it must do so through a rulemaking where it specifically articulates the purported basis for that jurisdiction in advance. Putting its position on the record and explaining its theory of its newfound authority over digital assets is essential to

---

[41] Hester M. Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://tinyurl.com/47cypbvt.

facilitate the public input the APA mandates, *see* 5 U.S.C. § 553(b)-(c), and the pre-enforcement judicial review of SEC rules that Congress prescribed, *see* 15 U.S.C. § 78y(b), especially given the public's reliance for years on the SEC's contrary position.

By forgoing the rulemaking process, the SEC has avoided articulating *any* single coherent theory of its claimed authority over the digital asset industry. For years the SEC stated that it had limited authority over digital assets. *See supra* pp.7-9, 12. But the Chair now insists that the agency "ha[s] enough authority … in this space," and that most digital assets *are* securities.[42] The SEC has brought an avalanche of enforcement actions premised on that novel view. And even across those numerous lawsuits, the SEC cannot get its story straight, telling one federal court that digital assets themselves are securities but telling another they are *not*.

It is precisely this kind of confusion that rulemaking is designed to avoid. Rulemaking would force the SEC to settle on a stance, both as to the source and scope of its authority, so that the public and courts can properly test it against the statute. The SEC may not continue to regulate through enforcement actions while withholding any reasoned explanation of its current understanding of the law.

---

[42] Gensler, *Runway Is Getting Shorter*, *supra* note 15; *Oversight of the Securities and Exchange Commission*, *supra* note 31.

**b.    Rulemaking is the only way for the SEC to grapple with all aspects of the problem of regulating the entire digital asset industry**

Bedrock principles of administrative law require the SEC to contend with all important aspects of its sweeping view of the securities laws. *State Farm*, 463 U.S. at 43. The SEC's attempt to regulate this vibrant, complex industry through ad hoc enforcement focuses the agency on discrete components of the industry in isolation. That blinds the agency to the bigger picture. The SEC's complete failure to grapple with the workability of its rules for digital assets, discussed below, is one inevitable and particularly problematic consequence of this blinkered approach.

This Court has recognized that there are cases where "notice and comment rulemaking" is "particularly appropriate" because it is "advisable" for an agency to solicit and learn from the insights of affected parties. *Fed. Lab. Rels. Auth. v. U.S. Dep't of Navy*, 966 F.2d 747, 763 n.15 (3d Cir. 1992) (en banc). That admonition applies with full force here.

**c.    The SEC's regulation of the digital asset industry using new standards in backward-looking enforcement actions creates glaring fair-notice problems**

The troubling thread connecting the shifting theories in the SEC's enforcement action is that they all would extend the securities laws to vast numbers of assets and commodities that have never been subject to them—from gold to trading cards to Beanie Babies—in conflict with the CFTC's treatment of many digital assets as

commodities.[43] Such "great leaps" sideways in policy that "depart[] abruptly" from the agency's prior views give rise to serious fair-notice concerns. *Pfaff*, 88 F.3d at 748 & n.4.

That fair-notice problem is "heightened" when the agency itself has experienced "considerable difficulty" interpreting a statute that it administers and its actions produce "considerable uncertainty." *Gen. Elec.*, 53 F.3d at 1332; *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1044 (D.C. Cir. 2017). That is precisely what has happened here. The SEC cannot make up its own mind on how or why the securities laws extend to digital assets. And the digital asset industry is not clairvoyant—it cannot ascertain the SEC's unwritten and constantly changing position. That position instead must be developed and set forth through rulemaking so the agency can provide advance notice to regulated parties.

The fair-notice concerns are heightened further by the industry-altering "adverse consequences" and "new liability" that the SEC is attempting to impose on the digital asset industry "for past actions which were taken in good-faith reliance on [the SEC's] pronouncements." *Bell Aerospace*, 416 U.S. at 295. The digital asset industry—now valued at more than two trillion dollars—has been built in reliance

---

[43] *The Future of Digital Asset Regulation*, Hearing Before the H. Comm. on Agric., 117th Cong. 10 (June 23, 2022) (Dir., CFTC Div. of Market Oversight, Vincent McGonagle), http://tinyurl.com/5a9dvba3.

on the SEC's prior position that it had at most limited jurisdiction over digital assets. Entire business models were designed on that premise. The agency's new position threatens to upend those reliance interests.

Coinbase is a perfect case in point. The SEC allowed Coinbase to become a public company in 2021 after reviewing and commenting on its business model without ever suggesting that Coinbase needed to register with the SEC or fundamentally change the way it does business.[44] That induced billions of dollars in investments by Coinbase and its public shareholders. Yet the SEC is now trampling that good-faith reliance and seeking to force fundamental changes to Coinbase's business and to impose significant, retrospective penalties for purported past violations of the securities laws. *See, e.g.*, Coinbase Enforcement Action, Compl. at 100 (seeking disgorgement of purportedly "ill-gotten gains" and "civil money penalties").

The SEC's new view of the securities laws, if accepted, could force many digital asset developers and platforms to restructure their businesses or even cease operating altogether. As Coinbase explained in a March 2023 comment letter in support of its rulemaking petition, existing securities regulations would break the "backbone of the digital asset ecosystem." JA67; *see also infra* 40-46.

---

[44] *See supra* 8-9, *see also* Coinbase Enforcement Action, ECF 1 (Compl.) ¶ 111 (Coinbase Global, Inc.'s S-1 form was "declared effective").

These circumstances require rulemaking. A "decision branding as 'unfair' conduct stamped 'fair' at the time a party acted, raises judicial hackles." *NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir. 1966) (Friendly, J.). "And the hackles bristle still more when a financial penalty is assessed for an action that might well have been avoided if the agency's changed disposition had been earlier made known." *Id.*; *see also Sheet Metal Workers' Int'l Ass'n, Loc. No. 355 v. NLRB*, 716 F.2d 1249, 1257 n.4 (9th Cir. 1983) (citing *Bell Aerospace*, 416 U.S. at 295).

