IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

COINBASE, INC.,

*Petitioner,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of an Order of the
Securities and Exchange Commission
Docket No. 4-789

## BRIEF OF AMICI CURIAE
## SATOSHI ACTION FUND AND TEXAS BLOCKCHAIN COUNCIL
## IN SUPPORT OF PETITIONER

Joshua B. Simmons
Frank Scaduto
Michael J. Showalter
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
fscaduto@wiley.law

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Satoshi Action Fund and Texas Blockchain Council state that each has no parent corporation and no publicly held corporation that owns 10% or more of its stock.

March 18, 2024

*/s/ Frank Scaduto*
Frank Scaduto

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES .................................................................................. iii

INTERESTS OF AMICI CURIAE........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT .......................................................................................................3

    I.   The SEC's Unauthorized Enforcement Actions Jeopardize The Tangible Benefits That The Digital Asset Industry Offers Everyday Americans..........3

    II.  The SEC's Refusal To Conduct Rulemaking Is Unlawfully Foreclosing An Orderly Process That Would Account For State Laws And Regulations. ......8

CONCLUSION ...................................................................................................13

CERTIFICATIONS OF COMPLIANCE ............................................................14

CERTIFICATE OF SERVICE ...........................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Alden v. Maine,*
    527 U.S. 706 (1999).........................................................10

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023)...............................................10, 12

*DHS v. Regents of the Univ. of California,*
    140 S. Ct. 1891 (2020).....................................................11

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012)............................................................9

*LEJILEX v. SEC,*
    No. 24-CV-168 (N.D. Tex. Feb. 24, 2024)........................8

*McCulloch v. Maryland,*
    17 U.S. (4 Wheat.) 316 (1819) .........................................11

*New York v. United States,*
    505 U.S. 144 (1992)..........................................................10

*NFIB* v. *OSHA,*
    595 U.S. 109 (2022)............................................................9

*NLRB v. Bell Aerospace,*
    416 U.S. 267 (1974)............................................................8

*Sessions v. Dimaya,*
    584 U.S. 148 (2018)..................................................9, 10, 11

*United States v. Lopez,*
    514 U.S. 549 (1995)..........................................................11

*Wayman v. Southard,*
    23 U.S. (10 Wheat.) 1 (1825)...........................................10

*West Virginia* v. *EPA,*
    597 U.S. 697 (2022)............................................................9

**Statutes and Regulations**

H.B. 851, 94th Gen. Assembl., Reg. Sess. (Ark. 2023)..........................12

H.B. No. 1666, 88th Leg. (Tex. 2023)....................................12

S.B. 178, 68th Leg. (Mont. 2023) ........................................12

**Other Authorities**

Ali Menati et al., *High resolution modeling and analysis of cryptocurrency mining's impact on power grids: Carbon footprint, reliability, and electricity price*, Advances in Applied Energy 10 (June 2023), https://tinyurl.com/4p97r475 ..........................5

Allyson Chiu, *Limiting crypto helped the Texas power grid weather a heat wave*, Washington Post (July 15, 2022), https://tinyurl.com/5c7ruzyb................................5

Andrii Garanin, *Bitcoin Mining Can Help Fight Methane Emissions*, Bitcoin Magazine (Dec. 15, 2023), https://tinyurl.com/yz2ux5hz ....................6

Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989) ..........................9

Brady Dale, *Crypto mining advocate sees green business in abandoned gas wells*, Axios (Jan. 27, 2023), https://tinyurl.com/shbrp9ne .................................6

Corey Kilgannon, *A Bitcoin Boom Fueled by Cheap Power, Empty Plants and Few Rules*, N.Y. Times (Dec. 6, 2021), https://tinyurl.com/2sfra4zd .................................4

David Attlee, *1.5M houses could be powered by the energy Texas miners returned*, CoinTelegraph (Jan. 6, 2023), https://tinyurl.com/2mbnyyv3 .........................5

Jake Chervinsky & Amanda Tuminelli, *In* Lejilex vs. SEC*, Crypto Goes on Offense in the Courts*, Consensus Magazine (Mar. 8, 2024), https://tinyurl.com/y8pwr3ra....................7

