# No. 23-3202

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

COINBASE, INC.,

*Petitioner,*

v.

SECURITIES & EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of an Order of the
Securities and Exchange Commission

## BRIEF OF RESPONDENT
## SECURITIES AND EXCHANGE COMMISSION

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

TRACEY A. HARDIN
*Assistant General Counsel*

DAVID D. LISITZA
*Senior Appellate Counsel*

EZEKIEL L. HILL
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.7724 (Hill)
hillez@sec.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................... i

TABLE OF AUTHORITIES ................................................. iii

INTRODUCTION ....................................................................1

COUNTERSTATEMENT OF JURISDICTION .......................................3

COUNTERSTATEMENT OF THE ISSUES..........................................4

COUNTERSTATEMENT OF RELATED CASES..................................4

COUNTERSTATEMENT OF THE CASE...........................................5

    A.    Petitions for Commission Rulemaking .....................................5

    B.    Coinbase filed a rulemaking petition requesting that the Commission create an entirely new regulatory framework for crypto asset securities ..6

    C.    Coinbase filed a petition for writ of mandamus to compel the Commission to act immediately on the rulemaking petition ....................7

    D.    The Commission denied the rulemaking petition and explained its reasons for doing so..................................................................8

STANDARD OF REVIEW ......................................................9

SUMMARY OF ARGUMENT ................................................9

ARGUMENT ........................................................................11

I.    The Commission reasonably exercised its discretion over its regulatory agenda in denying Coinbase's rulemaking petition .........................................11

    A.    The Commission reasonably determined not to entirely replace the existing regulatory framework at this time ...............................................13

B.    The Commission reasonably considered the impact of the requested rulemaking on its regulatory agenda ........................................................17

C.    The Commission reasonably explained its disagreement with the petition's premise that application of the existing regulatory framework to crypto asset securities is "unworkable"............................22

II.   There are no compelling circumstances necessitating rulemaking.................26

A.    The Commission's position regarding its authority over crypto asset securities is unchanged.............................................................................26

B.    There has been no change in the factual predicate underlying the federal securities laws necessitating rulemaking .....................................32

C.    The Commission's exercise of its discretion to bring enforcement actions for violations of existing law does not necessitate rulemaking...36

III.  The Commission sufficiently explained its reasonable basis for denying Coinbase's petition and there is no basis for this Court to require rulemaking .......................................................................................................41

A.    The Commission reasonably explained its determination ......................41

B.    Should this Court disagree, the proper remedy is a remand ...................43

CONCLUSION ......................................................................................................47

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Am. Horse Protection Ass'n, Inc. v. Lyng*,
    812 F.2d 1 (D.C. Cir. 1987) ................................................................. 25, 34, 45

*City of Colorado Springs v. Solis*,
    589 F.3d 1121 (10th Cir. 2009) ........................................................... 42

*Compassion Over Killing v. FDA*,
    849 F.3d 849 (9th Cir. 2017) ............................................................... 21

*Continental Marketing Corp. v. SEC*,
    387 F.2d 466, 471 (10th Cir. 1967) ..................................................... 27

*Defs. of Wildlife v. Gutierrez*,
    532 F.3d 913 (D.C. Cir. 2008) ............................................... 12, 19, 25

*Dickson v. Secretary of Defense*,
    68 F.3d 1396 (D.C. Cir. 1995) ............................................................ 25

*Environmental Health Trust v. FCC*,
    9 F.4th 893 (D.C. Cir. 2021) ............................................................... 25

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ............................................................................ 34

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ............................................................................ 40

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ............................................................................ 25

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ............................................................................ 43

*Flyers Rts. Educ. Fund, Inc. v. United States Dep't of
    Transportation*,
    957 F.3d 1359 (D.C. Cir. 2020) ............................................. 19, 25, 42

*Gardner v. FCC,*
    530 F.2d 1086 (D.C. Cir. 1976) .......................................................... 42

*Geller v. FCC,*
    610 F.2d 973 (D.C. Cir. 1979) ............................................... 33, 35, 45

*Gen. Elec. Co. v. EPA,*
    53 F.3d 1324 (D.C. Cir. 1995) .......................................................... 40

*In re Barr Lab'ys, Inc.,*
    930 F.2d 72 (D.C. Cir. 1991) ............................................................ 21

*Int'l Union v. Chao,*
    361 F.3d 249 (3d Cir. 2004) .......................... 9, 12, 18, 20, 26, 44, 45

*Maier v. EPA,*
    114 F.3d 1032 (10th Cir. 1997) ........................................................ 17

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ............................................................... 9, 12, 17

*Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States,*
    883 F.2d 93 (D.C. Cir. 1989) ........................................................... 44

*Natural Resources Defense Council, Inc. v. SEC,*
    606 F.2d 1031 (D.C. Cir. 1979) ....................................................... 37

*NLRB v. FedEx Freight, Inc.,*
    832 F.3d 432 (3d Cir. 2016) ............................................................ 32

*Oil, Chem. & Atomic Workers Union v. OSHA,*
    145 F.3d 120 (3d Cir. 1998) ............................................................ 17

*Olivares v. TSA,*
    819 F.3d 454 (D.C. Cir. 2016) ......................................................... 43

*Patel v. INS,*
    638 F.2d 1199 (9th Cir. 1980) ......................................................... 40

*Pfaff v. HUD*,
 88 F.3d 739 (9th Cir. 1996) ...............................................40

*Pro. Drivers Council v. Bureau of Motor Carrier Safety*,
 706 F.2d 1216 (D.C. Cir. 1983)...........................................45

*Pub. Citizen Health Rsch. Grp. v. Chao*,
 314 F.3d 143 (3d Cir. 2002) ................................................44

*Reves v. Ernst & Young*,
 494 U.S. 56 (1990)..............................................................27

*Roelofs v. Sec'y of Air Force*,
 628 F.2d 594 (D.C. Cir. 1980)..............................................42

*SEC v. Aqua-Sonic Prods. Corp.*,
 687 F.2d 577 (2d Cir. 1982) ................................................27

*SEC v. Arbitrade Ltd.*,
 668 F. Supp. 3d 1290 (S.D. Fla. 2023) .................................24

*SEC v. Blockvest, LLC*,
 No. 18-cv-2287, 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ..........................24

*SEC v. Chenery Corp.*,
 332 U.S. 194 (1947)...................................................... 38, 39

*SEC v. Coinbase, Inc.*,
 No. 23-cv-4738, 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024)
 ........................................................ 6, 24, 28, 29, 30, 31

*SEC v. Edwards*,
 540 U.S. 389 (2004)...................................................... 26, 27

*SEC v. Genesis Glob. Cap., LLC*,
 No. 23-cv-00287, 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) .....................24

*SEC v. Kik Interactive Inc.*,
 492 F. Supp. 3d 169 (S.D.N.Y. 2020) ..................................24

*SEC v. Koscot Interplanetary, Inc.*,
497 F.2d 473 (5th Cir. 1974) ...............................................................27

*SEC v. LBRY, Inc.*,
639 F. Supp. 3d 211 (D.N.H. 2022)......................................... 24, 29

*SEC v. NAC Found., LLC*,
512 F. Supp. 3d 988 (N.D. Cal. 2021) ...............................................24

*SEC v. Nat. Diamonds Inv. Co.*,
No. 19-cv-80633, 2019 WL 13277296 (S.D. Fla. May 28, 2019) ...................24

*SEC v. Ralston Purina Co.*,
346 U.S. 119 (1953).........................................................................34

*SEC v. Ripple Labs, Inc.*,
682 F. Supp. 3d 308 (S.D.N.Y. 2023) ...............................................24

*SEC v. Ripple Labs, Inc.*,
No. 20-cv-10832, 2021 WL 1814771 (S.D.N.Y. May 6, 2021) ......................28

*SEC v. SG Ltd.*,
265 F.3d 42 (1st Cir. 2001)...............................................................27

*SEC v. Telegram Grp. Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...............................................24

*SEC v. Terraform Labs Pte. Ltd.*,
No. 23-cv-1346, 2023 WL 4858299 (S.D.N.Y. July 31, 2023)
............................................................... 24, 28, 29, 32, 39

*SEC v. Terraform Labs Pte. Ltd.*,
No. 23-cv-1346, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023)........................24

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946).........................................................................27

*SEC v. Wahi*,
No. 22-cv-01009, 2024 WL 896148 (W.D. Wash. Mar. 1, 2024) ....................24

*Shays v. FEC*,
    424 F. Supp. 2d 100 (D.D.C. 2006) ........................................................ 40, 41, 45

*Tourus Recs., Inc. v. DEA*,
    259 F.3d 731 (D.C. Cir. 2001) ................................................................42

*Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail &
Transportation Workers v. Fed. R.R. Admin.*,
    10 F.4th 869 (D.C. Cir. 2021) ................................................................13

*United States v. Felton*,
    No. 22-14215, 2024 WL 853687 (11th Cir. Feb. 29, 2024) ................................24

*United States v. Kane*,
    No. 23-cr-20172, 2023 WL 8277602 (S.D. Fla. Nov. 30, 2023) ......................24

*United States v. Kwok*,
    No. 23-cr-118, 2024 WL 1407057 (S.D.N.Y. Apr. 2, 2024) ............................24

*United States v. Zaslavskiy*,
    No. 17-cr-647, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) .........................24

*WWHT, Inc. v. FCC*,
    656 F.2d 807 (D.C. Cir. 1981) .................................................... 11-12, 33, 34, 45

**Statutes**

5 U.S.C. 553(e) ................................................................................5

5 U.S.C. 555(e) ..............................................................................3, 6

5 U.S.C. 706(2)(A) .........................................................................9, 12

<u>Securities Act of 1933, 15 U.S.C. 77a, et seq.</u>

    Section 2(a)(1), 15 U.S.C. 77b(a)(1) .................................................26

    Section 9, 15 U.S.C. 77i .................................................................3

    Section 19(a), 15 U.S.C. 77s(a) .......................................................5

Section 20(b), 15 U.S.C. 77t(b) ...........................................................38

Section 23, 15 U.S.C. 77w ..................................................................31

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.

