No. 23-3202

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

COINBASE, INC.,

*Petitioner*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

On Petition for Review of an Order of the
Securities and Exchange Commission
Docket No. 4-789

## REPLY BRIEF FOR PETITIONER

Eugene Scalia
  *Counsel of Record*
Jonathan C. Bond
Nick Harper
Tessa Gellerson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner Coinbase, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................. 1

ARGUMENT ....................................................................................... 4

I. The APA Requires The SEC To Engage In Rulemaking ............................4

   A. The SEC's Assertion Of Expansive Jurisdiction Over The Digital Asset Industry Must Be Tested Through Rulemaking .........................4

      1. Rulemaking Is Required For Major Policy Changes .....................4

      2. The SEC's Policy On Digital Assets Has Radically And Continually Changed ....................................................................5

   B. The SEC Must Engage In Rulemaking Because It Cannot Dispute That Its Existing Rules Are Unworkable For Digital Asset Firms ...................................................................................11

      1. The SEC Must Make Compliance With Its Rules Possible For Digital Asset Firms ...............................................................12

      2. The SEC's Belated Efforts To Show Its Existing Rules Are Workable Prove Exactly The Opposite ........................................15

II. The Court Should Order Rulemaking Based On The SEC's Complete Inability To Explain Itself ..........................................................................19

   A. The SEC Provided No Rational Explanation For Refusing To Engage In Rulemaking ................................................................20

      1. The SEC's Failure To Respond To Coinbase's Workability Concerns Is Fatal ......................................................................20

      2. The SEC's Remaining Explanation Is Equally Deficient ............23

   B. The SEC's Extraordinary Conduct Requires An Order Vacating Its Denial Order And Directing Rulemaking ......................................24

      1. The SEC's Recalcitrant Refusal To Explain Itself Requires Forceful Judicial Intervention .......................................................24

      2. Rulemaking Is Urgently Needed To Prevent Serious Harm To The Industry .........................................................................27

CONCLUSION .................................................................................. 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. for Cannabis Therapeutics v. DEA*,
930 F.2d 936 (D.C. Cir. 1991) ............................................................12

*Am. Horse Prot. Ass'n, Inc. v. Lyng*,
812 F.2d 1 (D.C. Cir. 1987) ................................................................20

*Blanca Tel. Co. v. FCC*,
991 F.3d 1097 (10th Cir. 2021) ..........................................................10

*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) ..........................................................21

*Butte Cnty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ............................................................22

*Compassion Over Killing v. FDA*,
849 F.3d 849 (9th Cir. 2017) ..............................................................24

*Dickson v. Sec'y of Def.*,
68 F.3d 1396 (D.C. Cir. 1995) ............................................................22

*Env't Health Tr. v. FCC*,
9 F.4th 893 (D.C. Cir. 2021) ..............................................................20

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ............................................................................14

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ................................................................20, 22, 23

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ............................................................................13

*Ford Motor Co. v. FTC*,
673 F.2d 1008 (9th Cir. 1981) ..............................................................5

*Grayscale Invs., LLC v. SEC*,
82 F.4th 1239 (D.C. Cir. 2023) ..........................................................26

ii

# TABLE OF AUTHORITIES

<u>Page(s)</u>

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994)......................................................................................13

*Meadville Master Antenna, Inc. v. FCC*,
  443 F.2d 282 (3d Cir. 1971) ...........................................................22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*
  *Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................................20, 21

*Nat'l Customs Brokers & Forwarders Ass'n of Am.,*
  *Inc. v. United States*,
  883 F.2d 93 (D.C. Cir. 1989)...........................................................24

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)................................................................................12, 21

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947)................................................................................5

*SEC v. Coinbase, Inc.*,
  No. 23-cv-4738, 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) .......................11

*SEC v. LBRY, Inc.*,
  639 F. Supp. 3d 211 (D.N.H. 2022)...............................................11

*SEC v. Ripple Labs, Inc.*,
  No. 20-cv-10832, 2021 WL 1814771 (S.D.N.Y. May 6, 2021)........................11

*Sierra Club v. EPA*,
  972 F.3d 290 (3d Cir. 2020) ...........................................................20

*Tourus Records, Inc. v. DEA*,
  259 F.3d 731 (D.C. Cir. 2001)........................................................22

*United States v. Dalton*,
  960 F.2d 121 (10th Cir. 1992) .......................................................13

# TABLE OF AUTHORITIES

Page(s)

**Statutes**

5 U.S.C. § 555(e) ..........................................................................21, 22

5 U.S.C. § 706(2) ..........................................................................24

5 U.S.C. § 706(2)(E) ....................................................................21

**Regulations and Administrative Decisions**

SEC, *Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, 86 Fed. Reg. 11627 (Feb. 26, 2021) ....................................................18

SEC, *Order Granting Accelerated Approval of Proposed Rule Changes, as Modified by Amendments Thereto, To List and Trade Shares of Ether-Based Exchange-Traded Products*, 89 Fed. Reg. 46937 (May 30, 2024) ........................................................18

SEC, *Supplemental Information and Reopening of Comment Period for Amendments Regarding the Definition of "Exchange,"* 88 Fed. Reg. 29448 (May 5, 2023) ..................................................16

**Other Authorities**

Brady Dale, *Senate Votes to Kill Crypto Accounting Rule*, Axios (May 16, 2024)................................................................26

*Fin. Mkts. Conf., Afternoon Keynote, May 15*, YouTube (May 15, 2023) ..........................................................................13

*First on CNBC: CNBC Transcript: SEC Chair Gary Gensler Speaks with CNBC's "Squawk Box" Today*, CNBC (Feb. 10, 2023) ........................13

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, 117th Cong. 1 (May 6, 2021).......................................................6