That is exactly what has happened to Coinbase, which now faces a suit by the SEC over the very business model that the SEC approved to go public barely three years ago. An entire industry needs the SEC to provide rational answers to the basic questions presented in Coinbase's rulemaking petition: whether and how the SEC believes the securities laws apply to digital assets. The agency must answer those questions in forward-looking rules that are subject to immediate pre-enforcement review.

### 3.    The SEC Cannot Rationally Regulate Digital Assets Through Ad Hoc District Court Enforcement Actions

Although agencies sometimes have discretion to make policy through adjudication rather than rulemaking, that leeway is irrelevant here. The SEC has never attempted to justify its refusal to engage in rulemaking on the ground that crafting rules would interfere with any ongoing agency efforts to shape its policy incrementally through case-by-case agency adjudications. Quite the opposite, the SEC has

already formed a new and sweeping (if indeterminate) view of the securities laws'
applicability to digital assets that it is asking federal courts to enforce with penalties.

Thus, unlike the typical case involving an agency's refusal to engage in rule-
making, the question here is not whether the SEC may reasonably choose to make
policy incrementally through ad hoc decisionmaking instead of writing rules. Rather,
the SEC already has resolved to adopt a revised, across-the-board position on an
important issue. The question is the proper avenue for adopting that position. That
avenue plainly is rulemaking, not backward-looking enforcement actions.

Adjudication generally is appropriate when "specialized problems" arise that
are ill-suited to the rulemaking process, including: (1) when "the administrative
agency could not reasonably foresee" the problem; (2) when the agency lacks "suf-
ficient experience with a particular problem to warrant rigidifying its tentative judg-
ment into a hard and fast rule"; and (3) when the problem is "so specialized and
varying in nature as to be impossible of capture within the boundaries of a general
rule." *Chenery II*, 332 U.S. at 202-03. None of those circumstances exists here, by
the SEC's own acknowledgment.

The SEC absolutely could and did "reasonably foresee" the need for rulemak-
ing. *Chenery II*, 332 U.S. at 202-03. It already acknowledged questions from "[m]ar-
ket participants … concerning the application of" existing rules to digital asset se-
curities, and one of its Commissioners has repeatedly implored the agency to

consider how its "rules can be modified to accommodate … new [digital asset] technology."[45]

Nor could the SEC plausibly claim that it is attempting to accrue "experience" via adjudication before making rules. *Chenery II*, 332 U.S. at 202-03. In the SEC Chair's words, rulemaking is unnecessary because "the rules have already been published," referring to longstanding regulations for legacy securities.[46] The agency's claim is that its course is justified by decades of experience under settled law, not that it is on uncertain terrain requiring modest, incremental adaptations.

And the SEC cannot argue that digital assets are "so specialized and varying in nature" that they are incapable of being regulated through comprehensive rules. *Chenery II*, 332 U.S. at 202-03. Rigid rules are precisely what the SEC is attempting to impose on the industry, and there is nothing the least bit tentative about its actions. Its contention now is that digital assets are just like other traditional financial assets and that enforcement is proper because digital assets are *not* so specialized.[47]

---

[45] Hester M. Peirce, Comm'r, SEC, *Token Safe Harbor Proposal 2.0* (Apr. 13, 2021), bit.ly/3us61Ok; SEC, *Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, 86 Fed. Reg. 11627, 11628 (Feb. 26, 2021).

[46] Brian Quarmby, *SEC Chair Gensler Claps Back at Coinbase, Says Crypto Rules Already Exist*, CoinTelegraph (May 16, 2023), https://bit.ly/458mHb2; *Oversight of the Securities and Exchange Commission*, *supra* note 31.

[47] *Oversight of the Securities and Exchange Commission*, *supra* note 31.

The SEC's wholesale refusal to engage in rulemaking, and its choice to proceed instead through regulation by enforcement against digital asset firms, cannot plausibly be justified under traditional administrative-law principles of agency discretion. The agency must engage in rulemaking to provide fair notice of its sweeping new view of the securities laws and to subject it to public and judicial scrutiny.

### B.    The SEC Must Engage In Rulemaking Because Fundamentally Changed Circumstances Have Rendered The SEC's Existing Rules Unworkable For Digital Assets, Including Digital Asset Securities

The SEC's current enforcement campaign rests on the claim that digital assets are securities covered by existing Commission regulations. Digital asset firms are told to "come in and register" pursuant to those regulations—and for not doing so, they are being bludgeoned in escalating enforcement proceedings.

The Commission is wrong in two critical respects: First, most digital assets are not securities, and second, even those that are (which Coinbase does not offer) cannot feasibly be registered under the existing SEC rules. Those rules were designed instead for fundamentally different legacy financial products.

Digital asset firms are therefore in a Catch-22 of the SEC's own making: The agency insists they comply with its regulations, but it refuses to conduct the rulemaking needed to establish regulations by which firms feasibly could do so. This is unfair, oppressive, and arbitrary. And it demonstrates conclusively that, to the extent

any digital assets *are* securities, the Commission must conduct rulemaking to pro-

vide regulations suited to these new circumstances.

### 1. An Agency Must Engage In Rulemaking When Changed Circumstances Eviscerate The Assumptions Underlying Its Existing Regulatory Framework

One of the "strongest potential bases for overturning an agency's refusal to

initiate a rulemaking" is that changed circumstances cast serious doubt on the prem-

ises underlying the agency's existing regulatory framework. *EMR Network v. FCC*,

391 F.3d 269, 273-74 (D.C. Cir. 2004). A "refusal to initiate a rulemaking naturally

sets off a special alert when a petition has sought modification of a rule on the basis

of a radical change in its factual premises." *Am. Horse Prot. Ass'n, Inc. v. Lyng*,

812 F.2d 1, 5 (D.C. Cir. 1987). An agency may not simply "ignore … information"

that suggests the factual preconditions for its rules are no longer valid. *RSR Corp. v.*

*EPA*, 102 F.3d 1266, 1270 (D.C. Cir. 1997).