Jason Brett, Congress Creates A Storm Of Crypto Legislation, Forbes (Aug. 3, 2023), tinyurl.com/2ms6u8by ...............................................9

Joseph Jasperse, University of Pennsylvania Wharton School, *50-State Review of Cryptocurrency and Blockchain Regulation*, tinyurl.com/3s9ueazm.......................................................13

KPMG, *Bitcoin's role in the ESG imperative* (2023), https://tinyurl.com/mt79adm8 ........................................6, 7

Mitchell Ferman, *Cryptocurrency miners line up to come to Texas, and rural counties are welcoming them*, Texas Tribune (Oct. 3, 2022), https://tinyurl.com/3cdar68c......................................4

Pedro Solimano, *Bitcoin Companies Must Provide 'Proof of Reserves' in Texas*, Yahoo! Finance (May 18, 2023), tinyurl.com/hbfppcwv .................12

Satoshi Action Fund, *Our Proof-of-Work*, tinyurl.com/24rb3hkt .........................12

Satoshi Action Fund, *What is Bitcoin Mining?* (Dec. 5, 2022), https://tinyurl.com/ycx2jm95.................................................4

*SEC's Unlawful Targeting of Digital Asset Industry Challenged in New Lawsuit From Startup LEJILEX and Crypto Freedom Alliance of Texas*, Business Wire, (Feb. 21, 2024), https://tinyurl.com/2s4j73s5 ...............................................7

Texas Blockchain Council, *Texas Takes Proof of Reserves Bull by the Horns*, tinyurl.com/3mv2r2h2 ........................................12

Tom Blackstone, 2024 Cryptocurrency Adoption and Sentiment Report, Security.org (Jan. 30, 2024), https://tinyurl.com/59fwzmw2.................................................3

Will Szamosszegi, *Bitcoin mining produces energy gold. Let's use it to help save our planet*, Yahoo! Finance (Apr. 20, 2023), https://tinyurl.com/254b63yy...............................................7

*Amici* are two of the leading digital asset and blockchain trade associations in the United States. They seek to foster a legal and regulatory environment in which the millions of U.S. citizens who participate in the digital asset industry can create and apply blockchain technologies for the benefit of the U.S. economy.

Satoshi Action Fund is a non-profit organization that advocates for digital assets and their mining technology, with a particular focus on Bitcoin regulation at state and local levels. Satoshi Action Fund designs leading legislation and policies that many states follow to develop sustainable creation and use of digital assets. This regulatory clarity helps ensure that the United States remains the global hub for these technologies and that Americans have the right to save and transact in digital assets the same way that they can with cash.

The Texas Blockchain Council is a nonprofit industry association working to make the State of Texas the jurisdiction of choice for bitcoin, blockchain, and digital asset innovation. Texas is the digital asset mining capital of the world, and over half of U.S. Bitcoin mining takes place in Texas. Texas Blockchain Council pursues

---

[1] No party's counsel authored any part of this brief. No party, party's counsel, or any other person or entity, other than *amici* and their counsel, contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E). Petitioner and Respondent consent to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2).

legal actions that further its mission, including a recent successful challenge to efforts by the U.S. Department of Energy to demand information in violation of statutory and regulatory requirements.

The digital asset industry faces grave threats from regulatory uncertainty. Many states, including Texas, have advanced the industry—and the tens of thousands of jobs and billions of dollars in economic value that flow from it—by enacting clear and robust laws and regulations for digital assets. Yet the Securities and Exchange Commission (the "SEC" or "Commission") undermines those advances nationwide through its regulation-by-enforcement actions against participants in the digital asset industry—without required Congressional action or agency rulemaking. The *amici*'s interest in filing this brief is to assist the Court in understanding the significance of this cloud of uncertainty that the SEC has caused for the digital asset industry, particularly in contrast to emerging clarity from state laws and regulations.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The stakes of this case are immense for everyday Americans. An estimated 40% of Americans own digital assets. Digital asset mining—the process of creating digital assets traded on platforms such as Coinbase—is driving economic growth and job creation, especially in rural areas. It is also delivering solutions to some of the country's most pressing environmental problems. Through continued expansion

2

and innovation, the digital asset industry can strengthen the nation's power grid, reduce greenhouse gases, and hasten the shift to renewable energy.