Section 3(a)(10), 15 U.S.C. 78c(a)(10)...............................................26

Section 3(f), 15 U.S.C. 78c(f) .............................................................36

Section 5, 15 U.S.C. 78e .....................................................................35

Section 10(b), 15 U.S.C. 78j(b) ..........................................................35

Section 13(e)(2), 15 U.S.C. 78m(e)(2) ...............................................35

Section 15(a)(2), 15 U.S.C. 78o(a)(2) .................................................35

Section 17A(b)(1), 15 U.S.C. 78q-1(b)(1)..................................... 35, 36

Section 17A(b)(2), 15 U.S.C. 78q-1(b)(2)...........................................35

Section 21(a)(1), 15 U.S.C. 78u(a)(1) .................................................27

Section 21(d), 15 U.S.C. 78u(d) .........................................................38

Section 23(a)(1), 15 U.S.C. 78w(a)(1) ..................................................5

Section 25, 15 U.S.C. 78y.....................................................................3

Section 25(b), 15 U.S.C. 78y(b) .........................................................39

Section 25(b), 15 U.S.C. 78y(b)(1).....................................................39

Section 26, 15 U.S.C. 78z....................................................................31

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......................................5

Financial Data Transparency Act of 2022,
　　Pub. L. No. 117-263, tit. LVIII, 136 Stat. 3421 (2022).......................................19

**Commission Regulations**

17 C.F.R. 200.735-4(d)(2)(ii)(A)............................................................................31

17 C.F.R. 201.192(a).................................................................................... 5, 6, 7

**Commission Releases**

*Custody of Digital Asset Securities by Special Purpose Broker-Dealers*,
　　86 Fed. Reg. 11627 (Feb. 26, 2021) ..................................................14

*Further Definition of "As a Part of Regular Business" in the Definition of
　　Dealer and Government Securities Dealer*,
　　87 Fed. Reg. 23054 (Apr. 18, 2022) ..................................................15

*Further Definition of "As a Part of Regular Business" in the Definition of
　　Dealer and Government Securities Dealer in Connection with Certain
　　Liquidity Providers*,
　　89 Fed. Reg. 14938 (Feb. 29, 2024) ........................................... 15-16

*Order Competition Rule*,
　　88 Fed. Reg. 128 (Jan. 3, 2023)........................................................19

*Regulation Best Execution*,
　　88 Fed. Reg. 5440 (Jan. 27, 2023)....................................................16

*Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency
　　of Better Priced Orders*,
　　87 Fed. Reg. 80266 (Dec. 29, 2022)..................................................19

*Regulation Systems Compliance and Integrity*,
　　88 Fed. Reg. 23146 (Apr. 14, 2023) ........................................... 16, 24

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange
　　Act of 1934: The DAO*,
　　Release No. 81207, 2017 WL 7184670 (July 25, 2017) ............. 27, 28

*Safeguarding Advisory Client Assets*,
88 Fed. Reg. 14672 (Mar. 9, 2023) ..................................................................17

*Supplemental Information and Reopening of Comment Period for Amendments Regarding the Definition of "Exchange,"*
88 Fed. Reg. 29448 (May 5, 2023) ..................................................................16

**Miscellaneous**

Coinbase Global, Inc., Form S-1 Registration Statement (Feb. 25, 2021) ....... 30, 32

Gary Gensler, Chair, SEC, *Prepared Remarks of Gary Gensler on Crypto Markets Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022) ....................................................................................................31

William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018) .............................................31

Office of Management and Budget, Office of Information and Regulatory Affairs, *Securities and Exchange Commission Agency Rule List – Fall 2023* (Dec. 6, 2023) ....................................................................................................19

Hester M. Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023) .................................................................31

## INTRODUCTION

Petitioner Coinbase, Inc. challenges the denial of a petition for rulemaking in which it requested that respondent Securities and Exchange Commission initiate rulemaking to replace existing securities regulations with a comprehensive and entirely new regulatory framework for crypto asset securities. Coinbase seeks the extraordinary remedy of an order from this Court requiring the Commission to engage in this otherwise discretionary rulemaking, but none of the rare and compelling circumstances that might justify such relief is present here. And the Commission's determination that the rulemaking Coinbase seeks is currently unwarranted was both reasonable and reasonably explained.

The Commission reasonably determined not to exercise its discretion to engage in the requested rulemaking at this time. It disagreed with Coinbase's premise that the existing regulatory framework—statutes and rules carefully crafted to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation—is "unworkable" for crypto asset securities, and it cited both related regulatory initiatives and competing regulatory priorities as reasons not to embark on the wide-ranging rulemaking sought by Coinbase. Coinbase denies that in asking this Court to overturn that reasonable decision and mandate rulemaking it is attempting to dictate the Commission's policy priorities.

But that assertion is belied by the largely policy-based arguments Coinbase makes, none of which provides a legal basis for affirmatively mandating rulemaking.

Coinbase's attempts to manufacture compelling circumstances that might justify immediate rulemaking are unavailing. Far from asserting "sweeping new authority" without "fair notice" (Br. 1-2), the Commission continues to apply legal standards that have existed for decades. And the Commission did not, as Coinbase claims, change its position regarding its authority over crypto assert securities. Nor does Coinbase's assertion that some market participants find compliance with current regulations impossible or not economically viable necessitate rulemaking. Coinbase cites no authority holding that agencies must undertake rulemaking based on such claims of compliance difficulties.

That the Commission has brought crypto-asset-security-related enforcement actions does not require the Commission to grant the rulemaking petition. To the contrary, in authorizing those enforcement actions, the Commission necessarily determined that the agency could assert claims under *existing* law. And the courts presiding over those cases have agreed, an objective judicial assessment that cannot be squared with Coinbase's protestations that those enforcement actions are an unauthorized "power grab" and an act of agency "self-aggrandizement." Br. 1. In any event, it is well-established both that rulemaking and enforcement are not

mutually exclusive paths and that the Commission can proceed through case-by-case adjudication.

Coinbase's alternative assertion that the Commission's reasoned explanation was insufficient both overstates the Administrative Procedure Act's requirement that the Commission provide Coinbase with a "brief statement" of the grounds for denying the rulemaking petition, 5 U.S.C. 555(e), and overlooks the straightforward reasonableness of the Commission's explanation. In all events, ordering the Commission to engage in the requested rulemaking would be an unjustified and impermissible intrusion upon the broad discretion that Congress granted the Commission.

The petition for review should be denied.

## COUNTERSTATEMENT OF JURISDICTION

On December 15, 2023, the Commission denied Coinbase's rulemaking petition. JA5-6. Coinbase timely filed a petition for review of the denial pursuant to Section 9 of the Securities Act of 1933, 15 U.S.C. 77i, and Section 25 of the Securities Exchange Act of 1934, 15 U.S.C. 78y. JA1-4.[1]

---

[1] The rulemaking petition was filed by Coinbase Global, Inc. JA11. The petition for review was filed by Coinbase, Inc. JA2. Coinbase, Inc. is a wholly owned subsidiary of Coinbase Global. Br. i.

## COUNTERSTATEMENT OF THE ISSUES

1. Whether in the exercise of its broad discretion the Commission reasonably denied Coinbase's rulemaking petition where the Commission disagreed with the petition's premise that existing regulations were unworkable, determined that the requested rulemaking was not currently warranted in light of existing regulatory initiatives relating to crypto asset securities and competing priorities, and where Coinbase has not shown compelling circumstances that necessitate the requested rulemaking.

2. Whether the Commission's explanation for exercising its broad discretion to deny Coinbase's rulemaking petition satisfied the APA's "brief statement" requirement because it provided the grounds for the denial.

## COUNTERSTATEMENT OF RELATED CASES

In April 2023, Coinbase filed a petition for writ of mandamus in this Court, seeking to compel the Commission to act on Coinbase's rulemaking petition within seven days. *In re Coinbase, Inc.*, No. 23-1779 (3d Cir.). On December 18, 2023, this Court dismissed the mandamus petition as moot. App. Dkt. 41 (No. 23-1779).