GAO, *SEC—Applicability of the Congressional Review Act to Staff Accounting Bulletin No. 121* (Oct. 31, 2023) ..................................26

Page(s)

Gary Gensler, *SEC Chair, Prepared Remarks of Gary Gensler on Crypto Markets Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022) ..................................................................6

Hester M. Peirce, Comm'r, SEC, *Dealer, No Dealer?: Statement on Further Definition of "as a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection with Certain Liquidity Providers* (Feb. 6, 2024).............................17

Hester M. Peirce, Comm'r, SEC, *Rendering Innovation Kaput: Statement on Amending the Definition of Exchange* (Apr. 14, 2023) ......4, 26, 27

Mark T. Uyeda, Comm'r, SEC, *Statement on Proposed Rule Regarding the Safeguarding of Advisory Client Assets* (Feb. 15, 2023) ...............................................................................................26

*Robinhood Response to Receipt of Wells Notice from the U.S. Securities and Exchange Commission* (May 6, 2024)..................................18, 19

RT Watson, *Gensler Repeats Most Cryptocurrencies Are Securities Ahead of Pending Ethereum ETF Decision*, The Block (May 23, 2024) .....................................................................................................9

SEC, Correspondence Related to Draft Registration Statement (Dec. 7, 2020) ......................................................................................7

Testimony of Daniel M. Gallagher Before the U.S. House of Representatives Committee on Agriculture (June 6, 2023).........................18, 19

# INTRODUCTION

At the core of this case is a single, conclusory sentence in the SEC order under review. That sentence—which "disagree[d]" that SEC rules are unworkable for digital asset firms—offered no reasoned decisionmaking; it offered no reason at all. The SEC's order must be vacated on this elementary ground alone.

The context surrounding the SEC's unreasoned "disagree[ment]" calls for a further remedy from this Court—not merely vacating the order, but ordering rulemaking too. That context includes a Catch-22 in which the SEC has demanded that digital asset firms come into compliance based on an untenably expansive view of its statutory authority; launched scorched-earth litigation against those firms for their failure to do so; and refused the rulemaking that would be needed to make possible the compliance the SEC demands. Coinbase Br. 5-19. This pattern of conduct is a purposeful effort to destroy an industry by demanding the impossible and prosecuting companies that fail to achieve it.

Far from refuting that reality, the SEC's response brief is confirmatory: Confirmatory that the government is intent on crushing the digital asset industry. Confirmatory that the SEC will advance the most startling, inconsistent, and insupportable propositions of law to prolong its oppressive campaign. And confirmatory that anything other than an order to promptly commence rulemaking will abet the dithering and delay that is central to the SEC's multi-prong attack.

1

All of those points are evident in the four main justifications the SEC's brief gives for the agency's ipse dixit "disagreement" with Coinbase's workability concerns:

*First*, the agency makes the astounding claim that it has no duty to make compliance with its rules possible. Today's SEC apparently views its rules not as tools to enable compliance with federal statutes, but as weapons to dismantle industries it disfavors.

*Second*, the Commission claims it has no obligation to explain how existing rules are workable and thus how compliance is possible. According to the SEC, its bare disagreement with Coinbase's arguments ends the inquiry.

*Third*, with no evident sense of irony, the SEC cites as proof of workability its myriad enforcement actions for purported failures to comply with existing rules.

And *fourth*, the SEC points to other rulemakings that are widely recognized as further attempts to crush the industry as somehow mitigating Coinbase's workability concerns. Those rulemakings are no more a solution than the agency's enforcement campaign. They are a bludgeon—by design.

These responses demonstrate that the SEC is bent on choking the digital asset industry, and is tightening the squeeze by refusing to provide the necessary rules the industry has requested.

The remainder of the SEC's arguments cannot redeem the agency's arbitrarily high-handed behavior. The SEC never persuasively rebuts Coinbase's arguments that rulemaking is required here under settled law. The SEC is seeking to effect a major policy change by asserting novel, expansive, and unlawful jurisdiction over the digital asset industry through a campaign of punitive enforcement actions. Although the SEC told digital asset firms for years that they need only "come in and register" to avoid enforcement actions, its brief shows that its assurance was a sham. The SEC claims that its stance on digital assets has never shifted. But that is untrue, and the SEC's contrary evidence is nothing more than abstract statements that application of the securities laws to digital assets turns on the "facts and circumstances." Such empty statements of the governing standard are precisely the problem: The SEC has exploited that approach to assert broad, yet ill-defined, jurisdiction over a new and dynamic industry, without articulating in advance its understanding of the law through rules vetted by public comment and pre-enforcement judicial review.

The SEC's behavior and briefing confirm that only a court order directing it to commence rulemaking will end its caprice. Coinbase filed its rulemaking petition almost two years ago. The SEC initially tried to pocket-veto that petition through inaction. It took a mandamus petition and orders from this Court—and the threat of an imminent extraordinary writ—to elicit even the SEC's cursory denial order. Meanwhile, the SEC has declared war on the digital asset industry—a war that (until

now) had necessarily been premised on the notion that compliance is possible. In these extraordinary circumstances, the agency's bid for a remand for further explanation is a thinly veiled attempt to perpetuate the industry-imperiling status quo by forestalling rulemaking, while the SEC continues its campaign to cripple digital asset firms.

As one SEC Commissioner has observed, "[a] Commission serious about regulating—and not destroying—this market would reflect on this near unblemished record of regulatory failure and do something about it."[1] But the SEC's recalcitrance has eliminated all other options: The Court must order the SEC to commence rulemaking.