The SEC's duty to reexamine its rules is heightened by the various provisions

of the Exchange Act—including provisions the SEC now invokes against Coinbase

and others—that require the agency to act in the "public interest."[48] An agency that

is "statutorily bound" to ensure that its regulations serve the "public interest" may

---

[48] *See* 15 U.S.C. § 78q-1(b)(1) (noting Commission may grant exemptions "consistent with the public interest, the protection of investors, and the purposes of this section"); *id.* § 78q-1(b)(2) ("may prescribe as necessary or appropriate in the public interest"); *id.* § 78o(a)(2) (similar); *id.* § 78e (similar); *id.* § 78j(b); *id.* § 78m(e)(2).

not "sidestep a reexamination of particular regulations when abnormal circumstances make that course imperative." *Geller v. FCC*, 610 F.2d 973, 979-80 (D.C. Cir. 1979) (per curiam).

### 2.    The SEC's Existing Rules Are Unworkable For Digital Assets Generally And Digital Asset Securities In Particular

Fundamental changed circumstances require the SEC to reexamine and modify how its rules apply to digital asset transactions. A key premise of the SEC's existing regulations is that compliance is possible for the firms that the SEC seeks to subject to those rules. But the emergence of digital assets and the SEC's claim that many or all are securities have deeply undermined that premise.

Digital assets run on radically different technology than legacy financial assets. Thus, even when the SEC articulated its view years ago that only limited numbers of digital assets might qualify as securities, the agency should have reexamined whether its rules are workable in this new context. Now, the agency's recent course reversal has made reexamination a pressing necessity. The agency is bringing a rash of enforcement suits premised on the view that digital asset firms are subject to those regulations and need only "come in and register" to avoid liability. Before launching such an enforcement campaign, the government must ensure that firms in this new industry *can* comply with the rules it is enforcing. In truth, they cannot.

***Registering digital assets would render many useless.*** Most fundamentally, many digital assets simply could not function if they were forced to register with the

SEC. Digital assets are unlike stocks, bonds, or investment contracts in that people actually *use* them. As Coinbase's petition explained, digital assets are used for "paying transaction, or 'gas' fees; voting on governance proposals related to the operation of the protocol; serving as a medium of exchange for native applications; and helping secure a network." JA18. If these digital assets were forced to be registered as securities, it often would be impossible to use them because all transactions would have to occur within a broker-dealer and registered-exchange framework. The current broker-dealer framework is not designed to facilitate the various real-time uses of digital assets.

***Issuer registration and disclosure requirements are unworkable.*** Digital asset developers also could not comply with existing registration and disclosure requirements. Issuer registration, for example, requires disclosures about "the operation of the issuer, its financial statements, its leadership, what risks it may face, and information about various other parts of the business." JA22 (pet. for rulemaking); *see also, e.g.*, 15 U.S.C. § 77e. But many digital assets are "created or managed by a diffuse group of individuals, who are not a central 'team,'" and "may not even know each other's true identities." JA23-24 (pet. for rulemaking). "[R]equiring them to coordinate and assume liability for disclosures would be both impracticable and futile." JA23.

Moreover, even those digital projects that have a centralized management team often seek to "dissolve or disaffiliate from the protocol" over time to achieve decentralization. JA50 (Coinbase Dec. 6, 2022, comment). "One of the primary goals of many digital asset development teams is to eventually relinquish control over their protocol to a community of users." JA50 (Coinbase Dec. 6, 2022, comment). Yet under existing regulations, that management team could be subject to ongoing disclosure obligations (and potential liability), even though it may no longer have the information necessary to comply. The SEC has not explained how its disclosure regime could possibly work under those circumstances.

There is also a mismatch between the information required to be disclosed under existing regulations and the information that a digital asset user needs. For example, under existing rules, disclosures must include information about an issuer's operation, finances, and leadership. JA22 (pet. for rulemaking). But that information is often irrelevant to a digital asset user. A digital asset user is far more likely to care about the details of the asset's underlying protocol—for example, "how the code may be updated or changed, or how transactions are validated." JA49 (Coinbase Dec. 6, 2022, comment). But existing rules do not address this.

Even one of the SEC's own Commissioners has underscored that the focus of existing requirements "on disclosure about companies, their management and their financial results" "poorly fit[s] the decentralized and open-source nature of

blockchain-based digital asset[s]."[49] The SEC's refusal to tailor disclosure requirements for the digital asset industry runs the risk of affirmatively misleading investors who may rely on information that is immaterial to a digital asset—potentially exposing digital asset firms to significant liability. *See* JA13 (pet. for rulemaking); 15 U.S.C. § 78*l*.

The net effect of all of this, as Coinbase explained in its rulemaking petition, is that "[e]xceedingly few issuers have successfully registered a digital asset security," and "many others hav[e] failed in attempts to do so." JA23 & n.30 (compiling examples of filings deemed "deficient" by the SEC). For example, the SEC rejected American CryptoFed DAO's S-1 filing for purported "serious deficiencies." *Id.* An attempted filing by Monster Products, Inc., met the same fate. *Id.* And numerous firms have had to either file for bankruptcy or shutter their doors because, in their words, "[c]urrent laws and regulatory regimes do not" allow them to "utilize" digital assets as originally "envisioned." *Id.*

***Exchange registration requirements are unworkable.*** Digital asset platforms would face comparable obstacles to registration were they forced to do so. Most importantly, registering as an exchange limits a platform to offering *only* registered securities. JA28 (pet. for rulemaking) (citing Exchange Act § 6(b)(1)). That is a

---

[49] Peirce, *Outdated*, *supra* note 33.

foundational problem for the industry not just because there are almost no registered digital asset securities, but also because the vast majority of digital assets are commodities, not securities. Even the SEC concedes that Bitcoin, the most prevalent digital asset, is not a security.[50] So even if a digital asset platform like Coinbase *could* register with the agency, it would have no digital assets to list. The SEC has never provided any solution to that obvious problem.