The SEC's unauthorized *ad hoc* enforcement jeopardizes these tangible benefits. In the absence of federal legislation from Congress, the notice-and-comment rulemaking sought by Petitioner is a prerequisite to adjudication and will allow an orderly process that balances the viewpoints of all stakeholders, including miners and state regulators. And while *amici* believe the results of such rulemaking should ultimately defer to state and local legislation and oversight, that debate should occur in a way that does not sow chaos and chill the growth of a significant new industry for modern America. For these reasons, *amici* support Coinbase's petition for review.

## ARGUMENT

I. **The SEC's Unauthorized Enforcement Actions Jeopardize The Tangible Benefits That The Digital Asset Industry Offers Everyday Americans.**

An estimated 40% of Americans own digital assets, and that number is expected to continue growing.[2] Many of the digital assets traded on Coinbase and similar platforms are generated through a process known as mining. Mining uses specialized computer hardware to solve complex mathematical problems that allow

---

[2] Tom Blackstone, *2024 Cryptocurrency Adoption and Sentiment Report*, Security.org (Jan. 30, 2024), https://tinyurl.com/59fwzmw2.

digital assets, such as Bitcoin, to be added into circulation in a steady and secure way. Because of the increasing competitiveness and complexity of this process—which is akin to finding a needle in a haystack—mining continues to involve more and more companies and groups of people who must pool together resources to increase their chances of success.[3] These efforts are occurring in every state, and they are producing real economic and environmental benefits that reach real Americans.

Digital asset mining is creating jobs and economic opportunities, especially in rural areas. In Texas, for example, mining companies have brought competitive salaries and meaningful tax dollars to rural counties, which in turn have enhanced the quality of local services and infrastructure for entire communities.[4] And in upstate New York, among other regions, companies often conduct mining by repurposing abandoned structures, such as old power plants, shuttered factories, and scrapyard shipping containers.[5]

---

[3] Satoshi Action Fund, *What is Bitcoin Mining?* (Dec. 5, 2022), https://tinyurl.com/ycx2jm95.

[4] Mitchell Ferman, *Cryptocurrency miners line up to come to Texas, and rural counties are welcoming them*, Texas Tribune (Oct. 3, 2022), https://tinyurl.com/3cdar68c.

[5] Corey Kilgannon, *A Bitcoin Boom Fueled by Cheap Power, Empty Plants and Few Rules*, N.Y. Times (Dec. 6, 2021), https://tinyurl.com/2sfra4zd

In addition, digital asset mining can strengthen the nation's power grid. Although mining is an energy-intensive process, it can swiftly reduce consumption by up to 97%. The flexibility of mining loads can bolster grid resilience during emergencies, significantly mitigate power shortages and market disruptions, and reduce the need for costly and carbon-intensive plants.[6] For instance, during winter storm Elliot in February 2022, Bitcoin miners delivered back enough power to Texas ratepayers to heat 1.5 million homes or keep 300 hospitals in operation.[7] Likewise, amid the summer heatwave later that year, Bitcoin miners significantly curtailed energy usage, contributing to grid resiliency and making energy available to cool homes and businesses.[8]

Digital asset mining can also help the environment by reducing greenhouse gases. It does so in at least three ways. *First*, many mining companies use methane emissions to power their operations. By harnessing methane that would otherwise be vented or flared from gas fields and landfills, miners reduce atmospheric

---

[6] Ali Menati et al., *High resolution modeling and analysis of cryptocurrency mining's impact on power grids: Carbon footprint, reliability, and electricity price*, Advances in Applied Energy 10 (June 2023), https://tinyurl.com/4p97r475.