## COUNTERSTATEMENT OF THE CASE

### A.     Petitions for Commission Rulemaking.

The Commission may engage in rulemaking for a number of reasons.  Some rulemakings are mandated by Congress.  *See*, *e.g*., Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 § 764, 124 Stat. 1376, 1785 (2010) (requiring, for example, that the Commission "shall issue rules" regarding "the registration of security-based swap dealers and major security-based swap participants").  More commonly, the Commission engages in rulemaking under its statutory authority to issue rules in its discretion, such as those that the Commission determines are "necessary or appropriate to implement the provisions" of the federal securities laws.  15 U.S.C. 78w(a)(1), 77s(a).  The Commission may choose to initiate such discretionary rulemaking, among other reasons, in response to market events, at the recommendation of its staff, or in response to a petition for rulemaking.

While the federal securities statutes do not expressly address rulemaking petitions, the APA provides that interested persons can petition agencies for rule issuance, amendment, and repeal.  5 U.S.C. 553(e).  And the Commission's Rules of Practice provide that "[a]ny person desiring the issuance, amendment or repeal of a rule of general application may file a petition therefor with the [Commission's] Secretary."  17 C.F.R. 201.192(a).  Once filed, a rulemaking

petition is referred to appropriate Commission staff for consideration, staff may

provide a recommendation to the Commission, and the Commission takes any

action on the petition that it "deems appropriate." *Id.* The Secretary notifies the

petitioner of any action taken by the Commission. *Id.* If the Commission denies

the petition, the APA generally requires the Commission to provide the petitioner

with "a brief statement of the grounds for denial." 5 U.S.C. 555(e).

> **B.** **Coinbase filed a rulemaking petition requesting that the Commission create an entirely new regulatory framework for crypto asset securities.**

On July 21, 2022, Coinbase filed a rulemaking petition requesting that the

Commission issue "rules to govern the regulation of [crypto asset] securities."

JA11-42.[2] The petition argued that the Commission should create "a new

regulatory framework" for crypto asset securities because "existing regulations are

unworkable" as they impose obligations that are for some "market participants[]"

either not possible or not economically viable," leaving "some market participants

---

[2] "Crypto asset" refers to an asset that is issued and/or transferred using distributed ledger or blockchain technology. For purposes of this brief, the Commission does not distinguish between the terms "crypto asset" and "digital asset." A blockchain is a peer-to-peer database that is spread across a network of computers that digitally records transactions in data packages, referred to as blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain. *See, e.g.*, *SEC v. Coinbase, Inc.*, No. 23-cv-4738, 2024 WL 1304037, at *3-4 & n.4 (S.D.N.Y. Mar. 27, 2024).

… less willing to invest the resources necessary to follow the rules." JA12-13; *see* JA18.

The rulemaking petition did not include "the text or the substance of [a] proposed rule," 17 C.F.R. 201.192(a), but rather identified 50 "[k]ey questions for the Commission to consider," with an additional 60 separately delineated sub-questions. JA17-38. The petition explained that the requested rulemaking might require the issuance of concept releases, consultation with advisory committees, public roundtables, consideration of exemptive relief, provision of interpretive guidance, and/or no-action letters, as well as coordination with Congress, banking regulators, other agencies, and other countries. JA13, 38-39.

Upon receiving the rulemaking petition, the Commission's Secretary confirmed receipt, referred the petition to the Commission's Division of Trading and Markets and Division of Corporation Finance, and opened a file for public comment. JA5, 43; *see* JA7-9. Commission staff considered the petition and responding comment letters in preparing a recommendation to the Commission. JA5.

**C.     Coinbase filed a petition for writ of mandamus to compel the Commission to act immediately on the rulemaking petition.**

Less than ten months after filing the rulemaking petition, Coinbase filed a petition for writ of mandamus in this Court, seeking to compel the Commission to act on the rulemaking petition within seven days. App. Dkt. 1 (No. 23-1779). This

Court did not grant the mandamus petition but ordered the Commission to update this Court regarding the status of the rulemaking petition. App. Dkt. 32 (No. 23-1779). After the Commission denied the rulemaking petition, this Court dismissed the mandamus petition as moot. App. Dkt. 41 (No. 23-1779).

**D.    The Commission denied the rulemaking petition and explained its reasons for doing so.**

After considering the rulemaking petition, the comment letters, and the staff recommendation, the Commission denied the rulemaking petition on December 15, 2023. *See* JA5-6. Consistent with the Commission's Rules of Practice, the Secretary sent Coinbase a letter notifying it of the denial and the Commission's reasoning. JA5-6.

The Commission explained that it was denying the rulemaking petition because, "in the exercise of its broad discretion to set its rulemaking agenda," it "conclude[d] that the requested rulemaking [was] currently unwarranted." JA5. The Commission disagreed with the rulemaking petition's premise that "application of existing securities statutes and regulations to crypto asset securities, issuers of those securities, and intermediaries in the trading, settlement, and custody of those securities is unworkable." JA6. The Commission invoked its discretion to determine the timing and priorities of its regulatory agenda and explained that consideration of changes to the existing regulatory framework may be informed by the results of various crypto-asset-security-related regulatory

8

undertakings. JA6. Finally, the Commission explained that the requested rulemaking was so substantial that it would significantly constrain the Commission's choices regarding competing priorities. JA5-6. The Commission also explained that, although it declined to undertake the requested rulemaking at this time, "[t]o the extent that future circumstances warrant, the Commission may undertake further consideration of the issues raised in the [p]etition." JA6.

The same day that the Commission denied the rulemaking petition, Coinbase filed a petition for review of the Commission's denial. JA1-4.

## STANDARD OF REVIEW

An agency's denial of a rulemaking petition may be vacated if the denial is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). But judicial review of such a denial is "extremely limited and highly deferential." *Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007) (cleaned up). "[D]enials of petitions to institute rulemaking proceedings … are scrutinized at the most deferential end of the arbitrary and capricious spectrum." *Int'l Union v. Chao*, 361 F.3d 249, 254-55 (3d Cir. 2004).

## SUMMARY OF ARGUMENT

The Commission reasonably denied Coinbase's rulemaking petition.

As the Commission explained, it disagreed with the petition's fundamental premise that application of the current regulatory framework to crypto asset

securities is unworkable. Indeed, courts have applied that current framework to crypto asset securities for years. In these circumstances, the Commission reasonably decided to await information and data from ongoing regulatory initiatives that could inform its consideration of whether and, if so, how, to further alter current regulations. The Commission also reasonably decided not to engage in the extensive regulatory action requested by Coinbase because it would have significantly constrained the Commission's pursuit of competing regulatory priorities.

Coinbase's assertion that rulemaking was "presumptively required" (Br. 20) is unfounded. In the absence of a congressional mandate or a threat to human health and safety—neither of which is present here—courts rarely overturn an agency's denial of a rulemaking petition and none have done so in circumstances akin to these. Nothing in Coinbase's lengthy series of policy arguments regarding its preference for rulemaking, or the caselaw it invokes describing circumstances in which *enforcement actions* may be inappropriate, provides a legal entitlement to the requested rulemaking.

Contrary to Coinbase's argument that fair notice requires rulemaking because the Commission has changed its view regarding its authority over crypto asset securities, there has been no such change. And, even if there had been, that would not warrant granting Coinbase's rulemaking petition. Nor has there been

any change in a factual predicate underlying existing securities rules that might necessitate rulemaking. Rather, existing securities rules are being applied to novel fact patterns (and not for the first time). Coinbase's view that some market participants have difficulty complying with current statutes and regulations does not require the Commission to immediately undertake the rulemaking Coinbase seeks.

Unable to establish a legal entitlement to the rulemaking it requests, Coinbase is left to argue that the Commission's explanation for the denial was insufficient. But the Commission satisfied the APA's requirement of a "brief statement" explaining the denial: it carefully considered Coinbase's petition, examined (and disagreed with) its premise, and reasonably determined that the requested rulemaking was not currently warranted in light of ongoing regulatory initiatives on related topics as well as competing regulatory priorities. No more is required. But if this Court finds the Commission's explanation insufficient, at most a remand would be proper, not an order compelling the Commission to undertake rulemaking.

## ARGUMENT

I.   **The Commission reasonably exercised its discretion over its regulatory agenda in denying Coinbase's rulemaking petition.**

"Congress did not intend to compel an agency to undertake rulemaking merely because a petition has been filed." *WWHT, Inc. v. FCC*, 656 F.2d 807, 813

(D.C. Cir. 1981). Rather, "an agency may exercise a generous measure of discretion respecting the launching of rulemaking proceedings." *Int'l Union*, 361 F.3d at 254 (cleaned up). Indeed, "an agency's refusal to institute rulemaking proceedings is at the high end of the range of levels of deference [courts] give to agency action." *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008) (cleaned up). "[O]nly in rare and compelling circumstances" will a court overturn an agency judgment not to institute rulemaking and order rulemaking. *Int'l Union*, 361 F.3d at 255.