## ARGUMENT

### I.     The APA Requires The SEC To Engage In Rulemaking

#### A.     The SEC's Assertion Of Expansive Jurisdiction Over The Digital Asset Industry Must Be Tested Through Rulemaking

##### 1.     Rulemaking Is Required For Major Policy Changes

As Coinbase showed (Br. 24-38), rulemaking is required for major policy changes like the SEC's about-face on digital assets because it ensures the clear, ex ante articulation of legal standards, allows the agency to consider all important

---

[1] Hester M. Peirce, Comm'r, SEC, *Rendering Innovation Kaput: Statement on Amending the Definition of Exchange* (Apr. 14, 2023), https://tinyurl.com/4wjcmbtk.

aspects of the problem, and provides fair notice. *See also* Chamber Amicus Br. 6-10. The SEC has no answer to the authorities Coinbase canvassed. Instead, it mischaracterizes Coinbase's contention as a "policy argument" reflecting Coinbase's "preference for rulemaking." SEC Br. 10, 26.

But make no mistake: Requiring rulemaking for major policy changes is no subjective policy preference. It is a settled legal principle that flows from the Constitution's guarantee of fair notice and the APA's requirements, which are critical safeguards against administrative abuses of power. The Supreme Court made clear as far back as *Chenery II* that the "function of filling in the interstices of [statutes] should be performed, as much as possible, through th[e] quasi-legislative promulgation of rules to be applied in the future." *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947). And lower courts have long recognized that rulemaking is necessary when an agency "seeks to change the law and establish rules of widespread application." *Ford Motor Co. v. FTC*, 673 F.2d 1008, 1009 (9th Cir. 1981). That is this case to a T.

### 2. The SEC's Policy On Digital Assets Has Radically And Continually Changed

Unable to fight on the law, the SEC argues at length that "there has been no change in the Commission's position" on how the securities laws apply to digital assets. SEC Br. 32; *id.* at 26-32. That is demonstrably false. The only consistency the agency can claim is that it has adopted a standard so abstract and empty that it

can mean whatever the Commission likes. The SEC's claim that its position has remained constant is wrong for at least three reasons.

*First*, a mere sampling of the Commission's contradictory stances over the past few years refutes its assertion of consistency:

- Chair Gensler initially told Congress in 2021 that "[r]ight now, there is not a market regulator [for] crypto exchanges."[2] But only a year later, Chair Gensler asserted that "Congress gave us a broad framework … to regulate exchanges."[3]

- In 2020, the SEC cleared the way for Coinbase to go public without ever suggesting that its business violated the securities laws. Now, the SEC is suing Coinbase claiming that the very same business violates the securities laws.[4]

---

[2] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, 117th Cong. 1, 12 (May 6, 2021), https://tinyurl.com/4hvny68m.

[3] Gary Gensler, SEC Chair, *Prepared Remarks of Gary Gensler on Crypto Markets Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022), https://tinyurl.com/5ba2vnan.

[4] The SEC denies that its failure to tell Coinbase it would need to register as an exchange was an official position. *See* SEC Br. 31 n.9. But Congress charged the SEC with protecting investors, and it is hard to credit that the SEC would have allowed the public to invest in a business that it believed was violating securities laws.

- During Coinbase's public-listing process, SEC Staff told Coinbase there is "no certainty" about whether most digital assets are securities.[5] Now, SEC lawyers tell courts that "decades of legal authority … provide that certainty."[6]

Even the SEC's latest legal positions are beset by contradictions. In one recent attempt to articulate a principled limit to its expansive view of *Howey*, the agency said that its analysis of tokens as securities hinges on the token's "ecosystem"—a vacuous buzzword that would have been alien to the authors of the Securities Act and *Howey*. But at other times the SEC has eschewed that concept. Coinbase Br. 11. The uncertainty is so debilitating that some industry participants have been forced to seek declaratory relief to get answers. *See, e.g.*, LEJILEX Amicus Br. 11-16; Compl. ¶ 54, *Consensys Software Inc. v. Gensler*, No. 24-cv-00369 (N.D. Tex. Apr. 25, 2024).

As it did in Coinbase's mandamus action, the SEC tries to muffle the dissonance by downplaying the statements of its own Chair, high-level officials, and agency staff. SEC Br. 31. This deflection has not grown more persuasive with repetition. The point is not that those statements have the force of law, but rather that

---

[5] SEC, Correspondence Related to Draft Registration Statement at 4 (Dec. 7, 2020), https://tinyurl.com/ynpjem2s.

[6] SEC Opp. to Coinbase Mot. to Certify Interlocutory Appeal at 2, *SEC v. Coinbase, Inc.*, No. 23-cv-04738 (S.D.N.Y. May 10, 2024), ECF 125.

they show the agency's own understanding of its jurisdiction at any given time. The conflicting statements at a minimum both illustrate and exacerbate the confusion and uncertainty that urgently warrant rulemaking. Moreover, the SEC itself has eagerly embraced its officials' statements when they serve its interests—countering fair-notice arguments in enforcement actions, for example, by insisting that public statements by the "SEC Chairman repeatedly *gave market participants notice*."[7]

*Second*, the standard the SEC claims to have applied consistently is no standard whatsoever. The SEC says it has always maintained that "whether a crypto asset implicates the federal securities laws depends on the facts and circumstances of its offer and sale." SEC Br. 26, 28. That truism could describe *any* test—what legal standard does *not* depend on facts and circumstances?—which means it is no test at all. If the SEC is arguing that it has always recognized that digital assets could implicate the securities laws, that too sheds no light. All agree—including Coinbase, as the SEC observes, *id.* at 30—that digital assets can be a part of a securities transaction, depending on the facts and circumstances.