Beyond that, under existing rules SEC-registered exchanges need broker-dealers to serve as members; yet there would be few-to-no broker-dealers who could do so for a digital asset "exchange." SEC rules prohibit broker-dealers from holding nearly all digital assets. Broker-dealers must "maintain 'physical possession' or 'control' over customers' fully paid and excess margin securities." JA33 & n.44 (pet. for rulemaking) (discussing Rule 15c3-3, i.e., the "Customer Protection Rule"). But that is impossible for most digital assets under existing SEC rules. Indeed, the "SEC Staff's general position has been that holding blockchain private keys"—a common way to assert control over digital assets—"does not qualify as good physical possession or control." *Id.*

Recognizing that problem, the SEC has created a narrow workaround by issuing a time-limited "conditional no-action position" allowing so-called "special

---

[50] SEC, *Correspondence Related to Draft Registration Statement*, *supra* note 12.

purpose" broker-dealers to custody digital asset securities. JA33 & n.47 (pet. for rulemaking). But the requirements for this exception are so onerous that, to date, only *one* entity has been able to successfully register.[51] Close to a year after registering, that entity apparently has not yet taken custody of a single digital asset, likely because there is no such viable business to be had.[52] And the CFTC has made clear that the SEC's push to register entities under this workaround has set the two agencies on a collision course.[53]

Further, even if digital asset broker-dealers could comply with existing SEC rules, compliance would be economically infeasible. JA34 (pet. for rulemaking). Broker-dealers generally do not need to record liabilities on their balance sheets for assets that they custody for customers. But under SEC Staff Accounting Bulletin No. 121, broker-dealers must do so for digital assets that they custody. In combination with other SEC rules, this effectively requires broker-dealers to contribute a dollar of cash as additional equity for every dollar worth of digital assets they hold for customers—a completely unsustainable business model. *Id.*

---

[51] *See* Amy Caiazza & Neel Maitra, *FINRA Finally Approves a Special Purpose Broker-Dealer to Custody Crypto Asset Securities—What's Next?*, JD Supra (May 24, 2023).

[52] Jesse Hamilton, *Prometheum Earns Final Regulatory Nod to Try Hand at Fully-Compliant Crypto*, Coinbase (Dec. 21, 2023), bit.ly/42GWJuA.

[53] Casey Wagner, *CFTC's Behnam Says Prometheum's ETH Stance Could Create Inter-Agency Conflict*, Blockworks (Mar. 6, 2024), https://blockworks.co/news/cftc-ether-security-commodity-conflict.

***Clearing agency rules do not work for digital assets.*** Finally, the Exchange Act defines a "clearing agency" broadly to include any person who "facilitates the settlement of securities transactions … without physical delivery of securities certificates." JA36 (pet. for rulemaking) (quoting Exchange Act § 3(a)(23)). Because digital assets settle without "physical delivery of securities certificates," the statute can be read to treat anyone involved in facilitating digital asset transactions as a "clearing agency," including the decentralized participants in a blockchain network that validate transactions, and even non-persons like the blockchain itself. JA36-37.[54] It would be impossible for a blockchain and "each of its components"—which "operate[] without central control"—to comply with existing rules for clearing agencies. JA37. Yet the SEC has never grappled with this problem, either.

*     *     *

Digital assets are a new technology that is incompatible with an essential premise of existing securities regulations—that compliance is possible for regulated firms. As a matter of law and fundamental fairness, the SEC may not insist that digital asset firms are covered by those regulations and sue them for not complying, yet refuse the rulemaking that would be needed to make compliance possible—to the extent it lawfully may be required at all.

---

[54] *See The Future of Digital Assets: Identifying the Regulatory Gaps in Digital Asset Market Structure*, Hearing Before the H. Fin. Servs. Comm., 118th Cong. (Apr. 27, 2023) (Zachary J. Zweihorn at 8 & n.24).

## II. The SEC's Refusal To Commence Rulemaking Should Be Vacated Because The SEC Offered No Rational Explanation For Its Inaction

Even if it were possible to justify withholding rulemaking here, it would take a compelling explanation. Yet the SEC has offered next to nothing. Its two-page denial letter contained only a paragraph of rationalization. And on the most crucial point—the unworkability of the existing securities regulations for digital assets— the SEC provided a single sentence of ipse dixit. For this reason alone, this Court should vacate the denial and remand to the agency to commence a rulemaking.

### A. The SEC's Unexplained Ipse Dixit That It "Disagrees" With Coinbase's Demonstrated Workability Concerns Is Insufficient

The serious workability concerns that Coinbase detailed in its rulemaking petition demanded a reasoned response from the SEC. *See supra* 40-46. "When an agency … is confronted with evidence that its current regulations are inadequate or the factual premises underlying its prior judgment have eroded, it must offer more to justify its decision to retain its regulations than mere conclusory statements." *Env't Health Tr. v. FCC*, 9 F.4th 893, 903 (D.C. Cir. 2021). Yet in denying Coinbase's rulemaking petition, the SEC addressed a single conclusory sentence to those concerns: "The Commission disagrees with the Petition's assertion that application of existing securities statutes and regulations to crypto asset securities, issuers of those securities, and intermediaries in the trading, settlement, and custody of those securities is unworkable." JA6.