[7] David Attlee, *1.5M houses could be powered by the energy Texas miners returned*, CoinTelegraph (Jan. 6, 2023), https://tinyurl.com/2mbnyyv3.

[8] Allyson Chiu, *Limiting crypto helped the Texas power grid weather a heat wave*, Washington Post (July 15, 2022), https://tinyurl.com/5c7ruzyb.

emissions of a key greenhouse gas.[9]  Efforts are underway to spur broader adoption of methane-reducing production methods through state policy that incentivizes the cleanup of orphaned oil and gas wells to power digital asset mining.[10]  Given the warming intensity of methane, it may only be a few years before the entire Bitcoin network is greenhouse-gas negative.

*Second*, digital asset mining could propel the adoption of renewable energy. Solar and wind energy projects, crucial for diminishing grid emissions, often generate excess power during periods of low demand (*e.g.*, because of mismatches between when the sun is shining or the wind is strong versus when consumers most need electricity).  Digital asset miners can absorb this surplus, offering the consistent demand essential for these projects' economic viability.  And by setting up in more remote areas, miners help boost demand for renewable projects that might not otherwise exist.  It is no surprise, then, that Texas leads the nation in both renewable energy production and Bitcoin production.[11]

*Third*, the heat generated from the specialized computer hardware used for digital asset mining can be recycled to heat homes, offices, and even swimming

---

[9] Andrii Garanin, *Bitcoin Mining Can Help Fight Methane Emissions*, Bitcoin Magazine (Dec. 15, 2023), https://tinyurl.com/yz2ux5hz.

[10] Brady Dale, *Crypto mining advocate sees green business in abandoned gas wells*, Axios (Jan. 27, 2023), https://tinyurl.com/shbrp9ne.

[11] KPMG, *Bitcoin's role in the ESG imperative* (2023), https://tinyurl.com/mt79adm8.

pools.[12]  Innovation is just beginning in this space, but the Canadian city of North Vancouver already has plans to be heated by Bitcoin mining, and countries in Europe are heating greenhouses with the same approach.[13]

The social benefits generated by the digital asset industry are real and growing, but they are not assured.  As discussed in Part II below, in the absence of federal legislation by Congress, the states are already setting clear guidance that is encouraging robust investment and competition.  However, the SEC's unauthorized effort to regulate by *ad hoc* enforcement creates significant uncertainty that threatens further growth of the digital asset industry and the benefits it provides our country. As one digital asset entrepreneur explained:  "The SEC's rogue enforcement actions targeting our industry have paralyzed those of us who just want to build lawful businesses and technologies."[14]  The SEC's overreach similarly "impedes the ability of other authorities whose jurisdiction may *properly* extend to digital assets to enter the field, making it harder for [stakeholders] to convince [state] policymakers to

---

[12] *Id.*

[13] Will Szamosszegi, *Bitcoin mining produces energy gold. Let's use it to help save our planet*, Yahoo! Finance (Apr. 20, 2023), https://tinyurl.com/254b63yy.

[14] *SEC's Unlawful Targeting of Digital Asset Industry Challenged in New Lawsuit From Startup LEJILEX and Crypto Freedom Alliance of Texas*, Business Wire (Feb. 21, 2024), https://tinyurl.com/2s4j73s5; *see also* Jake Chervinsky & Amanda Tuminelli, *In* Lejilex vs. SEC*, Crypto Goes on Offense in the Courts*, Consensus Magazine (Mar. 8, 2024), https://tinyurl.com/y8pwr3ra ("Many builders are afraid to operate in the United States due to fear of an SEC enforcement action.").

develop and adopt the sensible policies that [each state's] digital asset industry needs."[15] The uncertainty and paralysis created by the SEC could cause digital asset companies to move out of the United States altogether.

The need for clear rules, with adequate notice rooted in congressional authority, is especially crucial where the SEC seeks to impose "adverse consequences" and "liability" on the digital asset industry "for past actions which were taken in good-faith reliance on [the SEC's] pronouncements." *NLRB v. Bell Aerospace*, 416 U.S. 267, 295 (1974). Digital asset companies built their businesses in reliance on a hands-off approach by the SEC and now they find themselves in the SEC's crosshairs. As Coinbase has pointed out, the unpredictable breach of these reliance interests could break "the backbone of the digital asset ecosystem." JA67; *see also* Br. for Pet. at 32-35 ("Coinbase Br.").