The Commission was required to—and did—provide a "reasoned explanation" for its denial of Coinbase's rulemaking petition. *Massachusetts*, 549 U.S. at 534; *Defs. of Wildlife*, 532 F.3d at 919 ("[W]e look to see whether the agency employed reasoned decisionmaking in rejecting the petition."); *see* 5 U.S.C. 706(2)(A). The Commission reasonably determined that current circumstances do not warrant the wholesale replacement of the existing securities regulatory framework with a comprehensive new regulatory framework for crypto asset securities. JA5-6. The premise of Coinbase's request for this wide-ranging action was that the application of current law to crypto asset securities is unworkable. But the Commission reasonably disagreed with that premise and determined to, instead, continue with its current undertakings, some of which address the existing regulatory framework as it relates to crypto asset securities.

**A. The Commission reasonably determined not to entirely replace the existing regulatory framework at this time.**

Coinbase's petition asserted that existing statutes and regulations are "unworkable" because they impose obligations that are for some "market participants[] either not possible or not economically viable," and therefore a "new regulatory framework is needed." JA12-13. But instead of deciding to build a new regulatory framework from the ground up at this time, the Commission reasonably denied the petition and referred to a number of proposed rules and undertakings that it was pursuing that address questions regarding the application of the *existing* framework to crypto asset securities. JA6. As the Commission explained, "[a]ny consideration of whether and, if so, how to alter the existing regulatory regime may be informed by, among other things, data and information provided" by such initiatives. JA6. The decision to take this more incremental approach is reasonable and well within the Commission's discretion. *See Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transportation Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 875 (D.C. Cir. 2021) ("Agencies do not ordinarily have to regulate a particular area all at once.").

Coinbase's criticism that the Commission's current crypto-asset-security-related undertakings do not address certain of the issues identified in its petition (Br. 51-52) misses the point. The Commission did not claim that those undertakings were entirely coextensive with Coinbase's requested rulemaking.

Rather, the Commission reasonably explained that those undertakings may provide information and data that could inform its consideration of future regulatory action. JA6. And, far from "underscor[ing] the unworkability" of the existing regulatory framework (Br. 52), those undertakings—which include addressing ways that the securities law regime applies to crypto asset securities—show the reasonableness of the Commission's incremental approach.

For example, *Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, 86 Fed. Reg. 11627 (Feb. 26, 2021) (*Special Purpose Broker-Dealers*), provides a five-year period during which broker-dealers operating in defined circumstances with respect to crypto asset securities will not be subject to Commission enforcement action for particular violations of a custody-related rule. That period will "provide the Commission and its staff with the opportunity to gain additional insight into the evolving standards and best practices with respect to custody of digital asset securities" and "provide the Commission with experience in overseeing broker-dealer custody of digital asset securities to inform further action in this area." *Id.* at 11628. Moreover, the Commission also requested comments and "intends to consider the public's comments in connection with any future rulemaking or other Commission action in this area." *Id*.

Coinbase's rulemaking petition called *Special Purpose Broker-Dealers* a regulatory "path forward" but criticized it because at that time no broker-dealers

had been registered under its provisions. JA33. And while Coinbase now concedes that an "entity has successfully registered"[3] it nonetheless complains that there are not yet more registrants. Br. 52-53. But the opportunity remains available (and the comment period open) and, in any event, the results show that the Commission has identified a means for a registered broker-dealer to custody crypto asset securities and may inform the Commission's consideration of future regulatory action. Indeed, Coinbase's rulemaking petition endorsed such an approach. JA13 (arguing that the use of "appropriately tailored interpretive guidance and no-action relief" could "provide the Commission with an opportunity to assess the efficacy of emerging market practices with the ability to later promulgate rules, if appropriate").

Similarly, the Commission had sought public comment on proposed rules to further define a term used in the statutory definition of a securities "dealer," including with regard to crypto asset securities. *Further Definition of "As a Part of Regular Business" in the Definition of Dealer and Government Securities Dealer*, 87 Fed. Reg. 23054, 23057 n.36 (Apr. 18, 2022). The feedback received informed the Commission's ultimate determination that the new rules would apply to all securities, including crypto asset securities. *See Further Definition of "As a*

---

[3] *See* Prometheum Ember Capital, Central Registration Depository No. 312784, SEC No. 8-70739.

*Part of Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection with Certain Liquidity Providers*, 89 Fed. Reg. 14938, 14959-61 (Feb. 29, 2024).  Implementation of the revised definition in the now-adopted rules will provide information that could inform the Commission's consideration of future regulatory action.

The other crypto-asset-security-related rulemakings cited in the denial address, at least in part, how the federal securities laws apply to activities related to crypto asset securities and may similarly inform the Commission's consideration of changes to the current regulatory framework.  In *Supplemental Information and Reopening of Comment Period for Amendments Regarding the Definition of "Exchange,"* the Commission requested comments on the application of the proposed amended definition of "exchange" to securities trading systems, including systems for crypto asset securities.  88 Fed. Reg. 29448 (May 5, 2023). In *Regulation Best Execution*, the Commission requested comments on order handling and best execution practices of broker-dealers that engage in securities transactions for or with customers, including with respect to transactions in crypto asset securities.  88 Fed. Reg. 5440, 5448-49, 5540-42 (Jan. 27, 2023).  In *Regulation Systems Compliance and Integrity*, the Commission requested comments on proposed rules for "new SCI entities that trade crypto asset securities."  88 Fed. Reg. 23146, 23166-69 (Apr. 14, 2023).  And in *Safeguarding*

*Advisory Client Assets*, the Commission requested comments on investment advisers' possession and control of various assets, including crypto asset securities. 88 Fed. Reg. 14672, 14688-90 (Mar. 9, 2023).

Finally, while Coinbase claims that some of those rulemakings may have "an outsized impact on the crypto industry" (Br. 52), that claim supports the Commission's approach of acting in an incremental manner and examining the results of those undertakings before considering additional revisions to the current regulatory framework.

### B. The Commission reasonably considered the impact of the requested rulemaking on its regulatory agenda.

As Coinbase concedes, "an agency's prioritization of its agenda is generally entitled to deference." Br. 53. "[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." *Massachusetts*, 549 U.S. at 527. Indeed, it is within an agency's "quintessential discretion … to allocate [its] resources and set its priorities." *Oil, Chem. & Atomic Workers Union v. OSHA*, 145 F.3d 120, 123 (3d Cir. 1998). And courts have recognized that the judiciary may be "ill-equipped and poorly situated to address … the allocation of significant scarce resources given the nature of the many other problems the agency is attempting to address." *Maier v. EPA*, 114 F.3d 1032, 1040 (10th Cir. 1997) (cleaned up).

In denying Coinbase's petition, the Commission explained that the requested rulemaking "would significantly constrain the Commission's choices regarding competing priorities" in light of its scope (*e.g.*, concept releases, public roundtables, interpretive guidance, etc.) and the Commission's other regulatory undertakings, both those related to crypto asset securities and otherwise. JA6; *see supra* 8-9. Coinbase identifies no basis for intruding on the Commission's "broad discretion … to direct … resources elsewhere." *Int'l Union*, 361 F.3d at 256.

Coinbase argues that "regulating the digital asset industry *is* a priority for the SEC" and erroneously faults the denial for "not specifically identify[ing] *any* competing priorities, let alone priorities of a higher order." Br. 54. But the denial did not assert that the "digital asset industry" is not a priority. Indeed, the Commission explained that it is "currently pursuing" "numerous undertakings directly or indirectly relating to crypto asset securities." JA6; *see supra* 8-9. Rather, the Commission made a reasoned determination as to how to *order* its regulatory priorities. Even if, as Coinbase claims, "the digital asset industry *is* a priority for the SEC" (Br. 54), that does not require the Commission to prioritize crypto-asset-security-rulemaking over other priorities, much less a particular crypto-asset-security-rulemaking. *See Int'l Union*, 361 F.3d at 256 (concluding that an issue being a "regulatory priority … does not compel [the agency] to promulgate a rule"). Coinbase's policy disagreement with the Commission's

prioritization of other initiatives provides no basis for this Court to order otherwise.