Thus, the relevant and contested question is not *whether* the securities laws can apply to certain digital asset transactions, but rather *how and to what extent* they apply. On that question, the SEC has undeniably changed its view. For years, it spoke

---

[7] *E.g.*, SEC Mot. to Strike at 10, *SEC v. Ripple Labs Inc.*, No. 20-cv-10832, ECF 132 (S.D.N.Y. Apr. 22, 2021) (emphasis added).

and acted as if the securities laws generally do *not* apply to digital assets. Now, its words and actions evidence a far more expansive view, with Chair Gensler persisting in his assertions that "most [tokens] are" securities.[8] That is a major policy change requiring rulemaking.

The emptiness of the SEC's "facts and circumstances" standard also exacerbates the uncertainty the Commission has created and bolsters the need for prompt rulemaking. The SEC has never coherently explained, for example, why the facts and circumstances underlying Bitcoin and Ether (which the agency has stated are *not* securities) lead to a different result than the facts and circumstances underlying the tokens that it has claimed *are* securities. It has never explained the seemingly arbitrary subsets of digital assets it has identified as securities in enforcement actions—the suit against Coinbase targets just 12 of the more than 200 tokens Coinbase lists, while the suit against Kraken targets just 11 (three of which Coinbase also lists but the SEC did not raise in its Coinbase suit).[9] And the SEC has never persuasively articulated how its new approach avoids securitizing all sorts of assets that

---

[8] RT Watson, *Gensler Repeats Most Cryptocurrencies Are Securities Ahead of Pending Ethereum ETF Decision*, The Block (May 23, 2024), https://tinyurl.com/3ut5w63f.

[9] *See* Compl. ¶¶ 114, 125, *SEC v. Coinbase, Inc.*, No. 23-cv-04738 (S.D.N.Y. June 6, 2023); Compl. ¶ 59, *SEC v. Payward, Inc.*, No. 23-cv-06003 (N.D. Cal. Nov. 20, 2023).

have never before been subject to SEC jurisdiction, including real estate, commodities, and trading cards.

Rulemaking is the tailor-made solution to these problems. It would force the agency to articulate a single theory. And it would require the Commission to subject that theory to testing through public comment and judicial review *before* it can be the basis for enforcement actions.

*Third*, the few district-court decisions the SEC cites (Br. 28-29) that rejected fair-notice arguments in enforcement actions do nothing to diminish the need for rulemaking. Those decisions are inapposite because Coinbase's burden in challenging the denial of its rulemaking petition is not to prove that any (or every) particular new stance the SEC has taken violates fair-notice requirements (though many do, *see, e.g.*, Chamber Amicus Br. 15-20). Coinbase need only demonstrate that the SEC is attempting to effect a major policy change through enforcement rather than rulemaking. Whether or not such a change actually renders a particular enforcement suit unconstitutional, it raises (at least) serious fair-notice concerns that presumptively require rulemaking. *See Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1116-17 (10th Cir. 2021) ("Fair notice concerns will arise 'when an agency advances a novel interpretation of its own regulation in the course of a civil enforcement action.'"). And here it is beyond serious dispute that the SEC has changed course on the securities laws' application to digital assets in recent years.

The SEC's reliance on those district-court decisions also fails on its own terms. Those decisions are wrong and have yet to be tested on appeal. Indeed, in some cases the fair-notice issue was not briefed or even squarely presented, *see, e.g.*, *SEC v. Coinbase, Inc.*, No. 23-cv-4738, 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) (not briefed); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 221 (D.N.H. 2022) (fair-notice defense abandoned), and others were fully briefed before the SEC flipped the switch on its view of its authority to regulate digital assets, *see, e.g.*, *SEC v. Ripple Labs, Inc.*, No. 20-cv-10832, 2021 WL 1814771 (S.D.N.Y. May 6, 2021).

The reality apparent to everyone besides the SEC is that the agency has substantially changed its position on the central premise of its enforcement suits. That shift compels the agency to run its revised view through the gauntlet of rulemaking.

## B. The SEC Must Engage In Rulemaking Because It Cannot Dispute That Its Existing Rules Are Unworkable For Digital Asset Firms

Rulemaking also is required for the independent reason that Coinbase's rulemaking petition identified changed circumstances which undermine a key premise underlying the SEC's regulatory framework: its workability. The SEC concedes that courts can mandate rulemaking when changed circumstances cast serious doubt on a premise of existing rules. SEC Br. 32-33. The SEC briefly argues that this principle applies only if changed circumstances undermine an existing rule "on the subject" of digital assets. *Id.* at 34 (emphasis omitted). But that *is* this case—the SEC's position is that its existing rules *already* cover "the subject" of digital assets. An essential

premise of those rules is that compliance with the rules is possible. And, as Coinbase has shown, that premise does not hold for digital asset firms.

Far from refuting Coinbase's showing, the SEC offers two responses that further reveal its (at best) deliberate indifference toward the impossibility of compliance: (1) that its rules don't *need* to be workable for the digital asset industry, and (2) that its enforcement actions and rulemakings aimed at crippling crypto demonstrate the workability of its rules. Neither of those alarming arguments was put forward in the Commission's order, so both are off-limits now to the Commission. *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("*Chenery I*"). In any event, each argument is meritless.

## 1. The SEC Must Make Compliance With Its Rules Possible For Digital Asset Firms

The SEC's principal argument is that it *doesn't matter* whether "this new industry *can* comply with the existing regulatory framework." SEC Br. 34 (quotation marks omitted). According to the SEC, the fact that "market participants find compliance with current regulations impossible" is simply irrelevant, and does not "necessitate rulemaking." *Id.* at 2.