That response, redolent of Bartleby's refrain, is heartland arbitrary and capricious conduct. (It is also the sum total of the explanation the SEC's lawyers can now offer this Court to justify the agency's action—reasons not relied upon by the agency cannot be introduced in litigation. *Chenery I*, 318 U.S. at 88-90.) The SEC cannot slough off the serious concerns raised by Coinbase and others (including its own Commissioners) with a single sentence stating that it "disagrees." The APA requires it to provide a reasoned explanation *why* it disagrees. That is Administrative Law 101. *See, e.g.*, *Prometheus*, 592 U.S. at 423 (agency action must be "reasonably explained"); *Env't Health Tr.*, 9 F.4th at 905 ("conclusory statements 'cannot substitute for a reasoned explanation'"); *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995) ("conclusory statements … do not meet the requirement that 'the agency adequately explain its result'"); *Am. Horse Prot. Ass'n*, 812 F.2d at 6 (agency's two-sentence conclusory explanation for refusing to engage in rulemaking was arbitrary and capricious).

The SEC's haughty dismissal of the workability problem is inexcusable given the stakes here. The agency has filed a barrage of punitive enforcement actions against digital asset firms. The premise of those actions is that regulated parties have failed to "come in and register."[55] Yet the agency is refusing to explain *how* they can

---

[55] Gensler, *Runway Is Getting Shorter*, *supra* note 15.

do so. Now, when finally forced to explain in a judicially reviewable order why the industry is wrong and "coming in and registering" *is* feasible, the agency musters no answer at all. That is arbitrary, capricious, and ignores an "important aspect of the problem." *State Farm*, 463 U.S. at 43.

The SEC's failure to engage on this point requires vacating the SEC's denial of Coinbase's rulemaking petition. The unworkability of the SEC's rules is a gating issue. Unless the SEC reasonably responds to the workability issues raised in Coinbase's rulemaking petition, it cannot sensibly refuse to modify its rules while it simultaneously sues digital asset firms for failing to comply with those same rules. The SEC's additional reasons for denying the petition—although they are also deficient, as discussed below—cannot stand on their own.

The SEC's failure to do the bare minimum required by the APA warrants not merely a remand for further explanation, but an order directing the SEC to engage in rulemaking. The SEC has had sufficient opportunities to explain itself. It has proven in this litigation and elsewhere that it will not take action unless compelled by a court. And even after issuing a decision on Coinbase's rulemaking petition out of fear of imminent action by this Court, the SEC provided no reasoned explanation for forgoing rulemaking. That failure strongly indicates that the agency has no valid explanation. Time is of the essence for Coinbase and other digital asset firms, and this Court should not allow the SEC to delay reasoned consideration of these issues

any longer. The Court should compel the agency to engage in long-overdue rule-making. *See WWHT, Inc. v. FCC*, 656 F.2d 807, 230 (D.C. Cir. 1981) (an agency may "be forced … to institute rulemaking proceedings").

### B.   The SEC's Remaining Excuses For Inaction Are Makeweights

The remainder of the SEC's denial letter is equally defective. The SEC offered no explanation at all for its decision to regulate through enforcement actions rather than rulemaking. And the two justifications that it did proffer for the denial of Coinbase's rulemaking petition—that it is still learning from other digital-asset-related actions and that it has limited resources to spare—only underscore the need for rulemaking.

### 1.   The SEC Failed To Provide Any Reasoned Explanation For Its Refusal To Engage In Rulemaking

An agency's failure to provide any reasoned explanation for its decision to regulate via district court enforcement actions rather than rulemaking warrants a remand to the agency to "explain its decision or institute a new rulemaking." *Shays v. FEC*, 424 F. Supp. 2d 100, 115-16 (D.D.C. 2006). In *Shays*, the court concluded that the agency had abused its discretion in electing adjudication over rulemaking because it "did not explain how piecemeal adjudication could be executed on a sufficiently timely basis to be effective," "discuss[] whether the adjudication of individual cases that are resolved on particular facts and legal theories would be effective as a means to provide guidance," or explain whether "due process concerns might

impair its ability to bring enforcement actions … in the absence of a regulation providing clear guidance." *Id.* at 115-16.

So too here. For the reasons already discussed, there is no rational explanation here for preferring enforcement actions over rulemaking under these circumstances. But even if a rational explanation existed, the SEC has not provided it. The agency did not, for example, explain how enforcement actions could provide effective, timely, or comprehensive guidance to regulated parties, nor why this course of action would not run afoul of due process. This Court should, at a minimum, vacate the denial and remand to the agency to explain why it thinks ad hoc enforcement is the better approach.

### 2. The Reasons The SEC Did Provide For Refusing To Engage In Rulemaking Are Unavailing

*First*, the SEC stated that it has "discretion to determine the timing … of its regulatory agenda" and that "[a]ny consideration of whether" and "how to alter the existing regulatory regime" may be informed by "data and information" from other digital-asset-related undertakings. JA6. The SEC cited a handful of proposed rules and guidance that, as Coinbase has explained to the agency, do not address the critical questions on which Coinbase seeks clarity—that is, the SEC's standards for determining whether a digital asset is a security, the legislative authority for those

standards, and workable registration models for the industry.[56] Rather, these proposed rules and guidance seek to *expand* existing requirements to new domains but still without ever explaining how digital asset firms could comply with those requirements, and why the law requires them to do so. As two of the agency's Commissioners recently underscored, the agency's continued "expansion" of its purported authority over digital assets has only raised further "calls for clarity."[57]