Simply put, the SEC's use of enforcement in lieu of rulemaking is an existential threat to the digital asset industry.

## II. The SEC's Refusal To Conduct Rulemaking Is Unlawfully Foreclosing An Orderly Process That Would Account For State Laws And Regulations.

The SEC's regulation of the digital asset industry via enforcement-without-rulemaking flouts bedrock principles of constitutional law.

---

[15] Complaint ¶ 63 (ECF No. 1), *LEJILEX v. SEC*, No. 24-CV-168 (N.D. Tex. Feb. 24, 2024).

For one, as the Supreme Court has repeatedly emphasized, "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Our Constitution does not permit a regime that "leav[es] the people in the dark about what the law demands and allow[s] prosecutors and courts to make it up." *Sessions v. Dimaya*, 584 U.S. 148, 175 (2018) (Gorsuch, J., concurring). Rather, "[r]udimentary justice requires that those subject to the law must have the means of knowing what it prescribes." Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989).

For another, when Congress has not acted with respect to a particular subject matter, federal agencies cannot act either. Federal agencies "are creatures of statute," which means they "have only those powers given to them by Congress." *NFIB* v. *OSHA*, 595 U.S. 109, 117 (2022); *West Virginia* v. *EPA*, 597 U.S. 697, 723 (2022). Congress has not directed the SEC to act with respect to digital assets. Moreover, the number of pending bills related to digital assets suggests that Congress believes that legislative action is needed.[16]

Even if and when Congress has spoken, federal agencies cannot unilaterally decide important policy issues. *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43

---

[16] *See* Jason Brett, *Congress Creates A Storm Of Crypto Legislation*, Forbes (Aug. 3, 2023), tinyurl.com/2ms6u8by.

(1825). It is "Congress, rather than the executive or judicial branch," that "define[s] what conduct is sanctionable and what is not." *Dimaya*, 584 U.S. at 156 (Kagan, J., for plurality). When it comes to policy, federal agencies may decide only "interstitial matters … in the course of a statute's daily administration." *Biden v. Nebraska*, 143 S. Ct. 2355, 2380 (2023) (Barrett, J., concurring) (quoting Justice Breyer). They cannot decide "important subjects." *Id.* at 2381 (quoting *Wayman*, 10 Wheat. at 43). Federal agencies execute Congress's law; they are not legislatures.

When federal statutory law does not reach a particular subject, its governance is left to the states. The Constitution does not intend that result to be anomalous or peculiar. To the contrary, the Constitution makes the states "residuary sovereigns and joint participants in the governance of the Nation." *Alden v. Maine*, 527 U.S. 706, 748 (1999); *see also, e.g.*, *New York v. United States*, 505 U.S. 144, 188 (1992) ("[t]he Constitution … 'leaves to the several States a residuary and inviolable sovereignty'" (quoting The Federalist No. 39)). Indeed, because the federal government is "one of enumerated powers," *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819), the founding generation expected that it would regulate in only "few and defined" areas while the states could regulate on "numerous and indefinite" subjects. *United States v. Lopez*, 514 U.S. 549, 552 (1995) (quoting The Federalist No. 45). This "constitutionally mandated" division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." *Id.*

The SEC's use of adjudication to impose new standards of conduct on the digital asset industry runs roughshod over these principles.

*First*, the SEC is depriving the digital-asset industry of the fair notice the Constitution requires. Congress enacted the securities statutes in the early 1930s, and it is, to put it mildly, not readily apparent that they reach digital assets invented nearly a century later. *See* Coinbase Br. at 30. The SEC's adjudicative policymaking is effectively retroactive, revealing to regulated entities what the law forbids only after the fact. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1934 (2020) (Kavanaugh, J., concurring) (agency adjudications are "concerned with the determination of past and present rights and liabilities" (quoting Attorney General's Manual on the Administrative Procedure Act 14 (1947)). Regulated entities are "le[ft] … in the dark about what the law demands." *Dimaya*, 584 U.S. at 175 (Gorsuch, J.).