*See Flyers Rts. Educ. Fund, Inc. v. United States Dep't of Transportation*, 957 F.3d 1359, 1363 (D.C. Cir. 2020). In any event, the denial *did* specifically identify competing priorities, including current rulemaking related to crypto asset securities and, more generally, the 43 rules identified on the fall 2023 agency rule list. JA6 (citing Office of Management and Budget, Office of Information and Regulatory Affairs, *Securities and Exchange Commission Agency Rule List – Fall 2023* (Dec. 6, 2023), https://www.reginfo.gov/public/do/eAgendaMain).[4]

Coinbase criticizes the Commission for "provid[ing] no explanation for why [the requested] rulemaking would be an undue burden" (Br. 55), but that is not what is required. Rather, the Commission must make a reasoned determination whether to grant or deny the rulemaking petition, and it did so. *See Defs. of Wildlife*, 532 F.3d at 921 (refusing to disturb an agency's "policy decision to focus its resources on a [particular] strategy" when "[p]etitioners presented no evidence to rebut the agency's prediction" of how the requested rulemaking would impact

---

[4]  The Commission's competing priorities include, for example, *Order Competition Rule*, 88 Fed. Reg. 128 (Jan. 3, 2023); *Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders*, 87 Fed. Reg. 80266 (Dec. 29, 2022); and the joint rulemaking undertaken pursuant to the Financial Data Transparency Act of 2022, Pub. L. No. 117-263, tit. LVIII, 136 Stat. 3421 (2022).

its other undertakings).[5]  Coinbase also argues that "[the requested] rulemaking *should* be a priority for the agency."  Br. 54.  But, of course, it is not for Coinbase, or a court, to determine the Commission's priorities.

The authority cited by Coinbase (Br. 53-54) is not to the contrary.  In *International Union v. Chao*, this Court deferred to an agency's "decision to direct . . . resources elsewhere" because the agency identified other regulatory priorities and the requested rulemaking would have required "a lengthy and complex process."  361 F.3d at 255-56.  Here, the Commission similarly identified other regulatory priorities and explained that the requested rulemaking was of "substantial scope" and would "significantly constrain the Commission's choice regarding competing priorities."  JA5-6; *see supra* 7 (listing the numerous regulatory actions that Coinbase identified as potentially implicated by its requested rulemaking).

In *Compassion Over Killing v. FDA*, the Ninth Circuit concluded that an "agency's decision to prioritize other projects is entitled to great deference by a reviewing court" if the agency "clearly indicate[s] that it has considered the potential problem identified in the petition and provide[s] a reasonable explanation

---

[5]  Coinbase's unsupported assertions that "[i]ndustry leaders" will "shoulder much of the costs" of the requested rulemaking and that "[r]ulemaking is far less costly than enforcement" (Br. 55), even if true, do not show the Commission's decision to be unreasonable.

as to why it cannot *or will not* exercise its discretion to initiate rulemaking." 849 F.3d 849, 857 (9th Cir. 2017) (cleaned up; emphasis added). Far from seeking blind deference, the Commission explained that it would not undertake the requested rulemaking because, among other things, it disagreed with the premise that the current regulatory framework was "unworkable," it was already engaged in related regulatory action, and the requested rulemaking would inhibit its pursuit of other priorities. JA5-6.

And the D.C. Circuit likewise recognized in *In re Barr Lab'ys, Inc.* that it had "no basis for reordering agency priorities" because "[t]he agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way" and "[s]uch budget flexibility as Congress has allowed the agency is not for us to hijack." 930 F.2d 72, 76 (D.C. Cir. 1991). While the court acknowledged that it might properly question an agency's prioritization when faced with "agency concessions[] that the project backed by [a petitioner] was plainly more urgent than any that the project's acceleration might retard," just as in *Barr*, "[n]othing of the sort exists here." *Id.* (cleaned up).

**C.    The Commission reasonably explained its disagreement with the petition's premise that application of the existing regulatory framework to crypto asset securities is "unworkable."**

Coinbase complains that the Commission did not provide further detail as to "*why* it disagrees" that the existing regulatory framework is "unworkable" for crypto asset securities.  Br. 48-49 (original emphasis).  But it was not necessary for the Commission to provide a point-by-point refutation of Coinbase's blunderbuss claim that the existing regulatory framework is "unworkable" because it may not easily accommodate all existing business ventures related to crypto asset securities. *See supra* 8-9.  No additional explication is required to understand the Commission's policy decision not to replace the entire existing regulatory framework that has governed the multi-trillion dollar securities markets for decades simply to make compliance easier for a small set of market participants offering a purportedly new asset (a not-infrequent occurrence).  Indeed, the denial cited numerous current undertakings evidencing the Commission's decision to address questions regarding the application of the existing framework to crypto asset securities rather than replace it.  *See supra* 8-9.  Nor does the assertion that some market participants or some business models may have difficulty complying with discrete provisions undermine the Commission's disagreement with the

petition's assertion that the existing regulatory framework *as a whole* is "unworkable" for crypto asset securities.

Coinbase's assertions to the contrary stem from the mistaken belief that more explanation was required in light of the Commission's crypto-asset-security-related enforcement actions.  Br. 48-49.  But the filing of enforcement actions did not heighten the requirements under the APA.  And Coinbase's contention that the Commission's pursuit of enforcement actions for violations of existing law is somehow improper has no basis.  *See infra* 36-41.

Moreover, to the extent that those enforcement actions are relevant, they support the Commission's determination that the existing regulatory framework is not unworkable for crypto asset securities.  For years, federal courts have applied Congress's definitions and the Supreme Court's precedents to the particular facts and circumstances of crypto asset security offers, sales, and transactions in Commission enforcement actions, with no court concluding that the current regulatory framework is unworkable for issuers of crypto asset securities or

intermediaries in the trading, settlement, and custody of such securities.[6]  And

courts have similarly found the current framework workable for criminal violations

related to crypto asset securities.[7]

---

[6]  *See, e.g.*, *SEC v. Coinbase, Inc.*, No. 23-cv-4738, 2024 WL 1304037, at *20-25 (S.D.N.Y. Mar. 27, 2024); *SEC v. Genesis Glob. Cap., LLC*, No. 23-cv-00287, 2024 WL 1116877, at *5-16 (S.D.N.Y. Mar. 13, 2024); *SEC v. Wahi*, No. 22-cv-01009, 2024 WL 896148, at *4-7 (W.D. Wash. Mar. 1, 2024); *SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346, 2023 WL 8944860, at *12-16 (S.D.N.Y. Dec. 28, 2023); *SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346, 2023 WL 4858299, at *10-15 (S.D.N.Y. July 31, 2023); *SEC v. Arbitrade Ltd.*, 668 F. Supp. 3d 1290, 1300-02 (S.D. Fla. 2023); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 216-21 (D.N.H. 2022), *appeal dismissed*, No. 23-1743 (1st Cir. Oct. 23, 2023); *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 323-31 (S.D.N.Y. 2023); *SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988, 995-97 (N.D. Cal. 2021); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177-80 (S.D.N.Y. 2020); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 367-79 (S.D.N.Y. 2020), *appeal withdrawn*, No. 20-1076 (2d Cir. May 22, 2020); *SEC v. Nat. Diamonds Inv. Co.*, No. 19-cv-80633, 2019 WL 13277296, at *8-10 (S.D. Fla. May 28, 2019); *SEC v. Blockvest, LLC*, No. 18-cv-2287, 2019 WL 625163, at *4-9 (S.D. Cal. Feb. 14, 2019); *see also Regulation Systems Compliance and Integrity*, 88 Fed. Reg. at 23167 n.223 ("To date, five offerings of crypto asset securities have been registered or qualified under the Securities Act … and five classes of crypto asset securities have been registered under the Exchange Act.").

[7]  *See, e.g., United States v. Felton*, No. 22-14215, 2024 WL 853687 (11th Cir. Feb. 29, 2024) (affirming sentence for securities fraud in connection with crypto asset securities); *United States v. Kwok*, No. 23-cr-118, 2024 WL 1407057, at *7-8 (S.D.N.Y. Apr. 2, 2024) (rejecting argument that crypto asset transactions did not involve securities); *United States v. Kane*, No. 23-cr-20172, 2023 WL 8277602, at *2–4 (S.D. Fla. Nov. 30, 2023) (same); *United States v. Zaslavskiy*, No. 17-cr-647, 2018 WL 4346339, at *4-9 (E.D.N.Y. Sept. 11, 2018) (rejecting arguments that certain crypto assets were not securities and that the defendant lacked notice that the federal securities laws may apply to crypto assets).

Finally, the authority on which Coinbase relies does not show the Commission's explanation to be insufficient. Unlike *Dickson v. Secretary of Defense*, the Commission's denial was not "boilerplate language" that "merely parrots the language of a statute." 68 F.3d 1396, 1405 (D.C. Cir. 1995). Nor did the Commission's denial suggest that the Commission had "been blind to [a] mandate from Congress" to regulate the practice at issue. *Am. Horse Protection Ass'n, Inc. v. Lyng*, 812 F.2d 1, 7 (D.C. Cir. 1987). And unlike in both *American Horse* and *Environmental Health Trust v. FCC*, 9 F.4th 893 (D.C. Cir. 2021), where the agency's explanation was found inadequate because it failed to assess the implications of new scientific evidence, Coinbase's petition identified no new evidence requiring such an assessment. *See supra* 6-7. Coinbase also relies on inapposite cases addressing agency decisions other than the decision not to initiate discretionary rulemaking. *See, e.g.*, *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) (addressing agency decision to repeal or modify three rules). But the decision not to initiate discretionary rulemaking is different in kind because it is "akin to an exercise of prosecutorial discretion," *Flyers Rts.*, 957 F.3d at 1363, which courts afford the highest level of deference. *See Defs. of Wildlife*, 532 F.3d at 919.