That submission is shocking and indefensible. Courts have long recognized that under the APA "[i]mpossible requirements imposed by an agency are perforce unreasonable." *All. for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 940 (D.C. Cir. 1991). Due process, moreover, "dictate[s] that individuals should have an

opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994); *see also United States v. Dalton*, 960 F.2d 121, 123 (10th Cir. 1992) (law violates due process by punishing "fail[ure] to do an act which everyone agrees … could not [be] perform[ed]"). The Supreme Court has also made clear that an agency lacks authority (absent the clearest congressional direction) to ban an entire industry. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 126-27 (2000). These interlocking statutory and constitutional principles require the SEC to make existing regulations workable for a significant new industry it seeks to oversee.

The Commission's contrary stance is even more troubling in light of the agency's recent words and deeds. For two years, the agency has hammered digital asset firms with an aggressive enforcement campaign. It has justified those enforcement actions by proclaiming that "the rules have already been published" and that there is a "clear way" for digital asset firms to "come in and register."[10] But now, when pressed in Coinbase's rulemaking petition and in court to explain *how* firms can do so, the SEC demurs and disclaims any duty to create any path to compliance

---

[10] *Fin. Mkts. Conf., Afternoon Keynote, May 15* at 25:22, YouTube (May 15, 2023), https://tinyurl.com/yt7krjyj; *First on CNBC: CNBC Transcript: SEC Chair Gary Gensler Speaks with CNBC's "Squawk Box" Today*, CNBC (Feb. 10, 2023), https://tinyurl.com/kbwwr4em.

after all. In the SEC's view, it can impose rules it knows companies cannot satisfy and thereby drive the industry into the ground.

That stunning response eliminates any doubt about the Commission's endgame. The SEC does not resist rulemaking so it can endeavor in good faith to develop a workable framework through case-by-case adjudication; the agency believes workability is not required and prefers to bludgeon digital asset companies one-by-one.

The SEC tries to minimize its oppressive stance by asserting that only a "small set of market participants" "may" experience "compliance difficulties" under "discrete provisions" of existing rules. SEC Br. 2, 22. It should not have to address "every new issue" that arises, it protests, nor accommodate "all" crypto-related businesses. *Id.* at 22, 38. But as Coinbase's rulemaking petition explained—and as the SEC should know from its own experience—an entire $2 trillion-plus industry is fundamentally unable to comply with existing regulations under the SEC's mistaken view of the law, and for reasons the SEC has never rebutted. The industry impact is massive—as is the agency's simultaneous enforcement campaign. And regardless, the SEC unabashedly claims power to impose rules that no one can satisfy. But "due process protection[s]" do not leave "regulated parties … at the mercy of *noblesse oblige*." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 255 (2012) (brackets and citation omitted).

### 2. The SEC's Belated Efforts To Show Its Existing Rules Are Workable Prove Exactly The Opposite

As a fallback, the SEC feebly suggests that its rules in fact *are* workable for digital asset firms. Again, these arguments are off-limits because under *Chenery I* the SEC cannot now backfill its unreasoned order. But the SEC has no meaningful response to workability on appeal anyway—confirming the futility of its alternative request for a remand.

The Commission reflexively notes its "disagreement" on workability, *e.g.*, SEC Br. 22, but it never responds with substance to any of the concerns raised by Coinbase's rulemaking petition. The SEC does not dispute that registering digital assets would render them useless, JA18; that existing registration requirements are unworkable for digital asset developers, JA22-24, 50; that existing disclosure requirements are not fit for—and would be misleading as applied to—digital asset firms, JA22-26, 49-50; or that digital asset platforms would face insurmountable hurdles under existing rules, including the inability to list any digital assets or operate through broker-dealers, JA28, 33-34. *See also* Paradigm Amicus Br. 9-16. Just like its denial letter, the SEC's brief ignores these issues altogether.

Moreover, the few things the SEC does say about workability only further confirm the unworkability of its existing regime.

*First*, the SEC cites its own barrage of punitive enforcement actions—all premised on alleged failures to comply with existing rules—as proof that its rules

*are* workable. SEC Br. 23. This is perverse, of course. Those suits do not prove that compliance *is* possible; they prove that in fairness compliance *should be* possible. And that is what the SEC refuses to facilitate.

*Second*, the SEC points to digital-asset-related rules that the agency has adopted or is considering. SEC Br. 15-17. But the SEC *concedes* that those rules do not address the workability concerns that Coinbase has raised. *Id.* at 13. Moreover, although the agency paints its rules as preliminary steps toward regulatory solutions, *id.* at 14, in truth those rules compound the problem. They are part of the SEC's campaign to shutter the industry, not to facilitate compliance.

Each rule the SEC cites extends the SEC's chokehold to every aspect of the digital asset industry by expanding the agency's existing, unworkable regime without addressing any of the fundamental existing problems. The SEC's "exchange" rule, for example, would stretch the agency's existing exchange framework to decentralized finance ("DeFi") systems. SEC Br. 16. Rather than address how compliance would be possible for those systems, the proposed rule suggests that DeFi participants "may instead choose to operate outside the U.S. or exit the market."[11] The SEC's "dealer" rule (SEC Br. 15-16) expands existing broker-dealer regulations to

---

[11] SEC, *Supplemental Information and Reopening of Comment Period for Amendments Regarding the Definition of "Exchange,"* 88 Fed. Reg. 29448, 29486 (May 5, 2023).

a novel class of crypto liquidity providers. As one of the SEC's Commissioners explained, the rule refuses to "engage seriously" with how those providers would "even be able to register" with the agency; and the crypto industry has sued to vacate the rule, warning that it "threatens to bulldoze … much of the burgeoning digital asset industry."[12] The SEC's "safeguarding" rule similarly would apply an ill-fitting existing scheme to investment advisers' custody and use of digital assets. SEC Br. 16-17. Far from resolving Coinbase's unworkability concerns, the rules the SEC relies on make matters worse by attempting to subject ever more digital asset firms to the agency's inapt scheme. It is remarkable the SEC would suggest otherwise.