If anything, the recent actions the SEC cites only underscore the unworkability of existing rules for digital assets. In some of the proposed rules, the SEC acknowledges that their adoption would have an outsized impact on the crypto industry, potentially wiping firms out of business.[58] And guidance the SEC points to has already proved unworkable. The agency touts its workaround for so-called "special purpose" brokers, but—as noted—only *one entity* has successfully registered as

---

[56] *See* JA6 (citing SEC, *Regulation Best Execution*, 88 Fed. Reg. 5440, 5448-49, 5540-42 (Jan. 27, 2023); SEC, *Safeguarding Advisory Client Assets*, 88 Fed. Reg. 14672, 14676, 14688-94, 14700, 14706, 14710, 14715, 14726 (Mar. 9, 2023); SEC, *Regulation Systems Compliance and Integrity*, 88 Fed. Reg. 23146, 23166-69 (Apr. 14, 2023); SEC, *Supplemental Information and Reopening of Comment Period for Amendments Regarding the Definition of "Exchange,"* 88 Fed. Reg. 29448 (May 5, 2023)); Coinbase Mandamus Action, ECF 27 at 8.

[57] SEC, *On Today's Episode of As the Crypto World Turns: Statement on ShapeShift AG* (Mar. 5, 2024).

[58] *See, e.g.*, SEC, *Regulation Systems Compliance and Integrity*, 88 Fed. Reg. 23146, 23167 n.223 (Apr. 14, 2023); SEC, *Supplemental Information and Reopening of Comment Period for Amendments Regarding the Definition of "Exchange,"* 88 Fed. Reg. 29448, 29485 (May 5, 2023); SEC, *Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, 86 Fed. Reg. 11627 (Feb. 26, 2021).

a broker-dealer under this guidance, and that entity has not yet to the public's knowledge custodied a single digital asset. *See supra* 45.

All this confirms that the SEC is not making a good-faith effort to learn about the digital asset industry, let alone assess the bounds of its authority. Instead, it has raced to the courthouse to bludgeon firms in enforcement actions premised on the view that the SEC should be the primary regulator of the industry and already knows all it needs to know (even though the industry itself does not).

*Second,* the SEC asserted in its Order that it is "engaged in many undertakings that relate to regulatory priorities extending well beyond crypto asset securities" and that "[t]he requested regulatory action would significantly constrain the Commission's choices regarding competing priorities." JA6.

But while an agency's prioritization of its agenda is generally entitled to deference, it "should not be construed as providing a blanket exception to APA review in any matter involving the allocation of agency resources." *Compassion Over Killing v. FDA*, 849 F.3d 849, 857 (9th Cir. 2017); *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). Instead, the agency must "clearly indicate that it has considered" the issues raised in the petition and provide a "'reasonable explanation as to why it cannot or will not exercise its discretion' to initiate rulemaking." *Compassion Over Killing*, 849 F.3d at 857 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007)).

And it must "identif[y] the reasons why" action would be burdensome. *Int'l Union v. Chao*, 361 F.3d 249, 255 (3d Cir. 2004).

The SEC's own actions indicate that regulating the digital asset industry *is* a priority for the SEC—it has just decided to proceed through oppressive regulation by enforcement rather than through rulemaking. The SEC has instituted dozens of digital-asset-related enforcement actions since the summer of 2022.[59] It has nearly doubled the size of its digital asset enforcement team in the last two years.[60] And its denial of Coinbase's petition points to ongoing efforts to gather information about digital asset regulation, further suggesting that this area is a priority for the agency. JA6. The SEC's denial letter did not specifically identify *any* competing priorities, let alone priorities of a higher order.

More fundamentally, this rulemaking *should* be a priority for the agency. The SEC cannot downplay the significance of the issues raised in Coinbase's petition while simultaneously engaging in an all-out campaign of regulation by enforcement with dire consequences for regulated parties. That campaign imposes outsized costs

---

[59] *See* SEC, *Crypto Assets and Cyber Enforcement Actions*, bit.ly/48hlnmy (last updated Mar. 6, 2024).

[60] *See* Press Release, SEC, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022).

on an entire industry while simultaneously denying fair notice and an opportunity for public discussion of the SEC's novel assertion of authority over digital assets.[61]

The SEC also has provided no explanation for why rulemaking would be an undue burden. Rulemaking is far less costly than enforcement, and regulatory clarity would reduce the need for enforcement actions long-term. Industry leaders stand ready to shoulder much of the costs of devising workable regulations for the crypto industry, as Coinbase itself demonstrated through its extensive efforts to work collaboratively with the SEC. The SEC has provided no reasoned basis at all for denying Coinbase's rulemaking petition.

\*      \*      \*

The SEC's refusal to conduct rulemaking is arbitrary and capricious. That has now been laid bare for all to see, in the agency's complete inability to articulate a rational justification for its obdurate inaction.

## CONCLUSION

For the foregoing reasons, Coinbase respectfully requests that this Court vacate the agency's denial of Coinbase's rulemaking petition and remand with instructions for the SEC to engage in rulemaking, or, at a minimum, for further explanation consistent with this Court's opinion.

---

[61] *See* JA30 (pet. for rulemaking) (describing costs associated with regulatory uncertainty); Mandamus Action, Chamber of Commerce Br. at 5-12 (similar); Mandamus Action, Crypto Council Br. at 4-14 (similar).

Dated: March 11, 2024

Respectfully submitted,

/s/ *Eugene Scalia*
Eugene Scalia (D.C. Bar No. 447524)
 *Counsel of Record*
Jonathan C. Bond
Nick Harper
Tessa Gellerson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner Coinbase, Inc.*

## <u>CERTIFICATIONS</u>

1.      This petition complies with the type-volume limitations of the Federal Rules of Appellate Procedure 32 because it contains 12,873 words, excluding the parts of the Brief exempted from Federal Rule of Appellate Procedure 32(f).