*Second*, by attempting to step in where Congress has not acted, the SEC is exercising power that it does not have and that belongs to the states. Because the question how to regulate the digital-asset industry is an "important subject[]," *Nebraska*, 143 S. Ct. at 2381 (Barrett, J.), it is an issue for legislative determination. Given the continued Congressional inaction, an increasing number of state legislatures are passing laws with clear standards that address the regulatory needs of both consumers and industry.

In 2023, for example, Texas enacted its Proof of Reserves Bill, which requires digital asset exchanges to maintain sufficient reserves to fulfill their clients' payment obligations.[17] Among other things, the law requires exchanges to hold reserves in an amount sufficient to immediately make good on all possible customer withdrawals, to segregate customer and corporate funds, and to report annually on outstanding consumer liabilities.[18] The law addresses head-on the concerns that are supposedly animating the SEC to act in the wake of recent events in the industry.

Other states are also taking action to meet regulatory goals. Arkansas and Montana, for example, both passed Right to Mine laws in 2023.[19] Their bills, which adopt model legislation carefully crafted by *amicus* Satoshi Action Fund, ensure local governments have the tools to keep out bad actors and protect miners from specific types of discrimination.[20] Many other states have recently enacted

---

[17] *See* H.B. No. 1666, 88th Leg. (Tex. 2023).

[18] *See* Texas Blockchain Council, *Texas Takes Proof of Reserves Bull by the Horns*, tinyurl.com/3mv2r2h2; Pedro Solimano, *Bitcoin Companies Must Provide 'Proof of Reserves' in Texas*, Yahoo! Finance (May 18, 2023), tinyurl.com/hbfppcwv.

[19] *See* H.B. 851, 94th Gen. Assembl., Reg. Sess. (Ark. 2023); S.B. 178, 68th Leg. (Mont. 2023).

[20] *See* Satoshi Action Fund, *Our Proof-of-Work*, tinyurl.com/24rb3hkt.

legislation or are currently considering legislation related to digital assets and mining.[21]

Rulemaking would allow an orderly process for public discussion of how any SEC regulation should account for these state efforts. With policymaking by adjudication, however, the SEC is circumventing the notice-and-comment process and denying Americans the kind of transparent lawmaking that the states are currently undertaking and that the Constitution demands. This Court should put a stop to it.

## CONCLUSION

*Amici* support the petition for review.

March 18, 2024

*/s/ Frank Scaduto*
Joshua B. Simmons
Frank Scaduto
Michael J. Showalter
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
fscaduto@wiley.law

*Counsel for Amici Curiae*

---

[21] *See* Joseph Jasperse, University of Pennsylvania Wharton School, *50-State Review of Cryptocurrency and Blockchain Regulation*, tinyurl.com/3s9ueazm (providing an already outdated report on state laws).

# CERTIFICATIONS OF COMPLIANCE

1.  This amicus brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 14 point Times New Roman font.

2.  This amicus brief motion complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 2,839 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as calculated using the word count function on Microsoft Word software.

3.  Pursuant to this Court's Rule 31.1(c), the text of the electronic and hard copies of this brief are identical.

4.  Pursuant to this Court's Rule 31.1(c), a virus scan was run on the electronic copy of this brief using version 3.2.1000.28 of CylancePROTECT and Checkpoint Threat API and no viruses were detected.

5.  Pursuant to this Court's Rule 46.1(e), at least one attorney whose name appears on this brief is a member in good standing of the bar of this Court.


March 18, 2024                                    */s/ Frank Scaduto*
                                                 Frank Scaduto

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2024, the foregoing brief was filed via CM/ECF. Service was accomplished on all parties or their counsel of record via CM/ECF.

March 18, 2024                                         */s/ Frank Scaduto*
                                                       Frank Scaduto