**II.    There are no compelling circumstances necessitating rulemaking.**

Coinbase argues that rulemaking is required to provide fair notice of supposed changes in the Commission's approach to crypto asset securities.  Br. 23-38.  But the Commission's long-established and publicized position is that the federal securities laws apply when the facts and circumstances show that crypto assets are offered and sold as securities.  And the existing regulatory framework—which long predates the advent of crypto asset securities—*is* the status quo; it is Coinbase's rulemaking petition that seeks to alter it.  At bottom, Coinbase's assertions amount to a policy argument as to why it believes rulemaking is appropriate, which falls far short of the high legal bar this Court has recognized for requiring an agency to engage in discretionary rulemaking.  *See Int'l Union*, 361 F.3d at 255 (such an order would require "rare and compelling circumstances").

### A.    The Commission's position regarding its authority over crypto asset securities is unchanged.

Contrary to Coinbase's argument (Br. 29-31), the Commission's longstanding position has been—and remains—that whether a crypto asset implicates the federal securities laws depends on the facts and circumstances of its offer and sale.

The federal securities laws define "security" broadly to encompass "virtually any instrument that might be sold as an investment."  *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (cleaned up); *see, e.g.*, 15 U.S.C. 77b(a)(1), 78c(a)(10).  And the

Supreme Court has interpreted those statutes to demarcate the reach of "security," instructing that "form [is] disregarded for substance" and that "emphasis [is] placed upon [the] economic reality" of the transaction. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946); *Reves v. Ernst & Young,* 494 U.S. 56, 60-61 (1990) ("Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called.") (original emphasis). This analytical framework has been applied to non-traditional forms of investment for many decades.[8]

In July 2017, the Commission issued a report discussing the application of these principles to crypto assets, pursuant to statutory authority to investigate violations of the federal securities laws and to "publish information concerning any such violations" as it "deem[s] necessary or proper to aid in the enforcement of" those provisions, 15 U.S.C. 78u(a)(1). *See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, Release No. 81207, 2017 WL 7184670 (July 25, 2017) (*DAO Report*). The Commission published the *DAO Report* "in order to stress that the U.S. federal securities law

---

[8] *See, e.g., Howey*, 328 U.S. at 299-301 (citrus grove development); *Edwards*, 540 U.S. at 393-97 (payphone sale-and-leasebacks); *SEC v. SG Ltd*., 265 F.3d 42, 48-55 (1st Cir. 2001) ("virtual shares in an enterprise existing only in cyberspace"); *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 581-85 (2d Cir. 1982) (franchising); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-86 (5th Cir. 1974) (multi-level marketing scheme); *Continental Marketing Corp. v. SEC*, 387 F.2d 466, 469-71 (10th Cir. 1967) (animal breeding enterprise).

may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale." *Id.* at *7.

As courts have concluded, the *DAO Report* provided fair notice to a reasonable person operating within the industry that certain transactions in crypto assets may implicate various provisions of the federal securities laws. *See SEC v. Coinbase, Inc.*, No. 23-cv-4738, 2024 WL 1304037, at *16 & n.8 (S.D.N.Y. Mar. 27, 2024); *SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346, 2023 WL 4858299, at *9-10 (S.D.N.Y. July 31, 2023); *SEC v. Ripple Labs, Inc.*, No. 20-cv-10832, 2021 WL 1814771, at *3-4 (S.D.N.Y. May 6, 2021). The *DAO Report* "advise[d] those who would use … distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws." 2017 WL 7184670, at *1. It also advised that "[w]hether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the economic realities of the transaction." *Id.* at *14. And it "stress[ed] the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces." *Id.* at *2.

And courts have rejected the assertion that the Commission's position has changed. *See, e.g.*, *Coinbase*, 2024 WL 1304037, at *16-17 ("an examination of the … timeline of the SEC's positions regarding crypto-assets" reveals that since the *DAO Report* the Commission's consistent position has been that the federal securities laws reach crypto asset securities); *Terraform*, 2023 WL 4858299, at *9-10 ("[D]efendants' attempt to manufacture a 'fair notice' problem here comes down to asserting the SEC's position in this litigation is inconsistent with a position that the SEC never adopted."); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 221–22 (D.N.H. 2022) ("The SEC has not based its enforcement action here on a novel interpretation [but] on a straightforward application of a venerable Supreme Court precedent that has been applied by hundreds of federal courts across the country over more than 70 years.").

As one court explained, the Commission has "not announc[ed] a new regulatory policy, but rather is simply engaging in a fact-intensive application of an existing standard … to determine whether certain transactions involving crypto-assets meet the characteristics of an 'investment contract.'" *Coinbase*, 2024 WL 1304037, at *17. While Coinbase claims that the Commission's crypto-asset-security-related enforcement actions threaten "retroactive liability" (Br. 23), in fact they "challeng[e] transactions [that] fall comfortably within the framework that

courts have used to identify securities for nearly eighty years." *Coinbase*, 2024 WL 1304037, at *1.

Indeed, while Coinbase argues that the Commission changed its policy regarding the application of the securities laws to crypto asset securities in 2022 (Br. 9), Coinbase recognized in February 2021 that "[t]he SEC [has] taken the position that certain crypto assets fall within the definition of a 'security' under the U.S. federal securities laws," and that Coinbase could be subject to "judicial or administrative sanctions" for "for failing to offer or sell … crypto asset[s] in compliance with the registration requirements, or for acting as a broker, dealer, or national securities exchange without appropriate registration" under those laws. Coinbase Global, Inc., Form S-1 Registration Statement at 29-30 (Feb. 25, 2021), https://www.sec.gov/Archives/edgar/data/1679788/000162828021003168/ coinbaseglobalincs-1.htm (Coinbase S-1); *see also* Coinbase's Answer to Pl.'s Compl. ¶ 55, *SEC v. Coinbase, Inc.*, No. 23-cv-4738, Dkt. 22 (S.D.N.Y. June 28,

2023) (Coinbase "[r]ecogniz[ed] that the DAO [R]eport … reflected the SEC's view that *some* crypto assets *could be* securities").[9]

In nonetheless asserting that the Commission previously disclaimed authority over crypto asset securities (Br. 7-12), Coinbase relies on statements by Commissioners or Commission staff that do not represent the position of the Commission. *See* 17 C.F.R. 200.735-4(d)(2)(ii)(A); *Coinbase*, 2024 WL 1304037, at *16 (rejecting Coinbase's attempt to "make much hay" out of individual Commissioner's statements).[10] Indeed, Coinbase itself has previously recognized that "such statements are not official policy statements by the SEC and reflect only

---

[9] Coinbase argues that because its Form S-1 registration statement became effective, the Commission "cleared the way for Coinbase to become a public company … without ever suggesting that Coinbase needed to register with the SEC." Br. 8-9. But "[n]either the fact that the registration statement for a security has been filed or is in effect … shall … be held to mean that the Commission has in any way passed upon the merits of, or given approval to, such security" (15 U.S.C. 77w), and Commission action should not be "construed to mean that [the Commission] has in any way passed upon the merits of, or given approval to, any security or any transaction" (*id.* 78z).

[10] *See also, e.g.*, Gary Gensler, Chair, SEC, *Prepared Remarks of Gary Gensler on Crypto Markets Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022), https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422 (cited at Br. 9, 12) ("As is customary, I'd like to note that my views are my own, and I'm not speaking on behalf of the Commission or SEC staff."); William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 (cited at Br. 8, 12) (similar); Hester M. Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://www.sec.gov/news/speech/peirce-remarks-duke-conference-012023 (cited at Br. 14, 30, 43) (similar).

the speakers' views, which are not binding on the SEC or any other agency or court." Coinbase S-1 at 29. In short, Coinbase's assertion of a policy change fails because it is premised on "a [prior] position that the SEC never adopted." *Terraform*, 2023 WL 4858299, at *9-10.

Because there has been no change in the Commission's position, this Court need not decide whether a change would require rulemaking. *See NLRB v. FedEx Freight, Inc.*, 832 F.3d 432, 445 (3d Cir. 2016). In any event, there is no basis for Coinbase's assertion (Br. 25-38) that a change in the Commission's position regarding its authority over crypto asset securities would require the Commission to grant Coinbase's rulemaking petition. Indeed, Coinbase does not identify a single case in which a court required an agency to grant a rulemaking petition in analogous circumstances, and its argument that any such change must be articulated through rulemaking rather than adjudication is inconsistent with settled law. *See infra* 36-41. This Court should reject Coinbase's request to break new ground here.