*Third*, the SEC discusses at length its policy statement on the "Custody of Digital Asset Securities by Special Purpose Broker-Dealers." SEC Br. 14-15. But the agency does not claim that the policy statement resolves any of the workability concerns Coinbase has raised. And for good reason: The statement does not address *which* digital assets the SEC believes to be securities, or *how* digital asset developers and platforms can comply with existing rules. Instead, the statement merely provides broker-dealers time-limited relief from SEC enforcement "for particular violations

---

[12] Hester M. Peirce, Comm'r, SEC, *Dealer, No Dealer?: Statement on Further Definition of "as a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection with Certain Liquidity Providers* (Feb. 6, 2024), https://tinyurl.com/y2pdcvzj; Compl. ¶ 4, *Crypto Freedom All. of Tex. v. SEC*, No. 24-cv-361 (N.D. Tex. Apr. 23, 2024).

of a custody-related rule." SEC Br. 14; *see also* 86 Fed. Reg. 11627, 11628 (Feb. 26, 2021). So even if the policy statement offered broker-dealers a genuine path to compliance on that narrow issue, it would have no bearing on digital asset developers and platforms that cannot comply with the SEC's registration and disclosure regime.

And in reality, the policy statement doesn't even provide a viable path for the broker-dealer custody issue it addresses. The exemption expires in less than two years and allows custody only of digital asset *securities*—a concept the SEC refuses to define. 86 Fed. Reg. at 11628, 11631. Only a single entity has been able to register as a special-purpose broker-dealer, and after nearly three years it still has not established a viable business. *See* SEC Br. 15 & n.3. Although that entity recently announced custody services for Ether, it is unclear how those services could be lawful given the Commission's recent approval of spot Ether ETFs.[13] Meanwhile, the SEC has stonewalled good-faith efforts by others to register as special-purpose broker-dealers. Robinhood, for instance, spent sixteen months engaging with the SEC in more than a dozen meetings and calls.[14] Yet much like Coinbase, all Robinhood

---

[13] The SEC's approval of spot Ether ETFs appears to confirm that Ether is *not* a security and therefore is not eligible for the special-purpose broker-dealer exemption, which applies only to digital asset securities. *E.g.*, SEC, *Order Granting Accelerated Approval of Proposed Rule Changes, as Modified by Amendments Thereto, To List and Trade Shares of Ether-Based Exchange-Traded Products*, 89 Fed. Reg. 46937 (May 30, 2024).

[14] *Robinhood Response to Receipt of Wells Notice from the U.S. Securities and Exchange Commission* (May 6, 2024), https://tinyurl.com/28r6b6mc; Testimony of

received in return for its efforts was a Wells Notice for alleged violations of the securities laws.[15]

*    *    *

If the SEC is going to persist in its unlawful effort to shoehorn an entire new industry into its regulatory ambit, elementary principles of administrative law and due process require the agency to at least modify its rules to make compliance possible. This Court should order the SEC to take that most basic step.

## II. The Court Should Order Rulemaking Based On The SEC's Complete Inability To Explain Itself

The SEC utterly failed to offer any reasoned explanation in its denial order for refusing to engage in rulemaking. On the critical issue of workability, the SEC proffered only its unelaborated "disagreement"—not a "determination," notably, but merely an unelaborated difference of opinion. That is not reasoned decisionmaking; it is naked caprice. Contrary to the SEC's assertion, the remedy for that failure is to order rulemaking—not to *reward* the Commission's recalcitrance and delay by giving it more time to drag its feet on rulemaking while trying to run the digital asset industry into the ground.

---

Daniel M. Gallagher Before the U.S. House of Representatives Committee on Agriculture at 8 (June 6, 2023), https://tinyurl.com/3pmt544n.

[15] *Robinhood Response*, *supra* note 14.

### A. The SEC Provided No Rational Explanation For Refusing To Engage In Rulemaking

#### 1. The SEC's Failure To Respond To Coinbase's Workability Concerns Is Fatal

As the SEC repeatedly acknowledges, a "fundamental premise" of Coinbase's rulemaking petition was that the "application of the current regulatory framework to crypto asset securities is unworkable." *E.g.*, SEC Br. 9-10. The SEC concedes, in other words, that workability was "an important aspect of the problem" facing the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The SEC therefore needed to provide a response to Coinbase's workability concerns that was "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). And that required the agency to offer "more to justify its decision to retain its regulations than mere conclusory statements." *Env't Health Tr. v. FCC*, 9 F.4th 893, 903 (D.C. Cir. 2021); *Sierra Club v. EPA*, 972 F.3d 290, 305 (3d Cir. 2020) (vacating pollution standards because "the law requires" the "agency [to] rely upon its technical expertise to justify and explain this decision, not to simply adopt it via *ipse dixit* authority"). Without any SEC explanation, this Court cannot "assure" itself that the SEC's denial was "the product of reasoned decisionmaking." *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 6 (D.C. Cir. 1987).

The SEC does not and cannot seriously dispute that its denial order lacked any such explanation. The order's single, conclusory sentence "disagree[ing]" about workability speaks for itself. JA6. Nor does the agency deny that it cannot supply additional reasoning now to cure that defect. *See Chenery I*, 318 U.S. at 88.