2.      This Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

3.      Pursuant to this Court's Rule 31.1(c), the text of the electronic version of this document is identical to the text of the paper copies filed with the Court.

4.      Pursuant to this Court's Rule 31.1(c), the document has been scanned with version 7.05 of CrowdStrike Falcon malware and is free of viruses.

5.      Pursuant to this Court's Rule 46.1(e), I hereby certify that at least one attorney whose name appears on this Petition is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

March 11, 2024

*/s/ Eugene Scalia*
Eugene Scalia

*Counsel for Petitioner*
*Coinbase, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March 2024, I caused the foregoing Brief for Petitioner to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the Court's CM/ECF system and to be filed in paper format pursuant to this Court's Rule 113.1(a). I further certify that service was accomplished upon the following, in compliance with Rule 25(c) of the Federal Rules of Appellate Procedure, via the Court's CM/ECF system.

> Tracey Hardin
>   hardint@sec.gov
> Ezekiel L. Hill
>   hillez@sec.gov
> David D. Lisitza
>   lisitzad@sec.gov
> UNITED STATES SECURITIES & EXCHANGE COMMISSION
> 100 F Street, N.E.
> Washington, D.C. 20549
> (202) 551-5100

March 11, 2024

/s/ *Eugene Scalia*
Eugene Scalia

*Counsel for Petitioner*
*Coinbase, Inc.*

No. 23-3202

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

COINBASE, INC.,

*Petitioner*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of an Order of the
Securities and Exchange Commission
Docket No. 4-789

---

# JOINT APPENDIX
# Volume 1 of 2 (Pages JA1 to JA6)

---

Ezekiel L. Hill
Tracey A. Hardin
David D. Lisitza
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, D.C.  20549
(202) 551-7724

*Counsel for Respondent*
*Securities and Exchange Commission*

Eugene Scalia
  *Counsel of Record*
Jonathan C. Bond
Nick Harper
Tessa Gellerson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner Coinbase, Inc.*

# TABLE OF CONTENTS

Page

*Volume 1*

Petition for Review (Dec. 15, 2023) ...................................................... JA1

Letter Order Denying Petition for Rulemaking (Dec. 15, 2023) .......................... JA5

*Volume 2*

Certified List (Jan. 24, 2024) ............................................................ JA7

Petition for Rulemaking (July 21, 2022) .............................................. JA11

Letter from the Secretary to Paul Grewal, Chief Legal Officer,
Coinbase Global, Inc. (July 21, 2022) .............................................. JA43

Comments of Cameron Braswell (July 21, 2022) ........................................ JA44

Comments of Jarrod Lowery (July 25, 2022) .......................................... JA45

Comments of Alfredo Nava (July 25, 2022) ............................................ JA46

Comments of Judson Talbot (July 25, 2022) .......................................... JA47

Comments of Paul Grewal, Chief Legal Officer, Coinbase Global, Inc.
(Dec. 6, 2022) ........................................................................ JA48

Comments of Tom Quaadman, Executive Vice President, Center for Capital
Markets Competitiveness, U.S. Chamber of Commerce (Jan. 19, 2023) ...... JA59

Letter Type A submitted by 1,683 individuals and entities (undated) ............... JA63

Memorandum from the Office of Commissioner Hester M. Peirce regarding
a February 22, 2023 meeting with representatives of Coinbase
(Feb. 22, 2023) ....................................................................... JA64

Comments of Paul Grewal, Chief Legal Officer, Coinbase Global, Inc.
(Mar. 20, 2023) ....................................................................... JA65

Memorandum from the Office of Commissioner Hester M. Peirce regarding
an April 21, 2023 meeting with representatives of Coinbase
(Apr. 24, 2023) ....................................................................... JA83

Comments of Paul Grewal, Chief Legal Officer, Coinbase Global Inc.
(May 3, 2023) ......................................................................... JA84

Memorandum from the Office of Commissioner Hester M. Peirce regarding
a July 20, 2023 meeting with representatives of Coinbase
(July 20, 2023) ....................................................................... JA93

No. 23-_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

COINBASE, INC.,

*Petitioner*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of the
Securities and Exchange Commission
Docket No. 4-789

## PETITION FOR REVIEW

Reed Brodsky
Lefteri J. Christos
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
(212) 351-4000

Monica K. Loseman
Nicholas B. Venable
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Unit 4200
Denver, CO  80202
(303) 298-5700

Eugene Scalia
 *Counsel of Record*
Jonathan C. Bond
Nick Harper
Robert A. Batista
M. Christian Talley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner Coinbase, Inc.*

## PETITION FOR REVIEW

Pursuant to 5 U.S.C. § 706, 15 U.S.C. §§ 77i, 78y, and Federal Rule of Appellate Procedure 15(a), Coinbase, Inc. petitions the Court for review of a December 15, 2023 order of the Securities and Exchange Commission ("Order"). The Order is attached as Exhibit A to this petition.

The Commission's Order denies a petition for rulemaking that Coinbase filed on July 21, 2022. Coinbase's petition asked the Commission to commence a rulemaking to clarify its standards for determining whether digital assets may be securities and to create an avenue for digital asset issuers and exchanges to register when required. In April 2023, having received no response from the Commission, Coinbase filed a petition for a writ of mandamus in this Court to compel the Commission to respond to the rulemaking petition. This Court retained jurisdiction and directed the Commission to report on the petition's status. *In re Coinbase*, No. 23-1779 (June 20, 2023), Dkt. 32. On October 11, 2023, the Commission reported that its staff had made a recommendation to the Commission. *Id.*, Dkt. 33. On December 15, 2023, over the dissent of two Commissioners, the Commission issued the Order denying Coinbase's rulemaking petition.