## B. There has been no change in the factual predicate underlying the federal securities laws necessitating rulemaking.

Equally fruitless is Coinbase's invocation (Br. 38-40) of the "limited" principle that "an agency may be forced by a reviewing court to institute rulemaking proceedings if a significant factual predicate of a prior decision on the subject (either to promulgate or not to promulgate specific rules) has been

removed." *WWHT*, 656 F.2d at 819. The narrow grounds for such action do not exist here because the purported "changed circumstances" (Br. 39) to which Coinbase points—that some market participants may find compliance with long-standing requirements of the federal securities laws "not possible or not economically viable" (JA12)—differs in kind from the type of change referred to in the caselaw Coinbase cites.

Those cases allow for the possibility of requiring additional agency rulemaking in the distinct and narrow circumstances where the underlying premise that supported the adoption of existing regulations has been altered, thus necessitating consideration of whether the existing regulations should be modified or repealed. In *Geller v. FCC*, for example, the FCC refused to reexamine whether regulations adopted expressly to facilitate the passage of certain copyright legislation remained justified after that legislation was enacted. 610 F.2d 973, 974-76 (D.C. Cir. 1979). The D.C. Circuit remanded, ordering the FCC to consider— in "some suitable manner," "not … necessarily [a] rulemaking proceeding"— whether the regulations were still justified. *Id.* at 980-81 & n.59. And in *American Horse*, the Department of Agriculture stated in adopting regulations restricting a particular practice in the show-horse industry "that the premises for not enacting broader specific prohibitions might erode," "that it would consider prohibiting [additional devices and techniques] if the practice . . . continued," and "that [it] had

33

recently commissioned a study … that might eventually result in further changes in the regulations." 812 F.2d at 2 (cleaned up). When, despite study results indicating that additional restrictions could be warranted, the agency refused to reexamine its regulations, the D.C. Circuit remanded to the agency for further consideration (again, not necessarily rulemaking). *Id.* at 7-8.

By contrast, it is indisputable that, as to the rulemaking Coinbase is seeking, no "significant factual predicate of a prior decision *on the subject* … has been removed." *WWHT*, 656 F.2d at 819 (emphasis added). Indeed, Coinbase does not even base its arguments on "a prior decision … either to promulgate or not to promulgate [crypto-asset-security-related] rules." *Id.* Coinbase instead argues that the application of existing rules to a different context requires rulemaking. But there is no support for that proposition.

Moreover, Coinbase's argument reveals its misunderstanding of the purposes animating the existing securities regulatory framework. It asserts that the Commission "must ensure that firms in this new industry *can* comply" with the existing regulatory framework. Br. 40. But the securities laws, including their registration and disclosure requirements, balance the goal of facilitating capital formation with investor protection and the maintenance of fair, orderly, and efficient markets. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194–95 (1976); *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953) ("The design of the

[Securities Act] is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions.").  In other words, the securities laws do not require the Commission to alter the existing regulatory framework to satisfy new business ventures subject to the securities laws (much less to do so in the manner identified by those business ventures).

Coinbase tellingly fails to identify a single instance in which a court overruled an agency's decision not to modify its existing regulations because the petitioner was "unable to comply" (Br. 21) with them.  Instead, citing *Geller*, Coinbase asserts that the Commission's supposed "duty to reexamine its rules is heightened by the various provisions of the Exchange Act … that require the agency to act in the 'public interest.'"  Br. 39.  But *Geller* did not find that such provisions require an agency to undertake rulemaking when petitioned to do so. 610 F. 2d at 980 (requiring the agency to determine if regulations continue to serve the public interest following a change in the premise upon which the regulations were adopted).

And Coinbase misunderstands the Exchange Act provisions it cites, which do not impose affirmative obligations to undertake rulemaking but rather identify factors to be considered in connection with rulemaking.  *See* 15 U.S.C. 78e, 78j(b), 78m(e)(2), 78o(a)(2)*,* 78q-1(b)(1)*,* 78q-1(b)(2).  And the Exchange Act makes clear that additional considerations factor into the determination whether to adopt

rules.  *See, e.g.*, 15 U.S.C. 78c(f) (requiring, when the Commission considers

whether an action is in the public interest, that it also consider "the protection of

investors" and "whether the action will promote efficiency, competition, and

capital formation"); *id.* 78q-1(b)(1) (the Commission may act if it finds such action

"consistent with the public interest, the protection of investors, and the purposes of

this section").

Because there has been no significant alteration of a factual predicate for the

securities regulatory framework, the Commission was not required to engage in

rulemaking, much less grant Coinbase's rulemaking petition and adopt the rules

Coinbase seeks.

## C.      The Commission's exercise of its discretion to bring enforcement actions for violations of existing law does not necessitate rulemaking.

Contrary to the argument of Coinbase and certain amici that rulemaking is

required because the Commission has brought enforcement actions implicating

crypto asset securities (Br. 29-30), there is no requirement to adopt new rules

before an agency brings claims alleging that a newly conceived entity or business

concept is violating (or has violated) existing law.  In fact, enforcement and

rulemaking are often complementary in such circumstances, as enforcement

actions may inform the Commission's view of the current regulatory framework and its consideration of potential revisions to accommodate new circumstances.

In *Natural Resources Defense Council, Inc. v. SEC*, for example, the D.C. Circuit affirmed the Commission's determination to deny a request to require disclosure of certain employment information already shared with the Equal Employment Opportunity Commission, noting that "[t]he precise working out of the particular … data disclosure requirements could be left to case-by-case adjudication under … existing rules." 606 F.2d 1031, 1062 (D.C. Cir. 1979). As the court put it, such case-by-case adjudication may "provide [the SEC] with the experience enabling it to determine at a later date whether something other than [the current] rule is necessary or desirable." *Id.*

Moreover, consideration of new regulatory action is not inconsistent with enforcement of existing law—otherwise, agencies would be required to suspend enforcement every time they assessed whether to adjust regulatory requirements. Regardless of the Commission's decision on Coinbase's rulemaking petition, existing law would remain binding unless and until it was changed, and the Commission would retain the authority to bring enforcement actions (and to continue current enforcement actions) for violations of that law.

Coinbase contends that the Commission was required to engage in rulemaking because, in its view, the Commission's crypto-asset-security-related

enforcement actions show that Commission "has *already* formed a new view on how securities laws apply to digital assets that it is asking courts to enforce." Br. 20. But that argument reflects a fundamental misunderstanding. Before the Commission authorizes any enforcement action—including one related to crypto asset securities—it necessarily has decided that there is a basis for alleging that the charged conduct implicates existing securities laws. *See, e.g.*, 15 U.S.C. 77t(b), 78u(d). Otherwise, the agency could not bring those claims in good faith. That the Commission has authorized such actions means that it has formed a view that new rulemaking is not required to assert the claims *in that case*. But that does not mean that the Commission is foreclosing additional *future* rulemaking in this area. Not surprisingly, Coinbase fails to identify a single instance in which a court required an agency to initiate rulemaking before bringing an enforcement action under an existing statute because of an "already-formed" position that the statute applies to the alleged misconduct.

Coinbase relies (Br. 35-37) on *Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194 (1947), but that case does not support requiring the Commission to undertake the rulemaking Coinbase is seeking. To the contrary, the Court in *Chenery* explained that requiring rulemaking to address every new issue or circumstance "would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise" because "[n]ot

every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule." *Id.* at 202. And that is particularly true with respect to the Commission's crypto-asset-security-related enforcement actions, which, unlike the agency action in *Chenery*, do not involve the articulation of a "new standard of conduct," *id.* at 203, but are "simply a fact-intensive application of a statutory standard, a category of agency action that has traditionally been exempt from the procedural requirements of notice-and-comment rulemaking." *Terraform*, 2023 WL 4858299, at *10 (cleaned up).

Coinbase next asserts that rulemaking would be preferable to enforcement actions because, in its view, rulemaking would allow an articulation of the Commission's interpretation of the existing laws which could be subjected to judicial review. Br. 30-31. But that is *exactly* what is happening in the Commission's crypto-asset-security-related enforcement cases: The Commission sets out its view of the application of the existing law to the facts, and defendants such as Coinbase have the opportunity to argue to the contrary in district court and on appeal. *See, e.g., supra* 24 n.6. And those enforcement cases do not in any way thwart "pre-enforcement judicial review of SEC rules." Br. 31 (citing 15 U.S.C. 78y(b)). Pre-enforcement judicial review permits challenges to *newly-adopted rules* within 60 days of promulgation. 15 U.S.C. 78y(b)(1). The enforcement cases Coinbase alludes to, including the one in which it is a defendant, assert

claims based on the application of decades-old statutes to particular facts. Coinbase and others can and have raised challenges to the application of those statutes as a defense in the enforcement context, both as defendants and as amici.

Coinbase also cites cases in which courts have found enforcement actions to be inappropriate when based on insufficiently announced agency positions. *See, e.g.*, Br. 25, 28, 29, 33 (citing, *e.g.*, *FCC v. Fox Television Stations, Inc.,* 567 U.S. 239 (2012) (vacating adjudication for lack of fair notice of agency interpretation); *Gen. Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) (same); *Pfaff v. HUD*, 88 F.3d 739 (9th Cir. 1996) (finding the agency abused its discretion in bringing enforcement action based on legal standard "announce[d] … by adjudication"); *Patel v. INS*, 638 F.2d 1199 (9th Cir. 1980) (same)).  But those cases merely demonstrate that fair notice is a defense that defendants may attempt to assert to enforcement in certain circumstances.  They are not a basis for mandating rulemaking.