Instead, the SEC argues that it did not have to explain its disagreement on workability at all. Were that true—were agencies free to spurn "fundamental premise[s]" of rulemaking submissions by providing no finding or determination, but merely pronouncing their disagreement—it would rewrite the law of judicial review of agency action. "[S]ubstantial evidence" could be disregarded, because no evidence need be cited. 5 U.S.C. § 706(2)(E). "[I]nternally inconsistent" justifications—even "unutterably mindless" ones—would no longer be fatal, because no explanations would be given. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1153, 1156 (D.C. Cir. 2011). "[F]ail[ing] to consider an important aspect of the problem" would be *de rigueur*, because the whole issue could be brushed aside with dismissive disagreement. *State Farm*, 463 U.S. at 43. Crediting the SEC's claim (Br. 22) that it need not "provide a point-by-point refutation" of Coinbase's workability concerns would eviscerate requirements that have been central to the APA since *State Farm*.

The SEC attempts to escape *State Farm* by suggesting that the APA imposes some lesser explanatory burden for denials of rulemaking petitions under 5 U.S.C. § 555(e). SEC Br. 42. That is incorrect. Section 555(e) applies to agency responses

to *any* "written application, petition, or other request of an interested person made in connection with *any* agency proceeding"—not merely to denials of rulemaking petitions. 5 U.S.C. § 555(e) (emphasis added). And far from diluting *State Farm*, the statute's command that the agency provide "a brief statement of the grounds for denial" "codifie[s]" *State Farm*'s "fundamental requirement[s]." *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001). Courts applying Section 555(e) have not hesitated to enforce those key safeguards. *See, e.g.*, *Butte Cnty. v. Hogen*, 613 F.3d 190, 195 (D.C. Cir. 2010); *see also Meadville Master Antenna, Inc. v. FCC*, 443 F.2d 282, 290 (3d Cir. 1971) (setting aside order under Section 555(e) based on the agency's "one-sentence responses").[16]

Contrary to the SEC's assertion, Coinbase does not seek to impose "heighten[ed]" reasoned-explanation requirements here—based on the SEC's enforcement actions or otherwise. SEC Br. 23. The SEC's war on the digital asset industry certainly heightens the *unfairness* of the agency keeping mum on how firms can comply with its rules, and an agency's obligation to explain how compliance is

---

[16] Nor is the APA bar lowered because the Commission abstained from using "'boilerplate language'" or because Coinbase's petition lacked "scientific evidence." SEC Br. 25. What binds decades of precedent to the present case is an agency's refusal to "provid[e] an account of how it reached its results." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995). No matter the posture, *see* SEC Br. 25, agency action can be judged "reasonable" only if it is "reasonably explained," *Prometheus*, 592 U.S. at 423.

possible becomes more urgent when the agency seeks to punish parties for purport-edly failing to comply. But Coinbase is simply asking the Court to apply settled APA standards—indeed, the APA's most basic requirement: that an agency "reasonably explain[]" itself. *Prometheus*, 592 U.S. at 423. The SEC's failure to satisfy that bare-minimum obligation dooms its denial order.

## 2. The SEC's Remaining Explanation Is Equally Deficient

The SEC's other reasons for refusing rulemaking are no more persuasive. The SEC argues that its other digital-asset-related rulemakings demonstrate an "incre-mental approach" to regulating digital assets—as if the agency is considering Coin-base's concerns piecemeal. SEC Br. 13. As already discussed, however, those rules do not address *any* of the key threshold issues raised in Coinbase's rulemaking peti-tion; they only exacerbate the problems. *Supra* 16-17. The SEC offered no justifica-tion—let alone a reasonable one—for prioritizing rules that worsen the problems created by its unworkable regime over the issuance of rules seeking to solve them.

The agency's "regulatory agenda" beyond digital assets does not justify re-fusing rulemaking here either. SEC Br. 17-21. The SEC does not deny that regulating digital assets is a priority, *id.* at 18, and it has not identified any higher-priority rules. The agency instead cites *all* the rules on its agenda as "competing priorities." *Id.* at 19. But that generalized reference to agency resources cannot immunize the SEC

from judicial scrutiny. *See Compassion Over Killing v. FDA*, 849 F.3d 849, 857 (9th Cir. 2017).

The SEC also offered no explanation for its decision to regulate through ad hoc enforcement actions instead of rulemaking. The agency suggests that no such explanation is needed here because it may someday engage in "future regulatory undertakings." SEC Br. 41. That misses the point. The agency has *already* chosen to try to impose its new view of the securities laws through enforcement actions. The question the SEC needed, but failed, to answer is why the enforcement path it has charted is superior to comprehensive rulemaking.

## B. The SEC's Extraordinary Conduct Requires An Order Vacating Its Denial Order And Directing Rulemaking

Because the SEC's denial order lacks the reasonable explanation required by the APA, it must be "set aside," 5 U.S.C. § 706(2), and the Court should order the SEC to begin rulemaking. The Commission's request (Br. 43-46) for a remand and a re-do is a transparent attempt to continue down the same unlawful path.

### 1. The SEC's Recalcitrant Refusal To Explain Itself Requires Forceful Judicial Intervention

The SEC concedes that "compelling" and "unusual" circumstances can justify an order requiring an agency to engage in rulemaking. SEC Br. 44 (quoting *Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d 93, 97 (D.C. Cir. 1989)). That describes this case. The SEC sat on Coinbase's rulemaking

petition for ten months, forcing Coinbase to seek mandamus. The SEC then brought an enforcement action against Coinbase while still dragging its feet on rulemaking. Only the prospect of a writ from this Court (following months of further agency delay) prompted the agency to act. And even then all the SEC mustered was a two-page order that brushed aside a central issue in one sentence. Forced to defend that decision in this Court, the SEC now takes the extraordinary positions that: (1) it has no duty to make compliance with its rules possible; (2) it owes Coinbase, the industry, and the public no explanation for disagreeing with Coinbase's submission; (3) its existing rules are workable enough because the SEC has sued many in the industry for *violating* them; and (4) its other digital asset rules that aim to hobble the industry somehow mitigate the impossibility of compliance.