Coinbase seeks review of the Order on the grounds that it is arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* The Commission's refusal to

1

engage in rulemaking, even while it continues a campaign of regulation by enforcement against Coinbase and others that exceeds its statutory authority, flouts the APA and fundamental principles of fairness it embodies. Coinbase respectfully requests that the Court hold unlawful, vacate, enjoin, and set aside the Order; direct the Commission to commence rulemaking; and provide such additional relief as may be appropriate.

Dated:  December 15, 2023

Respectfully submitted,

Reed Brodsky
Lefteri J. Christos
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
(212) 351-4000

Monica K. Loseman
Nicholas B. Venable
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Unit 4200
Denver, CO  80202
(303) 298-5700

*/s/ Eugene Scalia*
Eugene Scalia (D.C. Bar No. 447524)
  *Counsel of Record*
Jonathan C. Bond
Nick Harper
Robert A. Batista
M. Christian Talley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner Coinbase, Inc.*

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the Court's CM/ECF system and to be filed in paper format pursuant to this Court's Rule 113.1(a). I further certify that service was accomplished upon the following, in compliance with Rule 25(c) of the Federal Rules of Appellate Procedure, via first-class mail.

**United States Securities and Exchange Commission**
c/o Vanessa A. Countryman
Secretary
100 F Street, N.E.
Washington, D.C.  20549
(202) 551-5400
Secretarys-Office@sec.gov
apfilings@sec.gov


December 15, 2023                              /s/ *Eugene Scalia*
                                              Eugene Scalia

                                              *Counsel for Petitioner Coinbase, Inc.*



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
100 F STREET, N.E.
WASHINGTON, D.C. 20549

**OFFICE OF**
**THE SECRETARY**

December 15, 2023

Paul Grewal
Chief Legal Officer
Coinbase Global, Inc.
paul.grewal@coinbase.com

     Re:   Petition for Rulemaking, File No. 4-789

Dear Mr. Grewal:

     This letter is in response to the Petition for Rulemaking that you filed on July 21, 2022 ("Petition" or "Pet.") on behalf of Coinbase Global, Inc. ("Petitioner").[1]

     The Petition suggests that the Commission engage in discretionary rulemaking of substantial scope to create "a new regulatory framework" for crypto asset securities.[2]  Pet. 1, 3. The Petition does not include the "text or the substance of any proposed rule" as required by the Commission's Rules of Practice.  17 C.F.R. § 201.192(a).  Rather, it includes "an outline to frame the topic" and more than 100 questions that Petitioner "believe[s] are important to consider."  Pet. 7.  The Petition generally addresses the classification of crypto assets as securities, registration and disclosure requirements for offers and sales of crypto asset securities, and intermediation of crypto asset security transactions.

     Pursuant to the Commission's Rules of Practice, the Petition was referred to the staff of the Divisions of Trading and Markets and Corporation Finance.  The staff considered the Petition and comment letters received in response thereto and made a recommendation to the Commission.  The Commission has carefully considered that recommendation, as well as the Petition and comment letters.  After such consideration, and in the exercise of its broad discretion to set its rulemaking agenda, the Commission concludes that the requested rulemaking is currently unwarranted and denies the Petition.

---

[1]  *See* Petition for Rulemaking – Digital Asset Securities Regulation, https://www.sec.gov/files/rules/petitions/2022/petn4-789.pdf.

[2]  "Crypto asset" refers to an asset that is issued and/or transferred using distributed ledger or blockchain technology.

Paul Grewal
December 15, 2023
Page 2

The Commission disagrees with the Petition's assertion that application of existing securities statutes and regulations to crypto asset securities, issuers of those securities, and intermediaries in the trading, settlement, and custody of those securities is unworkable. Moreover, the Commission has discretion to determine the timing and priorities of its regulatory agenda, including with respect to discretionary rulemaking such as that requested in the Petition.  *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007).  Any consideration of whether and, if so, how to alter the existing regulatory regime may be informed by, among other things, data and information provided by numerous undertakings directly or indirectly relating to crypto asset securities that the Commission is currently pursuing.[3]  Accordingly, the Commission concludes that it is appropriate to deny the Petition.  The Commission is also engaged in many undertakings that relate to regulatory priorities extending well beyond crypto asset securities.[4] The requested regulatory action would significantly constrain the Commission's choices regarding competing priorities, and the Commission declines to undertake it at this time.

The Commission appreciates receiving Petitioner's considered views on the issues related to crypto asset securities raised in the Petition.  The Commission benefits from engagement with market participants, including those focused on crypto asset securities, and will continue to so engage.  To the extent that future circumstances warrant, the Commission may undertake further consideration of issues raised in the Petition.

By the Commission,


Vanessa A. Countryman
Secretary

---

[3]  *See, e.g.*, *Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, 86 Fed. Reg. 11627 (Feb. 26, 2021); *Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer*, 87 Fed. Reg. 23054, 23057 n.36 (Apr. 18, 2022); *Regulation Best Execution*, 88 Fed. Reg. 5440, 5448-49, 5540-42 (Jan. 27, 2023); *Safeguarding Advisory Client Assets*, 88 Fed. Reg. 14672, 14676, 14688-94, 14700, 14706, 14710, 14715, 14726 (Mar. 9, 2023); *Regulation Systems Compliance and Integrity*, 88 Fed. Reg. 23146, 23166-69 (Apr. 14, 2023); *Supplemental Information and Reopening of Comment Period for Amendments Regarding the Definition of "Exchange,"* 88 Fed. Reg. 29448 (May 5, 2023).

[4]  *See, e.g.*, Office of Management and Budget, Office of Information and Regulatory Affairs, *Securities and Exchange Commission Agency Rule List – Fall 2023* (Dec. 6, 2023), https://www.reginfo.gov/public/do/eAgendaMain; *see also Regulatory Flexibility Agenda*, 88 Fed. Reg. 48694 (July 27, 2023).