Coinbase mistakenly relies on *Shays v. Federal Election Commission*, 424 F. Supp. 2d 100 (D.D.C. 2006), in asserting that the Commission was required to at least explain "its decision to regulate via district court enforcement actions."  Br. 50.  In that case, the FEC considered a rule to categorize so-called 527 political organizations for purposes of federal campaign finance laws.  But the FEC did not issue a rule, instead concluding "that adjudication is preferable to rulemaking for

regulating 527 groups." *Shays*, 424 F. Supp. 2d at 115.  The district court found that choice permissible but concluded that the FEC had failed to provide a "reasoned explanation" for it.  *Id.* at 115-16.  By contrast, the Commission's denial of Coinbase's rulemaking petition was not a decision to address crypto asset securities exclusively through adjudication instead of rulemaking; no such choice was presented or made.  Indeed, far from choosing to proceed solely by enforcement, the Commission explained that several ongoing rulemakings "directly or indirectly relat[e] to crypto asset securities" and that their results may inform its future regulatory undertakings.  JA6; *see supra* 8-9.

## III.  The Commission sufficiently explained its reasonable basis for denying Coinbase's petition and there is no basis for this Court to require rulemaking.

Unable to establish a legal basis for this Court to mandate rulemaking, Coinbase is left to argue that that rulemaking is required because it believes that the Commission's explanation for denying the rulemaking petition was inadequate.  But that misstates both what is required under the APA and the appropriate remedy, if any.

### A.  The Commission reasonably explained its determination.

In denying Coinbase's rulemaking petition, the Commission outlined the scope of Coinbase's request, disagreed with its premise that the "application of existing securities statutes and regulations to crypto asset securities" is

"unworkable"; pointed to "numerous undertakings directly or indirectly relating to crypto asset securities that the Commission is currently pursuing" and from which the Commission may be informed "whether and, if so, how to alter the existing regulatory regime"; and noted the "many undertakings that relate to [its] regulatory priorities extending well beyond crypto asset securities." JA5-6. No more was required.

Coinbase's arguments to the contrary misstate an agency's obligations under the APA. Befitting the decision *not* to engage in regulatory process, the "brief statement" under 5 U.S.C. 555(e) "need not be exhaustive." *Flyers Rts.*, 957 F.3d at 1363. "[T]he core requirement is that the agency explain why it chose to do what it did." *Tourus Recs., Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (cleaned up); *cf. City of Colorado Springs v. Solis*, 589 F.3d 1121, 1134 (10th Cir. 2009) (finding a "terse" statement "sufficient for review" because the "statement … need not include detailed findings of fact" or be of "ideal clarity if the agency's path may be reasonably discerned"). It is "sufficient to advise … of the general basis of the denial." *Gardner v. FCC,* 530 F.2d 1086, 1089 n.12 (D.C. Cir. 1976) (cleaned up).

For all of the reasons discussed above (*see supra* 11-25), the denial meets these standards. *See Roelofs v. Sec'y of Air Force*, 628 F.2d 594, 601 (D.C. Cir. 1980) (the "brief statement" requirement is "modest," and "probably does not add

to, and may even diminish, the burden put on an agency by the APA's provision for judicial review").

## B.    Should this Court disagree, the proper remedy is a remand.

Because the Commission provided a reasoned explanation for denying the rulemaking petition and Coinbase cannot show compelling circumstances that might justify an order mandating rulemaking, the petition for review should be denied.  But if this Court finds that the Commission failed to provide a sufficient explanation or basis for denying the rulemaking petition, the proper remedy would be to remand to the Commission for further consideration, not an order compelling rulemaking.

"[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  That is because "[t]he reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."  *Id.*; *see Olivares v. TSA*, 819 F.3d 454, 463 (D.C. Cir. 2016) ("When an agency provides a statement of reasons insufficient to permit a court to discern its rationale … the usual remedy is a remand to the agency for additional investigation or explanation.") (cleaned up).

Courts have universally recognized that ordering an agency to engage in rulemaking is extraordinary. And it is particularly unwarranted "in the sphere of economic regulation" as opposed to instances in which "human lives are at stake." *Pub. Citizen Health Rsch. Grp. v. Chao*, 314 F.3d 143, 148 (3d Cir. 2002) (cleaned up). In *Public Citizen*, for example, in recognition of a "grave risk to public health," OSHA began a rulemaking to lower the permissible exposure limit for a carcinogen. *Id.* at 145. But more than nine years later, OSHA acknowledged that it "might not promulgate a rule for another ten or twenty years, if at all." *Id.* In those extraordinary circumstances, this Court found "that OSHA's delay [had] exceeded the bounds of reasonableness" and ordered "OSHA to proceed expeditiously with its … rulemaking." *Id.* at 159.

As this Court later explained, "[t]he human lives at stake played a critical role in *Public Citizen*." *Int'l Union*, 361 F.3d at 255 n.1 (cleaned up). But where, as here, "the interests at stake are primarily economic, … [s]uch interests, without more, do not present the unusual or compelling circumstances that are required in order to justify a judgment by [a] court overturning a decision of [an agency] not to proceed with rulemaking." *Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d 93, 97 (D.C. Cir. 1989) (cleaned up); *see, e.g.*, JA11 (Coinbase asserting that the requested rules will "allow for a more efficient and

effective allocation of capital in financial markets and create new opportunities for investors").

And even when something other than economic interests is at stake, "an order directing [an agency] to institute rulemaking proceedings is appropriate only in rare and compelling circumstances." *Int'l Union*, 361 F.3d at 255. Such circumstances include "statutorily imposed rulemaking requirements." *WWHT*, 656 F.2d at 819 n.21 (citing statutory rulemaking requirements). But no statutory rulemaking requirement is at issue in this case. Moreover, even if the Commission somehow were required to initiate rulemaking, that would not mean that it was required to do so by granting Coinbase's rulemaking petition in particular. *See Pro. Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1223 (D.C. Cir. 1983) (concluding that the petitioners had "no right to compel the agency to hold rulemaking proceedings addressing [*their*] *specific recommendations* for amending the existing rules"). Just as in the cases relied on by Coinbase, the proper remedy would be further consideration, not rulemaking. *See, e.g.*, *Am. Horse*, 812 F.2d at 7 (animal health regulations); *Geller*, 610 F.2d at 980 n.59 (cable television regulations); *Shays*, 424 F. Supp. 2d at 116 (campaign finance regulations).

Coinbase does not identify a single instance in which a court has ordered an agency to institute rulemaking because the court could not discern the agency's

rationale for declining to do so. And Coinbase's arguments for deviating from the usual remedy of remand are without merit. Coinbase provides no basis for its assertion that the Commission "has had sufficient opportunities to explain itself" (Br. 49), and if an insufficient explanation were grounds for ordering rulemaking, ordering a sufficient explanation—not remanding for further consideration—would be the default remedy.[11] Nor is there any basis for Coinbase's assertion that this Court must urgently order rulemaking now because "[t]ime is of the essence for Coinbase and other digital asset firms." Br. 49-50. This professed urgency cannot be squared with Coinbase's assertion that it "does not offer securities on its platform" (Br. 7) or its rulemaking petition's time-consuming and varied "[n]ecessary [p]reconditions to [r]ulemaking" (JA38-39).

---

[11] Coinbase also argues that the Commission "has proven in this litigation … that it will not take action unless compelled by a court." Br. 49. But the Commission's denial of the rulemaking petition was not compelled by a court—this Court dismissed Coinbase's mandamus petition as moot after the Commission denied the rulemaking petition. *See supra* 8.

# CONCLUSION

The petition for review should be denied.

Respectfully submitted,

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

TRACEY A. HARDIN
*Assistant General Counsel*

DAVID D. LISITZA
*Senior Appellate Counsel*

*/s/ Ezekiel L. Hill*
EZEKIEL L. HILL
(D.C. Bar. No. 1684647)
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.7724 (Hill)
hillez@sec.gov

May 10, 2024

# CERTIFICATIONS

I hereby certify that:

1.     I am an attorney representing a federal agency.

2.     The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 10,203 words, excluding the parts exempted by Fed. R. App. P. 32(f).

3.     The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, Time New Roman-style, 14-point typeface.

4.     On May 10, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit through the Court's CM/ECF system.  Service on counsel of record will be accomplished through the Court's CM/ECF system.

5.     Pursuant to 3d Cir. L.A.R. 31.1(c), the text of the electronic version of the foregoing brief is identical to the text in the paper copies.

6.     Pursuant to 3d Cir. L.A.R. 31.1(c), this document was scanned with Trellix Endpoint Security (version 10.7.0.6149) and no virus was detected.

*/s/ Ezekiel L. Hill*
Ezekiel L. Hill

Dated: May 10, 2024