The SEC has shown in other ways, too, that its violation of its APA obligations does not derive from agency negligence or mine-run resource constraints. It is part and parcel to the agency's entrenched hostility towards the digital asset industry. The SEC has brought a flurry of enforcement actions expressly premised on the proposition that the defendants can simply "come in and register." If that were possible, the agency should have no trouble explaining how. Yet it has refused to do so despite repeated entreaties from regulated parties, a petition for rulemaking, and multiple lawsuits. The obvious explanation is that the agency knows that compliance

is impossible. And that is the point. The SEC does not want to regulate digital asset firms. It wants to destroy them.

The Court need not take Coinbase's word for it. The SEC's own Commissioners have described the agency's digital-asset-related initiatives—including some of the same rules the SEC here claims are good-faith information-gathering exercises—as efforts "to block access to crypto as an asset class" and "welcome extinction of new technology."[17] The D.C. Circuit recently found the SEC's longstanding refusal to approve spot Bitcoin exchange-traded products as lacking any "coherent explanation." *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242, 1248 (D.C. Cir. 2023); *see also* CCI Amicus Br. 8-9. And the Government Accountability Office has declared unlawful, and bipartisan majorities of Congress have voted to overturn, the SEC's Staff Accounting Bulletin 121, which makes it economically infeasible for certain financial institutions to hold digital assets. Coinbase Br. 45.[18] As Commissioner Peirce has put it: "A Commission serious about regulating—and not destroying—

---

[17] Peirce, *Rendering Innovation Kaput*, *supra* note 1; Mark T. Uyeda, Comm'r, SEC, *Statement on Proposed Rule Regarding the Safeguarding of Advisory Client Assets* (Feb. 15, 2023), https://tinyurl.com/2ztdcxx5.

[18] GAO, *SEC—Applicability of the Congressional Review Act to Staff Accounting Bulletin No. 121* (Oct. 31, 2023), https://tinyurl.com/3ta4k7jx; Brady Dale, *Senate Votes to Kill Crypto Accounting Rule*, Axios (May 16, 2024), https://tinyurl.com/ymw4nk8d.

this market would reflect on this near unblemished record of regulatory failure and do something about it."[19] The SEC *is* serious—about the destruction of digital assets.

Giving the agency further opportunity to explain itself is both pointless and exquisitely undeserved. Indeed, even now the SEC identifies no explanation it *could* provide on remand to support its action.

### 2. Rulemaking Is Urgently Needed To Prevent Serious Harm To The Industry

Remand for a mulligan would not merely be futile, but profoundly harmful and unfair. The SEC's unmistakable objective is to continue its regulation-by-enforcement campaign as long as possible, and consequently to forgo rulemaking until its hand is forced. From the agency's perspective, there is no daylight between a ruling from this Court upholding the SEC's denial of Coinbase's rulemaking petition and a decision remanding the matter for a cogent explanation. Under either disposition, the SEC could continue to push off rulemaking with one hand, while pursuing relentless enforcement with the other. But time is of the essence for the digital asset industry. Each day the SEC dithers (and prosecutes or files more enforcement suits), the industry's fate grows steadily more precarious.

This Court should not enable and encourage the SEC's obstruction. It should order the SEC to promptly initiate a rulemaking that explains which digital assets

---

[19] Peirce, *Rendering Innovation Kaput*, *supra* note 1.

the SEC believes to be securities and how digital asset firms can comply with the rules the SEC is seeking to impose on them. At a minimum, the Court should vacate the SEC's denial, maintain jurisdiction over this case, and require the agency to submit a response within 45 days that either sets forth an expeditious schedule to begin rulemaking or provides a reasoned explanation to the workability and other concerns Coinbase has raised.

## CONCLUSION

For the foregoing reasons, Coinbase respectfully requests that this Court vacate the SEC's denial of Coinbase's rulemaking petition and order the agency to engage in rulemaking.

Dated: May 31, 2024

Respectfully submitted,

/s/ *Eugene Scalia*
Eugene Scalia (D.C. Bar No. 447524)
  *Counsel of Record*
Jonathan C. Bond
Nick Harper
Tessa Gellerson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner Coinbase, Inc.*

## CERTIFICATIONS

1.     This brief complies with the type-volume limitations of the Federal Rules of Appellate Procedure 32 because it contains 6,494 words, excluding the parts of the brief exempted from Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

3.     Pursuant to this Court's Rule 31.1(c), the text of the electronic version of this document is identical to the text of the paper copies filed with the Court.

4.     Pursuant to this Court's Rule 31.1(c), the document has been scanned with version 7.13 of CrowdStrike Falcon malware and is free of viruses.

5.     Pursuant to this Court's Rule 46.1(e), I hereby certify that at least one attorney whose name appears on this Petition is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

May 31, 2024

*/s/ Eugene Scalia*
Eugene Scalia

*Counsel for Petitioner*
*Coinbase, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of May 2024, I caused the foregoing

Reply Brief for Petitioner to be electronically filed with the Clerk of the Court for

the United States Court of Appeals for the Third Circuit using the Court's CM/ECF

system and to be filed in paper format pursuant to this Court's Rule 113.1(a). I fur-

ther certify that service was accomplished upon the following, in compliance with

Rule 25(c) of the Federal Rules of Appellate Procedure, via the Court's CM/ECF

system.

Tracey Hardin
    hardint@sec.gov
Ezekiel L. Hill
    hillez@sec.gov
David D. Lisitza
    lisitzad@sec.gov
UNITED STATES SECURITIES & EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-5100

May 31, 2024                              /s/ *Eugene Scalia*
                                         Eugene Scalia

                                         *Counsel for Petitioner*
                                         *Coinbase, Inc.*